UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALLAN KUSTOK (M49528) | ) | |
| | ) | |
| Petitioner, | ) | Case Number: 21 CV 6932 |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID MITCHELL, Warden, | ) | Case Number of State Court Conviction: |
| Pinckneyville Correctional Center | ) | 10 CR 1917401 |
| | ) | |
| Respondent. | ) | |

**PETITION FOR WRIT OF HABEAS CORPUS**
**PERSON IN STATE CUSTODY**

1. Name and location of court where conviction entered:

   Circuit Court of Cook County, Illinois, Criminal Division

2. Date of judgment of conviction:

   March 11, 2014

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

   First degree murder

4. Sentence(s) imposed:

   60 years (at 100%)

5. What was your plea? (Check one)   ☒ Not guilty   ☐ Guilty   ☐ Nolo contendere

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details: n/a

1

**PART I – TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one): ☒ Jury ☐ Judge only

2. Did you testify at trial? ☐ YES ☒ NO

3. Did you appeal from the conviction or the sentence imposed? ☒ YES ☐ NO

    (A) If you appealed, give the

    (1) Name of court: Appellate Court of Illinois, First Judicial District

    (2) Result: conviction affirmed

    (3) Date of ruling: August 12, 2016

    (4) Issues raised:

    i. whether the trial court abused its discretion in allowing the State to introduce evidence of Petitioner's extramarital contacts as proof of intent, motive, or state of mind;

    ii. whether the trial court abused its discretion in denying Petitioner's motion for a new trial based upon newly discovered evidence

    (B) If you did not appeal, explain briefly why not: n/a

4. Did you appeal, or seek leave to appeal, to the highest state court? ☒ YES ☐ NO

    (A) If yes, give the

    (1) Result: Leave to appeal denied

    (2) Date of ruling: March 29, 2017

    (3) Issues raised: same issues

    (B) If you did not appeal, explain briefly why not: n/a

5. Did you petition the United States Supreme Court for a writ of *certiorari*?

    ☐ YES ☒ NO

    If yes, give date of petition: n/a

    Date *certiorari* was denied: n/a

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    ☒ YES    ☐ NO

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A. Name of court:   Circuit Court of Cook County, Illinois, Criminal Division

    B. Date of filing: December 22, 2017

    C. Issues raised:

    Whether Petitioner was denied his constitutional right to effective assistance of counsel in violation of the 6th and 14th Amendments of the United States Constitution and Article 1, Section 8 of the Illinois Constitution

    D. Did you receive an evidentiary hearing on your petition?    ☐ YES    ☒ NO

    E. What was the court's ruling?   The court granted the State's motion to dismiss the petition

    F. Date of court's ruling:   August 23, 2019

    G. Did you appeal from the ruling on your petition?    ☒ YES    ☐ NO

    H. (a) If yes,  (1) what was the result?   The dismissal was affirmed

    (2) date of decision:   May 14, 2021

    (b) If no, explain briefly why not:   n/a

    I. Did you appeal, or seek leave to appeal this decision to the highest state court?

    ☒ YES  ☐ NO

    1. If yes,  (1) what was the result?   Leave to appeal was denied

    (2) date of decision:   September 29, 2021

    2. If no, explain briefly why not:   n/a

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?

    ☐ YES   ☒ NO

    A. If yes, give the following information with respect to each proceeding (use additional sheets if necessary):

        1. Nature of proceeding: n/a
        2. Date petition filed: n/a
        3. Ruling on the petition: n/a
        4. Date of ruling: n/a
        5. If you appealed, what was the ruling on the appeal?: n/a
        6. Date of ruling on appeal: n/a
        7. If there was a further appeal, what was the ruling?: n/a
        8. Date of ruling on appeal: n/a

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in federal court?   ☐ YES   ☒ NO

    A. If yes, give name of court, case title and case number: n/a

    B. Did the court rule on your petition? If so, state

        (1) Ruling: n/a

        (2) Date: n/a

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?   ☐ YES   ☒ NO

    If yes, explain: n/a

4

**PART III – PETITIONER'S CLAIMS**

1. State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

   **BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

**Introduction**

Petitioner Allan Kustok is serving a 60-year sentence for the murder of his wife Anita "Jeannie" Kustok. Kustok did not kill Jeannie; she died when the gun she fell asleep holding discharged accidentally.[1] Kustok's innocence, however, is not the issue in this habeas corpus petition. Rather, at issue is the fact that Kustok's constitutional rights were violated where he received ineffective assistance of counsel at trial.

Jeannie had a long history of fearing that intruders would break into the home she shared with Kustok. It was because of this fear that Jeannie had an alarm system installed, had her daughter sleep over when Kustok traveled, and acquired a gun. It was also because of this fear that she regularly woke her husband overnight to have him inspect the home for burglars. And it was because of this fear that, during these overnight episodes, she would retrieve her gun.

Early on September 29, 2010, Jeannie woke Kustok and requested that he search the home. Kustok did so. Jeannie got her gun. Finding nothing out of the ordinary, Kustok returned to bed. Around 5:00 a.m., Kustok woke again and used the bathroom. He returned to bed and fell asleep. Sometime before his alarm was set to go off at 5:30 a.m., Kustok awoke to the sound of a gunshot. On the other side of the bed, Jeannie lay dead, her gun by her hands.

A distraught Kustok responded in a way that the authorities considered atypical. He did not call 911 because he could immediately tell that his wife was dead (a conclusion later confirmed by the medical examiner who determined that Jeannie died instantaneously). Instead, he decided to kill himself. He grabbed Jeannie's gun, but then thought better of himself and discharged the remaining rounds into an armoire to prevent himself from committing suicide.

Aware that these would be his last moments with his wife of nearly 35 years, Kustok sat with her in the bedroom because "he wanted to spend time with her knowing she was dead, and that he would not see her again. 'She is my life[.]'" (Ex. 1 at Sup. R. 2685).[2] During this time, Kustok attempted to clean Jeannie up. After a period of time, Kustok wrapped Jeannie in the

---

[1] For clarity, we refer to Mr. Kustok as "Kustok" and to Mrs. Kustok as "Jeannie."

[2] Exhibit 1 consists of excerpts of transcripts from Kustok's state court proceedings. Kustok will gladly provide any additional transcripts necessary for the adjudication of this matter. The pages of this exhibit are ordered and numbered as they were in the state court appellate record.

5

bedsheets and drove her to the hospital.

A security guard met Kustok's car when he pulled up to the emergency room. Kustok got out and told him, "my wife is dead, she shot herself." (Ex. 1 at Sup. R. 3470). The security guard called for assistance and a nurse arrived. The nurse later testified that Kustok was distraught, "very upset," "tearful," "crying," and "repeating that she had shot herself." (*Id*. Sup. R. 3076, 3077, 3042).

In the emergency room, Kustok was grief-stricken. He punched a wall. He told doctors he was thinking of killing himself. As a result, he was placed on a suicide watch. After he was released, Kustok was taken to the police station. He was subsequently charged with the murder of his wife.

Kustok was eventually convicted of murdering Jeannie on the basis of three things: (1) he was a "philanderer"; (2) his reaction in the immediate aftermath of finding his wife shot to death on the other side of their bed was not what the State deemed to be normal; and (3) his attorney failed to adequately investigate the case and marshal available scientific evidence (via a 5-minute test both sides' experts opined was available) that could have proven (and later did prove) the State's theory of what happened in the Kustoks' bedroom to be impossible.

Kustok admits now—and has always admitted—the first two factors. He acknowledges that he cheated on his wife. He deeply regrets these actions and is ashamed of them. He further acknowledges that his actions immediately following his wife's death were not what one would necessarily anticipate. In a state of shock and mental distress, Kustok chose to spend a final, brief period of time alone with Jeannie ahead of what he correctly anticipated would be a chaotic whirlwind of events at the hospital and thereafter.

The subject of this petition is the third element: his trial counsel's ineffectiveness. That trial counsel was constitutionally ineffective should be beyond dispute. Although trial counsel was involved in Kustok's case from the very day Jeannie died, counsel did not get around to seeking scientific testing that would have resulted in Kustok's acquittal ***until the middle of trial several years later*** and when it was too late to have the testing performed and the results presented to the jury.

The trial court concluded that defense counsel "could have ***and should have*** sought [the] testing" prior to trial. (Ex. 2 at R. 1443). After the testing was ultimately performed months after Kustok was convicted, the trial court would conclude that the results meant that "***nobody can say how this [Jeannie's shooting] happened***." (Ex. 1 at Sup. R. 3306). Nevertheless, the court refused to grant Kustok a new trial.

Kustok brought a state post-conviction petition arguing that his counsel provided constitutionally ineffective assistance. His claim was dismissed without an evidentiary hearing. The Illinois appellate court affirmed and the Illinois Supreme Court denied Kustok leave to appeal. Kustok has thus raised and exhausted these issues in state court.

Consistent with this Court's directions, Mr. Kustok <u>briefly</u> describes below the <u>facts</u>

6

demonstrating that he received ineffective assistance of trial counsel. Mr. Kustok respectfully requests the opportunity to brief the legal issues involved in his claim in order to more fully address the ways in which he received constitutionally ineffective assistance of trial counsel.

(A) **Ground #1: Allan Kustok was denied his right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial counsel failed to investigate and marshal available scientific evidence which would have rendered impossible the so-called "crime scene reconstruction" that formed the basis of the State's case.**

Supporting Facts:

With no direct evidence of what occurred in the Kustoks' bedroom the morning Jeannie died, the State relied on a deeply flawed crime scene "reconstruction" performed by Rod Englert, an Oregon police officer and "crime scene reconstructionist" with no apparent scientific education. (Ex. 1 at Sup. R. 624).

Englert opined that the gunshot that killed Jeannie could only have been fired by a person standing or crouching above her within four feet of where she lay sleeping. He further opined, based on the trajectory of the bullet, the location of the entry wound, and the absence of soot or burn marks on the pillows, that the shot had to originate at some distance from the bed and could not have been self-inflicted or accidental. (*Id*. Sup. R. 3842-50).

We now know, based on dispositive testing performed at the Illinois State Police crime lab, that Englert's reconstruction was wrong. We also know that the only reason the jury never heard this fact was because of Kustok's counsel's ineffectiveness.

After Englert had formed his opinion but before trial, his reconstruction was called into question by the State itself. Prior to trial, the State contacted Englert with concerns regarding whether a dark area on a photograph of one of the pillowcases from the Kustok bed was in fact a soot stain, contrary to Englert's reconstruction. In Englert's reconstruction, this pillowcase was located beneath the pillow in which the bullet was found and therefore shielded from any soot or burn marks associated with the firing of Jeannie's gun. (*Id*. Sup. R. 3903-06).

Englert agreed that it would have been "really important" if this stain was in fact soot. Indeed, he agreed that it would have been impossible for soot to have been deposited on this pillow if his reconstruction were accurate. (*Id*. Sup. R. 3906, 4633-34). So, Englert flew to Chicago and inspected the pillowcase. Based solely on his visual examination, he concluded that the stain in question "was clotted blood, it was dark blood, it was not soot." (*Id*. Sup. R. 3907). Englert emphasized this conclusion to the jury: "I will repeat, that's what we did not find [*i.e.*, soot]. We looked for it and we did not find it[.]" (*Id*. Sup. R. 3902).

Englert admitted that a particular five-minute scientific test—a sodium rhodizonate test—and not a visual inspection, is the definitive method of evaluating for the presence of soot, but testified that he deemed no such test necessary because the mark in question was "obviously clotted blood." (*Id*. Sup. R. 3908-09).

7

Just prior to the start of Englert's testimony, **ten days into the trial**, defense counsel moved for leave to conduct the sodium rhodizonate test. The trial court denied the request. Consequently, Englert's testimony, which was premised on the absence of soot or gunshot residue, went forward without the results of available scientific testing. (*Id*. Sup. R. 620, 4690-91)

Englert's blood spatter and crime scene reconstruction opinions were partially refuted at trial by defense experts Paul Kish and Matthew Noedel—neither of whom had performed the scientific testing that could have exposed Englert's erroneous conclusions. Kish opined that Englert's testimony regarding blood spatter was "simply an unreasonable opinion." (*Id*. Sup. R. 2373). Kish further testified that he first learned of the questions raised by the prosecution team regarding a potential soot stain midtrial a few days earlier and that the markings were visually consistent with those caused by gas expelled from a fired gun. (*Id*. Sup. R. 2378-79, 2382). He said that a sodium rhodizonate test should have been performed. (*Id*. Sup. R. 2381-83).

Noedel testified that, based on the "stippling" marks on Jeannie's face, the likely distance between the muzzle of the gun and her skin was three to six inches. (*Id*. Sup. R. 757). In Noedel's analysis, there was insufficient information to determine the position of Jeannie's head or the trajectory of the gunshot. (*Id*. Sup. R. 787).

Kustok was ultimately convicted.

Over two months after the jury reached its verdict, the defense made a post-trial motion to have sodium rhodizonate testing performed. The State did not object and the testing was conducted at the Illinois State Police crime laboratory. (*Id*. Supp. R. 1049). The trial court later held a post-trial hearing at which the forensic scientist who performed the testing testified that the stain on the pillowcase was in fact soot, contrary to Englert's conclusions. (*Id*. Sup. R. 1102-03). As a result, she concluded that the gun must have been fired within inches of the pillow. (*Id*. Sup. R. 1118-19). Moreover, if the pillowcase had been located beneath another pillow, as Englert posited in his reconstruction, it could not have received these gunshot residue deposits. (*Id*. Sup. R. 1127).

During this post-trial hearing, the defense re-called its ballistics expert Noedel. He testified that these new findings contradicted several key aspects of what Englert told the jury. For example, the gun was likely inches from the pillow at the time it was discharged, rendering testimony about the proximity of the gun to the pillow "absolutely reverse[d]." (*Id*. Sup. R. 3172). Critically, Englert's testimony that the gun was not on or near the pillows, which was based on the absence of soot, "cannot be true." (*Id*. Sup. R. 3198-99).

Based on the test results, the defense moved for a new trial. The State opposed the motion, arguing that it was failures by Kustok's counsel that prevented this evidence from being presented to the jury. The State told the trial judge, "I don't know how anybody could possibly stand up here and say the first time that the defense became aware of a particular piece of evidence was during the trial itself." (*Id*. Sup. R. 1150). The trial court agreed, holding that the evidence could have been discovered prior to trial with the exercise of diligence. (*Id*. Sup. R. 3312). Specifically, the trial court ruled:

> The defense was on notice that potential evidence existed … more than a year and a half prior to trial. Whether it was inadvertence, a matter of trial strategy, the defense chose not to do anything about it. This whole idea that, all of a sudden, days before trial, this becomes significant is disingenuous. Because this information was out there. And the mountains of evidence they talk about, everybody had that. But the fact that it was overlooked until the time of trial is something that, with due diligence, the defense could have discovered. And I find that the evidence could have been discovered prior to trial with the exercise of due diligence.

(*Id*. Sup. R. 3304).

The trial court was correct to find that the evidence would have been available to the jury had Kustok's counsel acted diligently and undertaken a competent investigation of the scientific evidence. The need for this testing was manifestly apparent. Prosecution expert Englert provided an expert report long before trial regarding the specific stain at issue and concluding that, based solely on a visual inspection he performed in the United Club at O'Hare airport: "what was thought to be soot in the photograph, was actually a blood clot on the pillow case." (Ex. 3 at 82). Defense counsel was in possession of that report well over a year before trial and failed to act on this information.

Even worse, the defense's own expert, Mr. Noedel, wrote in his report that "[d]ark smudges that may represent cylinder gap gasses … are typically searched for, located or confirmed with the use of Sodium Rhodizonate, a colorimetric test for lead." (Ex. 4 at 2). In the "Conclusions" section of the report, Noedel specifically stated that "Cylinder gap gasses are best located and identified with the use of a colorimetric test known as the Sodium Rhodizonate test." (*Id*. at 3).

Thus, despite the prosecution's expert stating that the relevant stain was a potential issue and the defense's expert stating that sodium rhodizonate testing should be done, defense counsel did exactly nothing with this information for ***years*** and until the ***middle of trial***. This lack of diligence allowed the State to present, fundamentally unchallenged, an impossible crime scene reconstruction on the basis of which Kustok was ultimately convicted. Counsel's performance therefore fell below an objective standard of reasonableness and deprived Kustok of a fair trial. Had the defense requested the sodium rhodizonate test at any point before trial, the jury would have been presented with evidence that directly contradicted the State's reconstruction, creating a reasonable probability that the outcome at trial would have been different.

Although the judge who presided over the trial would later deny Kustok post-conviction relief, he would nevertheless conclude that "defense counsel … could have ***and should have*** sought [the] testing." (Ex. 2 at R. 1443).

Had the testing been performed pretrial, as defense counsel "should have" done, Englert would have been subjected to effective cross-examination based on actual scientific data, rather than two days' worth of unavailing cross-examination absent the evidence necessary to do it properly. Similarly, Englert's expertise would have been called into substantial doubt before the jury. He would have been exposed as blood-spatter and crime scene "expert" who could not tell

9

the difference between blood and soot.

What is more, had trial counsel been diligent, the scientific evidence would have fully supported the defense's theory of the case, not the State's. Englert rejected accident as an explanation for Jeannie's death because of "[t]he absence of soot" on any pillow. (Ex. 1 at Supp. R. 3849). Indeed, Englert was adamant that this "absence of soot" was critically important to his conclusions. In explaining why the evidence was supposedly inconsistent with an accidental shooting, Englert said:

> The absence of soot. The absence, if it's laying on the pillow, of fire. I mean, fire actually comes out that can burn, that can start a little burning on the pillow itself, and there's no evidence whatsoever that you would expect to see, based upon experimentation, knowing what guns do and having been injured myself in shooting them, that the gun was laying on a pillow or pillows when it accidentally discharged.

(*Id*.) All of that was wrong. But the jury never knew it because Kustok's counsel did not seek the necessary testing until it was far too late.

Englert's testimony served to lend expert credence to the State's theory of the case. In fact, the State *asked* the jury to rely on Englert's aura of expertise:

> We paid over $150,000 to bring you the guy that has over 50 years of experience in bloodstain pattern and crime scene reconstruction. We want the guy who says I don't need a pristine crime scene to be able to read the clues and piece it all together and tell you what happened …. No one testified in this case who has the experience that Rod Englert has… If we have to pay the best guy in the country $150,000 to tell you what happened to Jeannie Kustok then you bet you we are going to do it….

(*Id*. Sup. R. 982-83).

Kustok's counsel's lack of diligence not only resulted in the jury deliberating without critical pieces of evidence, it meant that the jury was able to unknowingly rely on "evidence" that was outright false but cloaked in the aura of the expertise of "the best guy in the country."

After the results of the sodium rhodizonate testing came to light following Kustok's conviction, the trial court noted the following in denying the defense motion for a new trial:

> So what are we to draw from that? We're to draw that, at best, ***these competing expert opinions cancel each other out. Nobody can say how this happened. No expert that testified can say how this happened.*** And, in such, that is exactly what was testified to by the defense experts. They testified that there were other ways that they believed or other explanations how it could potentially be a suicide. But the jury had this at their disposal. Clearly this type of evidence was merely cumulative and not of such a character that it would change the trial.

10

(*Id*. Sup. R. 3306) (emphasis added). Similarly, in dismissing Kustok's post-conviction petition without holding an evidentiary hearing, the trial judge asked, "if we conclude that these experts actually cancel each other out, what do you do? You look at the evidence at trial." (Ex. 2 at R. 1451). But without Englert's "reconstruction," there was no real evidence at trial—there were assumptions based on the fact that Kustok cheated on his wife and the fact that he did not respond to his wife's death "properly."

Kustok received constitutionally ineffective assistance of counsel where counsel's lack of diligence was the only reason the jury itself was not able to weigh whether to convict solely on the basis of these extraneous issues. The jury was asked to convict Kustok based on a deeply flawed "reconstruction" created by an expert they were told was the "best guy in the country." Had defense counsel been effective and sought the testing they "could have ***and should have*** sought" (ex. 2 at R. 1443), the jury would have known that "nobody can say how this happened" (ex. 1 at Sup. R. 3306).

Kustok's counsel's failures fell below an objective standard of reasonableness and there is a reasonable probability that the result of the proceedings would have been different absent these errors. Mr. Kustok was denied post-conviction relief in state court on this issue based on unreasonable findings of fact and the misapplication of clearly established federal law.

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?

    ☒ YES  ☐ NO

3. If you answered **"NO"** to question (2), state briefly what grounds were not so presented and why not:    n/a

**PART IV – REPRESENTATION**

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

    (A) At preliminary hearing:

        Richard Beuke
        801 North Cass Avenue, Suite 200
        Westmont, IL 60559

    (B) At arraignment and plea:

        Richard Beuke
        801 North Cass Avenue, Suite 200
        Westmont, IL 60559

    (C) At trial:

        Richard Beuke
        Steven Rueckert
        801 North Cass Avenue, Suite 200
        Westmont, IL 60559

        Laura Morask
        Timothy Black
        713 Devon Avenue
        Park Ridge, IL 60068

    (D) At sentencing:

        Richard Beuke
        801 North Cass Avenue, Suite 200
        Westmont, IL 60559

    (E) On appeal:

        Jonathan Lahn
        Kirkland & Ellis LLP
        300 North LaSalle Street
        Chicago, IL 60654

(F) In any post-conviction proceeding:

>Karl Leonard
>Tara Thompson
>The Exoneration Project
>    at the University of Chicago Law School
>311 N. Aberdeen Avenue, 3rd Floor
>Chicago, IL 60607

(G) Other (state):  n/a

**PART V – FUTURE SENTENCE**

Do you have any future sentence to serve following the sentence imposed by this conviction?

☐ YES        ☒ NO

Name and location of the court which imposed the sentence:  n/a

Date and length of sentence to be served in the future:   n/a

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on:   December 30, 2021            /s/ Karl Leonard
                 (Date)                   Signature of attorney (if any)

Karl Leonard
THE EXONERATION PROJECT
    at the University of Chicago Law School
311 N. Aberdeen Avenue, 3rd Floor
Chicago, IL 60607
(312) 243-5900 (tel)
(312) 243-5902 (fax)
karl@exonerationproject.org

13

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Signature of petitioner)

ALLAN J. KUSTOK

M49528
(I.D. Number)

5835 State Route 154

Pinckneyville, IL 62274

_____

(Address)