# EXHIBIT 1

STATE OF ILLINOIS   )
                    )   SS:
COUNTY OF C O O K   )

        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT-CRIMINAL DIVISION

    THE PEOPLE OF THE          )
    STATE OF ILLINOIS,         )
                               )
            Plaintiff,         )
                               )   No.  10 CR 19174
                 VS.           )   Charge:  Murder
                               )
    ALLAN KUSTOK,              )
                               )
            Defendant.         )


        REPORT OF PROCEEDINGS HAD at the hearing of the

above-entitled cause, before the Honorable JOHN J. HYNES, one

of the Judges of said Division, on the 4th day of March, 2014.

PRESENT:

        HON. ANITA M. ALVAREZ,
        STATE'S ATTORNEY OF COOK COUNTY, by
        MDMS. JENNIFER H. GONZALEZ & LORNA T. AMADO-CHEVLIN,
        MR. JAMES J. PAPA,
        Assistant State's Attorneys,
            Appeared on behalf of the People;


        MESSRS. RICHARD M. BEUKE & STEVEN C. RUECKERT,
        MS. LAURA J. MORASK,
            Appeared on behalf of the Defendant.



Charles T. Coleman
Official Court Reporter
Circuit Court of Cook County, Illinois
Criminal Division

. SUP R 593

1  board here to demonstrate the different blood patterns on them.

2  When he sets up the board, it kind of goes in a U-shape

3  pattern.  I want to give the court a heads up about that.

4  THE COURT:  All right.  Whoever is going to cross-examine

5  Mr. Englert can move in the courtroom and observe this

6  demonstration.

7  Anything else from the State, defense?

8  MR. RUECKERT:  Yes, judge.  I want to bring up a point

9  about Mr. Noedel.  He is going to testify on Thursday morning.

10  THE COURT:  Who is this?

11  MR. RUECKERT:  He is the firearms expert we have.

12  THE COURT:  His name is?

13  MR. RUECKERT:  Matt Noedel.

14  THE COURT:  All right.  Go ahead.

15  MR. RUECKERT:  He wants to perform a -- he has alluded to

16  this in the last notice I gave to the State about a sodium

17  Disonate test he can do on those pillow case, that one pillow

18  case in this room over here.  Take 20 minutes.

19  So if he comes in here at 9:00 and does that, we

20  just want to be able for him to do that and be able to testify

21  to that.

22  THE COURT:  What is your position?

23  MS. GONZALEZ:  Well, judge, in the sake of trying not to

24  cause any problems, I didn't say a word when we got this motion

1   or this supplemental expert report in the middle of our trial

2   last week after witnesses began testifying.  I didn't say one

3   word about it.

4             But now they are talking about doing a test in

5   the middle of the trial.  We would be entitled to those expert

6   opinions prior to this trial starting.  Perhaps we would have

7   had our own motion we wanted to file.  It just seems at this

8   point we are too far in this game to be conducting tests.

9             As a matter of fact, judge, those tests could

10  have been requested to be ran by the ISP when they did their

11  test or it could have been done by their own experts long

12  before we are in the middle of the trial, actually the State

13  about to rest their case.

14     MR. RUECKERT:  We didn't know about this until

15  February 14th.  That was part of what they gave us on

16  February 14th.  And that pillow case has never been identified

17  by anybody until Blue testified here in the trial.  So how

18  would we know about that?

19     THE COURT:  Well.

20     MR. RUECKERT:  It's going to take 15 minutes.  I don't

21  know what the results are going to be.  They can tell -- if

22  it's a negative, it's good for them.

23     THE COURT:  Well, if you got some case law, I think it's

24  very unusual to have someone do a test during the middle of

1   trial, and there is the discovery issue, too.  I will take a

2   look at it if you have some case law to back it up.  But it's

3   very unusual to do that.  So that's where I am at.

4       MR. RUECKERT:  All right.

5       THE COURT:  All right.  Are we ready to bring out the

6   jury?

7       MS. GONZALEZ:  Yes, sir.

8       THE COURT:  All right.  I am going to explain to them the

9   absence of the one juror and just tell them generally we had

10  some legal issues we had to attend to beforehand.

11      THE SHERIFF:  All rise for the jury.

12                      (Whereupon the jury entered

13                      the courtroom at 11:03 a.m.

14                      and the following

15                      proceedings were had in

16                      open court:)

17      THE COURT:  Folks, you may be seated.

18                  First of all I want to apologize for the late

19  start here.  We had some matters of law that we had to discuss

20  outside your presence.  Used to be a little faster on that, but

21  now a little slower on that nowadays.  Apologize for the delay.

22  There's a country western song, "I am not as good as I once

23  was."  Well, that's where I am at now.

24                  I also want to inform you that one of your

1    jurors, I believe it was Miss Lautner, went to the hospital.  I

2    don't know if she gave birth or she's in the process.  But she

3    will not be with us for the rest of the proceedings here, so we

4    will seat the first alternate juror with us.

5                   With that then, I believe we are ready to

6    proceed here, and State, I will ask you to call your next

7    witness.

8        MS. GONZALEZ:  State calls Rod Englert.

9                         (Witness duly sworn)

10       THE COURT:  You can have a seat there, sir.

11       THE WITNESS:  Thank you, your Honor.  Good morning.

12                         ROD ENGLERT,

13   called as a witness on behalf of the People of the State of

14   Illinois, having been first duly sworn, was examined and

15   testified as follows:

16                      DIRECT EXAMINATION

17                             BY

18                        MS. GONZALEZ

19   BY MS. GONZALEZ:

20       Q     Sir, in a loud and clear voice, can you please state

21   your name for the jury and spell your last name for the benefit

22   of the court reporter.

23       A     My name is Rod Englert.  That is spelled

24   E-N-G-L-E-R-T.

1    Q    Mr. Englert, what is your current employment?

2    A    I am a forensic crime scene reconstructionist.

3    Q    Do you currently have your own consulting firm?

4    A    I do.

5    Q    How long have you had your own consulting firm?

6    A    I had that since the 70s.

7    Q    Can you tell us about your education?

8    A    Yes.  I have an associates in arts degree from East

9    Los Angeles Junior College in Los Angeles.  That's in police

10   science.

11        I have a bachelor of science degree from

12   California State University at Los Angeles.  That's in police

13   science and administration.

14        I have a psychology minor.  Also a graduate of

15   the FBI National Academy in Quantico, Virginia.

16        And I have taken numerous courses as late as two

17   weeks ago that I stay current in the occupation I am going to

18   explain.

19   Q    Do you have experience working in law enforcement?

20   A    I do.

21   Q    Can you tell us about that?

22   A    I am in my 51st year.  I was a police officer in

23   Los Angeles.  I joined in 1963, and I left there in 1969 and

24   moved to Portland, Oregon and became a deputy sheriff at the

SUP R 624

1   sheriff's office that covers Portland, Oregon.  That's called

2   Multnomah, M-U-L-T-N-O-M-A-H, Multnomah County.  And that is an

3   area about a million people in population at that location.

4           I was there from '69 until I retired as a deputy

5   chief number two in charge of operation section, which we have

6   about a thousand men and women with the sheriff's department.

7           Most of my tenure there was working homicide

8   investigations, going to murder scenes, and working those even

9   when I was going through the ranks and became the number two,

10  the undersheriff of the agency.

11  Q    Can you tell us a little bit more about your

12  experience as a homicide detective?

13  A    Yes.  I started reconstructing crime scenes when I

14  was in the police academy.  They teach you that basically.  And

15  then when I became a homicide detective and was promoted to

16  that, then in going to those scenes it becomes more complex,

17  and I start trying to reconstruct and use many different

18  disciplines.

19          You have to have a knowledge of many different

20  disciplines like pathology, wound ballistics, trajectories,

21  weapons, knives.  All types of information in order to

22  reconstruct and put a crime scene back together.

23          There is no substitute for not being able to go

24  to a crime scene.  There is no other substitute because that is

1    so important to see those scenes and learn about what you see

2    over and over, day in and day out, accidents, homicides,

3    suicides.

4        Q    How many homicide investigations have you worked in

5    your career, sir?

6        A    Outside of my agency on a consulting basis, which I

7    was doing before I retired on weekends or days off, those would

8    be in the thousands, like 1500 maybe 2,000.  But this is what I

9    did day in and day out.  So I would be multiple thousands that

10   I have seen and going to scenes.

11               When I started in '63, I have been doing that up

12   until today going on 51 years.  In my 51st.

13       Q    How many active crime scenes have you been at?  And

14   by "active," I am talking about crime scenes that you were at

15   shortly after the time the crime occurred?

16       A    Most of those we go to and those would be in the

17   thousands.  As I stated, this is something that I did on a

18   daily basis and putting it together, going to crime labs,

19   working with multiple resources to be able to determine five

20   things:  Who, when, what, where, and how.  That's what we go

21   to.  What we try to learn when we go to a scene is to determine

22   who, when, what, where, and how.

23       Q    How many cold case homicides have you worked in your

24   career?

1    A    Numerous.  I am still sworn by the sheriff's office

2    on a voluntary basis.  I go in twice a week when I am not

3    traveling, and the oldest one is 45 years old that we are

4    working and making progress on.  So I still work for the

5    sheriff's office, sworn.

6              I have to go through driving education.  I have

7    to qualify on the range.  I have to do all those things that I

8    had to do when I was a deputy chief at the agency.

9              So I am still involved in that, and we work --

10   we have 35 that we are working.

11   Q    Do you have any specialty training?

12   A    Yes.

13   Q    Can you tell us about that?

14   A    My specialty training and I have over 6200 hours of

15   in service training over those 51 years.  That's not going to,

16   that's just in service within the agency, and -- I lost my

17   train of thought.

18   Q    That's okay.  Specialty training I'm talking about.

19   A    Specialty training in blood pattern analysis, and

20   spend a lot of time in that.  Specialty training in

21   reconstructing crime scenes.  I belong to organizations that do

22   that.

23   Q    You received on-the-job training?

24   A    That's the in service training, yes.  6200 hours.

SUP R 627

DIRECT EXAMINATION

1    Q    And throughout all of your career and working in law

2    enforcement and then with the specialty training that you

3    developed and done, have you developed a specialty in the work

4    that you perform?

5    A    Yes.

6    Q    Can you -- is that -- what area is that in?

7    A    In scene reconstruction.  Using the -- that's the

8    umbrella over many different disciplines that I mentioned

9    earlier.

10   Q    And is it fair to say that bloodstain pattern

11   analysis is one of the things that comes under the umbrella of

12   crime scene reconstruction?

13   A    It is, yes.

14   Q    How many years have you spent in total doing blood

15   contain pattern analysis?

16   A    I started in the 70s, like the mid 70s.  Not --

17   that's where I went to my first school and educated in it where

18   I found out there was a discipline in that.

19            But trying to understand blood was -- being a

20   patrolman in uniform in California and trying to determine

21   blood patterns, it just made no sense, and through that and

22   having made some mistakes and having not known what it meant, I

23   was able to learn this and more about this discipline.

24   Q    How many years have you spent doing crime scene

SUP R 628

1    reconstruction?

2      A   Since the day I graduated from the police academy,

3    1963 in Los Angeles.

4      Q   Is it fair to say those two things, bloodstain

5    pattern analysis and crime scene reconstruction, go hand in

6    hand?

7      A   They do.  When there is a bloody scene, that becomes

8    part of the reconstruction.  Reconstruction, again, is the

9    umbrella that covers all the different disciplines.

10      Q   How many crime scenes in your career have you

11    reconstructed?

12      A   Thousands.  I lecture on it.  I lecture around the

13    world, and there's people that bring cases and we try together

14    to do reconstruction.  So every week there is something

15    involved in in this area.

16      Q   As a police officer for, I believe, decades how did

17    you apply your knowledge of crime scene reconstruction and

18    blood scene pattern analysis to your job?

19      A   Because it's a very important part of reconstructing.

20    When there is blood at a scene, in reconstruction it's an event

21    that you try to put pieces back together.

22           There is a lot of moving parts at a crime scene

23    and it becomes very still when you go there and there is many

24    things that you have to do to control that scene and protect

SUP R 629

1    that scene from contamination, and you have to take your time.

2    You cannot release a scene in order to make sure that you

3    collect all the pieces that may be important to that scene.

4        Q    Do you train others in bloodstain pattern analysis

5    and crime scene reconstruction?

6        A    I do.

7        Q    Can you tell us who you train?

8        A    I train police officers.  I train attorneys and

9    defense attorneys.  I train college students.  And I train

10   every year, probably ten times a year, I lecture Princeton

11   University every June to about 150 police officers.  In

12   Las Vegas every December to -- there is about 2,000 police

13   officers there and attorneys that come there, so.

14             And I have a group of those and I teach officer

15   involved shootings and also advanced homicide investigation to

16   the investigators, attorneys, and people that have an interest

17   in the field.

18       Q    Do you belong to any professional organizations?

19       A    I do.

20       Q    Can you tell us about those?

21       A    I belong to the International Association of Blood

22   Pattern Analysts which I was president of that organization at

23   one time.

24             I belong to the Association of Crime Scene

SUP R 630

1  Reconstruction, which I was also the president of that

2  organization which I just attended three weeks ago their

3  conference.

4          And also a member of the American Academy of

5  Forensic Sciences, which I am a fellow of that organization,

6  and I belong to numerous homicide investigators' association

7  across the country.  The international one, which covers the

8  world, and Arizona, California, Florida, Washington, Oregon,

9  homicide investigators' associations.  I belong to all of

10  those.

11      Q    Can you tell us about any work or training that you

12  have done with the FBI?

13      A    Yes.  I have worked for the FBI, been hired by the

14  FBI, also the U.S. Attorney's Office.  And I have done cases

15  for them and I have also lectured for the FBI and had FBI

16  agents in the lectures.

17      Q    Have you authored any books in bloodstain pattern

18  analysis or crime scene reconstruction?

19      A    Yes.  I have several publications or papers that I

20  have written, and also have chapters on luminol in *Cold Case*

21  *Homicides*, Richard Walton, the first and second edition.

22          Then I also published by St. Martin's press a

23  book that I published came out April 10th called *Blood Secrets*

24  which is a compilation and biography of all the cases that I

. SUP R 631

1   have worked in my career in that book.

2       Q    How many times have you been hired to render your

3   professional opinion in bloodstain pattern analysis or crime

4   scene reconstruction?

5       A    Within my agency because you go to court a lot and

6   you have to render an opinion a lot, so too numerous to mention

7   because it was my everyday job.

8            Outside of the agency is over 400 consultations

9   that I have done throughout the United States, and many of

10  those have gone to trial, a lot of them haven't.  That's for

11  prosecution, for defense attorneys, for families, and others

12  that seek consultation for myself and others that may be in the

13  field.

14      Q    How many states have you been hired to perform work

15  in bloodstain pattern analysis and crime scene reconstruction?

16      A    More than half of the states in the United States.  I

17  have testified in 26 states as an expert, and some of those

18  states multiple times like California, New York, Florida, of

19  course Oregon and Washington, Arizona.  Many of those states I

20  have testified.  In the Midwest a lot.

21           Illinois probably in my career ten times, and

22  just as recently as three weeks or four weeks ago in downtown

23  Chicago.

24      Q    Is there a difference in someone learning bloodstain

SUP R 632

1  pattern analysis and crime scene reconstruction working real

2  crime scenes versus learning this trade in an academic setting?

3       MS. MORASK:  Objection.

4       THE COURT:  Overruled.

5       THE WITNESS:  Academically you do not get as much

6  knowledge.  There is no substitute for going to crime scenes,

7  but both of them working together academically and going to

8  crime scenes having that homicide experience really is very,

9  very important.

10          But again, there is no substitute for being at

11 those crime scenes, learning what you see day in and day out,

12 accidents, homicides, suicides, suspicious death, rest home

13 deaths.  All of those I attended and you start learning like

14 the back of your hand your mind becomes like a library.

15          And when you go and see these scenes over and

16 over, you go to that library in your mind and you can say,

17 "Well, I think this happened," or "This is a result of a

18 shooting."  No body is here, but we see a pattern here.

19 Beatings.  The body is gone.  You can tell what happened in a

20 lot of cases.

21          There are times you can't figure it out.  Lot of

22 times you are stumped, but most of the time, with the knowledge

23 and if you protect that scene, you can figure out mostly what

24 happened or didn't happen.

SUP R 633

BY MS. GONZALEZ:

    Q    How many times have you testified in a court of law
as an expert in the area of bloodstain pattern analysis and
crime scene reconstruction?

    A    Over 400 times.

    Q    Were you qualified to testify as an expert every
time?

    A    Yes, ma'am.  I was.

    MS. GONZALEZ:  At this time, the State tenders Mr. Englert
as expert in the area of bloodstain pattern analysis and crime
scene reconstruction.

    THE COURT:  Any questions on the expertise?

    MS. MORASK:  I have no questions.  I will reserve them for
my cross-examination.

    THE COURT:  All right.

            Mr. Englert will be considered an expert in
those fields.  As such, if needed, he will be allowed to review
his notes.

    THE WITNESS:  Thank you, your Honor.

BY MS. GONZALEZ:

    Q    Mr. Englert, have you prepared a tutorial chart that
would assist you in explaining bloodstain pattern analysis to
the jury here today?

    A    I have.

SUP R 634

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

I, <u>CHARLES T. COLEMAN</u>, an Official Court Reporter in the

Circuit Court of Cook County, County Department, Criminal

Division, do hereby certify that I reported in shorthand the

proceedings had at the hearing of the aforementioned cause;

that I thereafter caused the foregoing to be transcribed, which

I hereby certify to be a true and accurate transcript taken to

the best of my ability of the proceedings had before the

Honorable JOHN J. HYNES, Judge of said Court.

Official Court Reporter

Dated March 16, 2015
CSR# 084-003101

SUP R 726

```
1    STATE OF ILLINOIS )
                       )  SS:
2    COUNTY OF COOK    )

3           IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                   COUNTY DEPARTMENT-CRIMINAL DIVISION
4
        THE PEOPLE OF THE      )
5       STATE OF ILLINOIS,     )
                               )
6                   vs.        )  No. 10 CR 19174
                               )
7       ALLAN KUSTOK.          )

8

9           REPORT OF PROCEEDINGS HAD at the Trial of

10   the above-entitled cause, before the Honorable

11   JOHN J. HYNES, one of the Judges of said

12   Division, on the 7th of March, 2014.

13
                PRESENT:
14
                HON. ANITA M. ALVAREZ
15              STATE'S ATTORNEY OF COOK COUNTY, by
                MS. JENNIFER GONZALEZ, MR. JAMES PAPA
16                  and MS. LORNA AMADO-CHEVLIN,
                Assistant State's Attorney,
17                  Appeared on behalf of the People;

18
                MR. RICK BEUKE, MR. RANDY RUECKERT,
19              MS. LAURA MORASK and MR. TIM BLACK,
                    Appeared on behalf of the Defendant.
20

21

22

23
     Barbara A. Evans
24   Official Court Reporter
```

QQQ-1

SUP R 730

1          MATTHEW NOEDEL,

2    called as a witness, having been first duly

3    sworn, was examined and testified as follows:

4          DIRECT EXAMINATION

5          BY

6          MR. RUECKERT:

7    Q    Good afternoon, Mr. Noedel.

8    A    Hello.

9    Q    Would you please tell the ladies and

10   gentlemen of the jury your name and spell your

11   last name for the Court Reporter?

12   A    Matthew Noedel N-o-e-d-e-l.

13   Q    And how are you employed or how do

14   you make a living?

15   A    I'm a forensic consultant with a specialty

16   in shooting scene reconstruction and forensic crime

17   scene reconstruction and I run my own company called

18   Noedel Scientific in that capacity.

19   Q    How long have you been doing that?

20   A    I have been running this business for nine

21   years now.

22   Q    Tell us about your education.

23   A    I have a Bachelor of Science degree in

24   Microbiology and Medical Technology with a minor in

QQQ-4

1    chemistry from the University of Montana.  I went on

2    to get a Bachelor of Science Degree in Forensic

3    Science after those degrees, and that's the basis of

4    my formal education.

5         Q    And where did you go to work after

6    college?

7         A    After completing college my first job was

8    as a forensic toxicologist.  I was doing blood and

9    tissue toxicologies for a testing agency where we had

10   contracts with various agencies for preemployment drug

11   screening, as well as postmortem autopsy-type

12   toxicology examinations for drugs and poisons in

13   biological fluids.

14        Q    You were there for three years; is

15   that right?

16        A    That's correct.  That was three years in

17   Sacramento, California.

18        Q    Where did you go after that?

19        A    I left that position to take a position

20   with the Washington State Patrol Crime Laboratory in

21   Tacoma, Washington.

22        Q    And how long were you there?

23        A    I worked for the State patrol in Tacoma

24   for 15 years.  I came in as, hired as a chemist and

QQQ-5

1    trace evidence examiner, basically microscopic

2    examination of small particles, hairs and fibers. In

3    my tenure with 15 years of the State Patrol, I was

4    also a member of the Crime Scene Response Team, which

5    was the team that actively went out and processed and

6    tried to reconstruct crime scenes.

7           And I also held a responsibility

8    ultimately as a fire and tool mark examiner. And so I

9    was responsible for examining everything associated

10    with ballistics and firearm and tool marks, including

11    bullet comparison, firearm evaluation, muzzle to

12    target distance determinations, virtually anything

13    that could come up with a firearm that might be

14    related to forensic analysis could come to the firearm

15    tool mark section.

16      Q    That was with the Washington State

17    Patrol; is that correct?

18      A    That's correct.

19      Q    And then you left there and started

20    your own business, true?

21      A    That's correct. After 15 years with the

22    patrol I have added nine more years now as my own

23    consulting business.

24      Q    And apart from your work history and

SUP R 734

1    things like that do you have any specialized

2    training?

3          A    Yes, I do.

4          Q    Can you tell us about that?

5          A    In order to maintain expertise in these

6    various areas that I work in, which is shooting scene

7    reconstruction and firearm analysis, and such, a big

8    part of that is to maintain professional affiliations

9    with professional societies and organizations.  One of

10   the big ones for me is an organization called the

11   Association of Firearm and Tool Mark Examiners.  It's

12   abbreviation is AFTE.

13         And AFTE is a collection of about 1,000

14   Scientists who study firearm ballistic-related issues.

15   We have annual conferences where we have training and

16   additional paper presentations.  We also have a

17   publication that we generate in that organization, the

18   AFTE Journal.  And the journal is the material where

19   we publish scientific findings about firearm and tool

20   mark analysis, and about trajectory analysis and

21   various things associated with firearm examination.

22         In my tenure in working with the

23   association of firearm and tool mark examiners I

24   ultimately became a distinguished member of that

QQQ-7

1    organization which is an award that's bestowed for

2    participation, publication and presentation in the

3    organization.

4            I also became the editor of that journal

5    and for five years served as the editor of the

6    association AFTE Journal.  So, that was service in one

7    of those organizations.  I have since served on other

8    committees within that, like nominating committee and

9    remain active in that association to this day.  I am

10   one of the people helping plan our annual conference

11   coming up this year in Seattle, Washington.

12           Beyond AFTE, I am a member of the

13   Association for Crime Scene Reconstruction ACSR.  ACSR

14   is a collection of examiners and investigators that

15   study crime scene reconstruction as a primary part of

16   their business responsibility and their duties.  So,

17   it's a mix of civilian employees, civilian workers,

18   civilian employees, law enforcement employees.

19           And this focus of this group is the

20   examination of scenes, how to process scenes, how to

21   reconstruct scenes and the various elements that go

22   along with those kinds of responsibilities.  I have

23   worked through that organization and am recently the

24   past President of that organization.  I have taught

1    many courses through that organization and presented

2    it at their annual conferences as well.

3              Those are the types of activities, along

4    with some other affiliations like the International

5    Association of Bloodstain Pattern Analysts, IABPA,

6    studies bloodstains in a similar capacity.  I'm a

7    member of that group.

8              The America Academy of Forensic

9    Scientists, I am also a member of that group.  And a

10   small regional group called the Northwest Association

11   of Forensic Scientists.  I have held various positions

12   in all of these organizations and I stay in these

13   organizations to maintain my expertise to make sure I

14   remain current in the field of crime scene

15   reconstruction and forensic analysis associated with

16   crime scene reconstruction.  So that's one avenue of

17   experience that I maintain to keep active in this

18   field.

19             Q    Are you certified by the I.A.I.?

20             A    I am.  I carry a certification in crime

21   scene reconstruction.  I.A.I. is a group known as the

22   International Association for Identification.  So very

23   large group and it includes a lot of investigators.

24   And the group in general studies is a group, an

QQQ-9

SUP R 737

1    organization for people who process crime scenes and

2    reconstruct crime scenes in some aspect.  And they

3    offer a certification which involves a written test

4    and a practical test.  I have taken and passed those

5    tests so I carry that certification.  It's not

6    required in the field of forensic reconstruction, but

7    I feel that it helps to establish myself as an expert

8    in those fields so I do that certification

9    voluntarily.

10        Q    Can you just briefly explain what

11   you mean when you talk about scene

12   reconstruction?

13        A    Crime scene reconstruction or shooting

14   scene reconstruction involves the use of scientific

15   principles and physical evidence to try to re-

16   establish or test various aspects of any given event.

17   When done properly a crime scene reconstruction takes

18   physical evidence and those objects that we have and

19   tries to piece them together in a logical and a

20   reasonable format.

21             So, we use physical evidence and testimony

22   and statements to be used as, to test against what we

23   have being said about a particular event.  We can test

24   and determine if an outcome is likely or unlikely or

QQQ-10

SUP R 738

1    sometimes the result is simply inconclusive.  But it's

2    a scientific process that we can apply to crime

3    scenes.

4         Q    Now, in your CV you list other

5    responsibilities; is that correct?

6         A    Yes.

7         Q    And I note that among other things

8    you noted that you are an instructor in crime

9    scene training; is that true?

10        A    Yes.

11        Q    Where did you do that?

12        A    Well, when I was with the State patrol

13   after a certain number of years, four or five years as

14   a scene analyst, I became a senior scene analyst and

15   began training other members within the State Patrol,

16   successors to me, within the scene and the processing

17   of crime scenes for the Washington State patrol.

18             After I left the patrol I continued

19   teaching in courses, short courses, one-day courses,

20   sometimes in affiliation with some of these

21   associations I work with.  I also offer a 40-hour

22   instruction in shooting scene reconstruction.  The

23   primary people who take that course are law

24   enforcement agencies that are looking to improve their

QQQ-11

1    abilities to process and reconstruct crime scenes.

2              And those courses involve how you collect

3    physical evidence, what can be told about the physics

4    and the chemistry of bullets and gunshot residue and

5    the various aspects of shooting scenes, the elements

6    of shooting scenes that we can reconstruct.

7         Q    And I also note that you list

8    primary responder and crime scene consultant for

9    the Washington State Patrol Crime Lab.  Can you

10   tell us a little bit about that?

11        A    That's essentially what I just described.

12   When I was with the State Patrol I had achieved a

13   level of primary responder, which means that I was

14   responsible for attending the scene, processing the

15   scene, issuing the report and ultimately testifying

16   about the findings on that scene.

17        Q    And you listed the number of things

18   about your specialized training.  One of those

19   being McCrones Advanced Microscopy; is that

20   right?  Did I pronounce that right?

21        A    Yes.

22        Q    Can you explain what that is?

23        A    You did not pronounce it right.  It's

24   microscopy.  At one point, this was when I was still

QQQ-12

1    with the State Patrol, the forensic laboratory, the

2    crime laboratory brought in instructors from the

3    McCrone Institute and gave us a one-week long training

4    course on forensic microscopy.  And we studied the use

5    of the microscope, analysis of small particles and how

6    we can use those to sort out physical evidence.

7          Q    Have you been involved in any

8    publications or presentations?

9          A    Yes.

10         Q    About how many?

11         A    I have published and/or presented probably

12   40 or 50 various topics.

13         Q    One of those being Persistence of

14   Gunshot Residue On Clothing; is that correct?

15         A    Yes.

16         Q    Can you tell us a little bit about

17   what that was all about?

18         A    One of the aspects that's in question with

19   gunshot residue and the particles that follow a bullet

20   is how durable are those particles once they are

21   deposited in a scene or on an object of clothing or

22   something like that.  And so that series of

23   experiments and that presentation involved research

24   that was conducted about what happens when you simply

QQQ-13

1    rough handle clothing, what occurs when we package it,

2    as compared if you launder clothing, do any residue

3    survive those types of activities.  And so that was

4    the basis of that.  And we catalogued, or I

5    catalogued, during the course of that, how residue

6    survive through various handling procedures.

7         Q    And among your other publications I

8    am just going to list a couple, you did a

9    publication on the detection of gunshot residue

10   on secondary services; is that correct?

11        A    That was a presentation.  I never

12   published that in the journal, but I did present that

13   topic and research that topic, yes.

14        Q    While we are talking about gunshot

15   residue why don't you just explain what you are

16   talking about?

17        A    Gunshot residue has a couple of different

18   definitions affiliated with it.  Basically generically

19   speaking, gunshot residue is anything that can come

20   out of the gun beyond the bullet.  It's any of the

21   combustion products that can emit from the gun.  There

22   is a couple of different forms of gunshot residue.

23   For example, we have residues that are pushing the

24   bullet, that follow the bullet out of the barrel.  And

SUP R 742

1   we have residues that simply can leak out of a gun and

2   land on adjacent surfaces.  We can detect some of

3   these residues and sometimes use them to interpret

4   physical evidence or reconstruct a scene.

5          Q    Now, Mr. Noedel, you have testified

6   previously; is that correct?

7          A    Yes, I have.

8          Q    And you have been qualified as an

9   expert in ballistics and shooting scene

10  re-creations -- I'm sorry, reconstruction; is

11  that correct?

12         A    That's correct.

13         Q    How many times have you testified in

14  other courts?

15         A    I have testified about reconstruction

16  events associated with ballistic events about 100,

17  maybe 125 times on reconstruction specific events.

18         Q    How about ballistics?

19         A    Ballistics is much higher because there is

20  a large volume of analysis that was just a firearm

21  without putting any context to the scene, probably 300

22  or 400 ballistics-type of testimony in my career.

23         Q    And how many times have you

24  testified for the prosecution?

1      A     I don't have an absolute count, but for

2   essentially the 15 years I was with the patrol was

3   essentially all prosecution testimony.  In my current

4   business, a little less than half of my testimonies

5   are for prosecution.  I maintain contracts.  For

6   example I teach and work at Washoe County Forensic Lab

7   in Reno, Nevada helping train new firearm examiners

8   and also help reduce their back log.  So, that's a

9   source of current prosecutorial-type of cases that I

10  get involved with and testify.

11            I am also, in my business, contacted

12  by attorneys for the defense.  And if they have

13  a forensic question or an examination that needs

14  to be done I may work for them as well.  So,

15  it's split fairly evenly between prosecution and

16  defense-type cases.

17            And I also have a small portion of my

18  work that's civil litigation that -- civil

19  lawsuits.  And I work for both, either side on

20  the civil litigation, depending on what is

21  needed during the course of a trial.

22      Q     You recently testified in Illinois,

23  correct?

24      A     I did.

QQQ-16

1          Q      What was that case about?

2          MS. AMADO-CHEVLIN:   Objection.

3          THE COURT:  Sustained to the form of that

4     question.

5     BY MR. RUECKERT:

6          Q      Where was that case?

7          A      That was in Will County, Illinois.

8          Q      That was a murder case, correct?

9          A      It was.

10         Q      Just one last thing.  You go to

11    Jamaica every month; is that correct?

12         A      That's correct.  As I described my

13    responsibility with the Washoe County Sheriffs

14    Department and Forensic Lab, I also have a contract

15    with an agency called INDECOM in Kingston, Jamaica.

16    And INDECOM is an agency, it's a government agency

17    that's been assigned to examine officer-involved

18    shooting situations on the island of Jamaica.

19             And so INDECOM has been taxed with

20    investigators and forensic teams.  They have a

21    relatively new forensic team so I am helping train

22    them on shooting scene reconstruction, as well as in

23    the laboratory, ballistic direct comparison

24    examinations.  So, that contract takes me to Kingston,

QQQ-17

1    Jamaica once a month during the course of that

2    contract.

3          MR. RUECKERT:  Your Honor, I would tender Mr.

4    Noedel as an expert in scene reconstruction and

5    ballistics.

6          MS. AMADO-CHEVLIN:  Your Honor, the State

7    has no objection.

8          THE COURT:  All right.  Mr. Noedel will

9    be qualified as an expert in that field and as

10   such he can refer to his notes when necessary

11         MR. RUECKERT:  Thank you, State.

12   BY MR. RUECKERT:

13         Q    Mr. Noedel, you were hired, correct?

14         A    That's correct.

15         Q    To provide some expert testimony in

16   this case; is that true?

17         A    That's correct.

18         Q    When did you start work on this

19   case?

20         A    I was first hired and documented my first

21   interactions on November 12th of 2012.

22         Q    And can you tell us what you were

23   provided, what were you provided to look at when

24   you were first hired?

QQQ-18

1      A      Initially I was provided with a couple of

2  police reports and some of the forensic reports and

3  some of the photographs associated with the Kustok

4  event.

5      Q      And since your first hiring what

6  else have you reviewed in this case?

7      A      Once I began to review the materials that

8  were available I began to make additional requests.  I

9  received additional police reports, autopsy reports,

10  autopsy photographs, crime scene and scene processing

11  photographs from the initial response, some of the

12  photographs of the physical evidence itself.  So, a

13  lot of photographs, some of the documentation.  I

14  received a copy of the notes and report from the

15  expert, the expert from the prosecution side of this

16  case, and used all of those materials in the course of

17  reviewing and preparing for the forensic examination

18  and reconstruction of this event.

19      Q      So, one of the things you were able

20  to look at was the report made by Mr. Englert;

21  is that correct?

22      A      That's correct.

23      Q      Now, tell us, explain to us what

24  shooting scene reconstruction is, please?

1        A       Well, in it's purest form it's the

2    analysis and application of the scientific practice

3    and principles that ballistics can offer in placing

4    them within the confines of a scene and then trying to

5    use that information to answer scene questions.  It

6    can involve the function of a gun, how a gun operates,

7    what are the various elements of the ammunition, for

8    example, associated with the gun.  It can involve

9    trajectory or bullet path analysis, gunshot residues.

10   All of these things that are associated with the

11   discharge of a firearm can be considered in the

12   context, depending on what materials are available in

13   an event, to try to reconstruct and test various

14   situations that are being proposed about a particular

15   event.

16        Q       That's what you were asked to do in

17   this case; is that right?

18        A       That's correct.

19        Q       Now, can you tell us what

20   examinations you did to prepare for your

21   testimony?

22        A       The basis of the type of examination that

23   I did in this case was to take the records that were

24   present; crime laboratory reports, autopsy reports,

SUP R 748

1    photos and begin to evaluate those elements and see

2    what kind of foundational building blocks we have to

3    consider here.

4            So, I consider, for example, the State

5    Police reports about the firearm, what kind of firearm

6    was used, what are the characteristics of this

7    firearm.  I look at the photographs and the

8    documentation of the fired cartridge cases, those

9    objects left behind after the discharge of a gun.

10   What brand are those, what kind of energies and

11   velocities might we encounter.

12           In considering each of these elements from

13   the records that we have, from the people who have

14   done the direct exams, the amount of pressure to pull

15   a trigger is considered, and start trying to organize

16   these into what we can use for testable data or

17   testable physical evidence points to consider for

18   reconstruction purposes, how much can we put back

19   together based on the physical evidence and data that

20   we have.

21           So, I went through that process with the

22   materials provided and began to organize thoughts

23   about how and what we can reconstruct in this event.

24           Q     You are to provide some opinions to

QQQ-21

SUP R 749

1   the jury today, correct?

2           A      I believe so, yes.

3           Q      And are those opinions to a

4   reasonable degree of scientific certainty?

5           A      Yes.

6           Q      Let's talk about the firearm first.

7   What test did you perform on the firearm?  First

8   of all, you never saw the firearm that was

9   actually used; is that right?

10          A      Correct.  I never directly examined any

11  physical evidence, objects in this event.  I worked

12  completely from the records and from the notes and

13  reports that were provided, and photographs that were

14  provided.

15              So, what the firearm results from the ISP

16  Crime Laboratory and these scene photographs

17  demonstrated is the make, model, and brand of firearm.

18  And that allows me to begin to consider how this

19  firearm functioned, how does it operate.  And that

20  became the first level.

21          MR. RUECKERT:  May I approach the witness, your

22  Honor?

23          THE COURT:  Yes.

24  BY MR. RUECKERT:

QQQ-22

1    have a stippling pattern in this event.

2         Q    And you looked at that stippling

3    pattern; is that correct?

4         A    I did.  The Medical Examiner documentation

5    from this event documented the size and distribution

6    to scale of the stippling pattern that was present on

7    the left cheek of Anita Kustok.

8         Q    And do you have an opinion about how

9    far the gun would have been away from her when

10   she was shot?

11        A    Yes, I do.

12        Q    What's that opinion?

13        A    I believe it's somewhere between three and

14   six inches away to get that kind of a stippling

15   pattern.  That's -- the muzzle of the gun, the end of

16   the gun is about three to six inches away.

17        Q    So, that's one part of the GSR test

18   or whatever, right?

19        A    Well, of the considerations.  So, the

20   first consideration is what follows the bullet or

21   muzzle effluent.  On revolvers, because we have this

22   rotating cylinder that we have to open and close to

23   introduce ammunition, we have a feature on revolvers

24   called cylinder gap.  And cylinder gap is that space

QQQ-29

1   between that rotating cylinder and the fixed barrel

2   that the bullet has to jump across.

3          So, when we fire a revolver the bullet

4   jumps across the gap and the gases that are pushing

5   the bullet forward, many of them follow the bullet.

6   But some of the gases are shaved off and exit this

7   gun, exit a revolver sideways.  Those are called

8   cylinder gap gases and it's a form of gunshot residue

9   that we see specific to revolvers.

10         Cylinder gap gases can be evaluated

11  because they carry even less energy than the particles

12  and the residues that are following the bullet.  So,

13  cylinder gap gases can only be expelled sideways for a

14  couple of inches before they run out of energy and

15  simply fall off.

16         If you have an object very close to the

17  side of the gun you might see cylinder gap gases

18  represented in the form of soot or deposits that would

19  be present on the adjacent object as those gases shave

20  off and go sideways.  So, that's the second

21  consideration as far as residues are with revolvers.

22      Q    What does that soot look like?

23      A    Typically it can be a brown to black

24  deposit.  It's basically -- we call it soot because it

QQQ-30

1    looks dark.  It's a dark, somewhat linear deposit.

2    Again it's being shaved off towards the sides.  So

3    it's not a big plume typically.  It's more of a linear

4    type of a pattern when it exists.

5        Q    And that would indicate that the gun

6    was how close to that, if you found it, indicate

7    how close the gun was to that where you found

8    it?

9        A    I have actually prepared this in other

10   forums and things.  Those gases tend to not survive

11   much more than approximately two or three inches,

12   depending on the ammunition and the load.  That is to

13   say that once those gases blast sideways, if there is

14   not something to intercept it within two inches we

15   tend to not see them at all.  So, that indicates, if

16   we don't see them, it would indicate that the gun is

17   farther away than maybe two or three inches from an

18   object being on the side of a gun.

19       Q    You just talked about the load,

20   that's talking about the bullets that were in

21   the gun; is that right?

22       A    Correct.  The complete round of ammunition

23   is called a cartridge and there are powerful

24   cartridges and light cartridges and different calibers

QQQ-31

1          Are there different ways her head

2     could have been positioned in the bullet hole in

3     the pillow we see.

4          A     Yes.

5          Q     Can you demonstrate those to us with

6     that exhibit, please?

7          A     I can.  So, what we have that is fixed in

8     association with Anita Kustok is her entry and exit

9     wound.  Those are fixed points.  The problem is they

10    are not fixed points within the confines of the

11    bedroom.  So, when we consider where was Anita Kustok

12    before she has been removed from the bedroom, so we

13    don't have her in the actual position at the time the

14    shot was delivered, nor were these pillows in their

15    same position.  They were somewhere relocated to one

16    side of the bed and other pillows were in various

17    positions around.  So, when we try to consider and

18    reconstruct the bullet path through Anita Kustok we

19    know that a bullet ultimately has to hit the surface

20    of this pillow and it stops.

21         Q     Would you mind showing the jury that

22    bullet hole please, just so they know what we

23    are talking about?

24         A     So, inside on the surface of this pillow

QQQ-54

1   is an ovoid-shaped defect, and it's from my

2   understanding that the detectives who processed these

3   pillows found the bullet just on the other side of

4   this and recovered it and collected it as a piece of

5   physical evidence.

6           So, what we know about the bullet that

7   caused this rip, and there was another layer in front

8   of this but what we know about that bullet that caused

9   this rip is that one, it was just about out of energy

10  and that makes sense for the light load, the 38

11  Special load, which is definitely still a powerful

12  load, but it's on the light end of the .357-Magnum 38

13  Special spectrum.  That bullet ran out of energy as it

14  exited her head and had just enough energy to just

15  enter the surface of this pillow and tear.

16          It did not go through and perforate the

17  mattress or the floor or the wall behind wherever Ms.

18  Kustok was located.  This is a problem from a

19  reconstruction perspective because now we have to try

20  to estimate or figure out where was this hole in the

21  room before the pillow was displaced.  We don't have

22  fixed data points like we do in the armoire associated

23  with Ms. Kustok.  So, when we use this model we don't

24  know, for example, if pillows were stacked two deep,

SUP R 783

1    if there is another pillow.  We don't know if the

2    pillows were stacked three deep or one deep.

3            We also don't know about how much

4    compression was on the pillow.  When you compress the

5    pillow angles are introduced into the pillow surface

6    that change.  We don't know if a pillow might have

7    been partially folded at the time.  We don't know if

8    originally the pillows may have been in series, one or

9    more pillows and she is in bed this way.  What we do

10   know is that the bullet that's running out of energy

11   has to ultimately impact at or near this position

12   where it tore the pillowcase.

13           Then we begin to consider where was Anita

14   Kustok in relation to this scene?  Of course we know

15   she is near where her blood pool ended.  That's where

16   the primary part is.  That's about how much we can

17   reconstruct about Ms. Kustok's position.  We cannot

18   simply assign her as having been laying in the bed

19   like this, or like this with compression or rotated or

20   leaning up.  All of these will create an entry wound

21   and an exit wound and a re-entry into the pillow.  So,

22   we don't get to just assign one of these paths as the

23   best path.  If we do that we begin to become,

24   introduce a type of error called confirmational bias.

SUP R 784

1          Confirmational bias is a type of error in

2   a scientific assessment where you preferentially

3   select conditions and data that support your notion or

4   view of a particular information, and don't include

5   parts of the reconstruction or the information that

6   don't fit with your notion of how things went.

7          So, the reality is that data does not

8   allow us to say the exact position, if she was facing

9   up, sitting up, leaning up; one pillow, two pillows.

10  We are not able to reconstruction that because Anita

11  was moved, the pillows were moved. And all of that,

12  none of that has anything to do with the armoire. So,

13  we have to consider Anita Kustok's bullet path on it's

14  own. So, in order to try to not introduce

15  confirmational bias we need to consider all of these

16  different kinds of orientations. Different

17  orientations of how the pillows may have been

18  arranged, how much was she weighted, was she leaning

19  forward.

20          Anita Kustok had rotation and the ability

21  to move her head in different orientations. So, those

22  are the elements that restrict us from saying too

23  terribly much about the reconstruction of the path

24  into Anita Kustok. She is not a fixed point in this

1   environment, nor were the pillows fixed in position

2   like our armoire was fixed in position.

3          So, we have to be careful about how we

4   assign and open up our range of possibilities when

5   considering the bullet path to Ms. Kustok.

6      Q    Now, when you are moving that around

7   you are keeping the end of the bullet path in

8   that hole; is that correct?

9      A    Correct.  What we can say about this is we

10  know that the bullet that exited from the back of Ms.

11  Kustok's head did create this defect.  So, we can kind

12  of move these two in tandem.  We can achieve a lot of

13  different orientations and still maintain how the

14  bullet actually ends in the pillow because she does

15  have this potential for mobility.  We can compress the

16  pillow and change positions and so forth.

17          But all of those orientations that we must

18  consider, they do have to end in this pillow.  So, we

19  know that she is near or associated with this pillow

20  in some capacity.  But where she was on this pillow,

21  where she was looking, was her entry wound face up or

22  leaning forward, we simply don't have that data.  And

23  so we can't fill it in or we may fall in this problem

24  of confirmational bias where we are supporting one

QQQ-58

1    version without considering all of the other elements

2    meant of the reconstruction.

3         MR. RUECKERT:  Can we put up Page 78, please?

4         THE COURT:  Is this a new exhibit?

5         MR. RUECKERT:  It's Page 78 of Mr. Englert's

6    report.

7         THE COURT:  What number is that exhibit-

8    wise?

9         MR. BEUKE:  It would be our exhibit

10   number --

11        MR. BLACK:  Defendant's 35 is the report.

12   BY MR. RUECKERT:

13        Q    Mr. Noedel, do you recognize this

14   photograph from being in Mr. Englert's report?

15        A    Yes, I do.

16        Q    And you just talked about the fact

17   that that bullet path could be from any of a

18   number of different directions, right?

19        A    Yes.

20        Q    And her head could be in a number of

21   different positions, do you agree with that?

22        A    That is correct.

23        Q    And that's all based on the evidence

24   that you saw in the pillow, right?

1          A     That's correct.

2          Q'    So, by assigning her this one

3     position, do you agree with that?

4          A     I can't eliminate that one position but in

5     my opinion this is an example of a type of

6     confirmational bias, this error that we sometimes

7     encounter in scientific assessments.  Because in this

8     image we see a proposed outcome.  We have a path

9     represented by the rod that's going from the right of

10    the screen to her cheek.  That is, in this image, this

11    is a re-enactment image.  This is where we have an

12    actress portraying what the actress believes Ms.

13    Kustok's positioning and things would have been as

14    being directed by someone who is influencing and

15    saying that we need to maintain this bullet path

16    that's represented from the right of the screen to the

17    left, impact the cheek.  And then instruct the actress

18    to try to align along that single bullet path.

19              And the text associated with this is that

20    the actress was not able to accommodate this past but

21    what we can see from a confirmational bias perspective

22    is if we let the actress just act without any

23    direction and without the inhibition of that single

24    rod she can simply rotate her head to the right,

QQQ-60

1    presents her left cheek and she maybe able to achieve

2    an orientation in this and accommodate the path

3    through Ms. Kustok that we know occurred.

4        We also are relying on the fact, or on the

5    idea that that bullet, that these pillows are

6    appropriately positioned and that the load on the

7    pillows is the proper load.  These are all variables

8    we simply do not have in this scene because Ms. Kustok

9    was moved and the pillows were moved and we can't put

10   them back in exactly the same position as occurred

11   when the shot was delivered.

12       Q    So, for instance, if this were how

13   they have it in there, right?

14       A    I would rotate it toward me a bit.

15       Q    Okay.  And if you just move it this

16   way it would still fit, right?

17       A    Sure.  That accommodates, the exit of that

18   bullet would go right into a hole in the pillow, where

19   the pillow is positioned behind her head and that

20   completely changes the orientation.  It still allows

21   us to have a stippling pattern forward of her left

22   cheek and maintain the path entry and exit through her

23   head.  We can move her in the space of the bedroom.

24   She is not a fixed entity.

QQQ-61

1          Q     So, would you agree with Mr.

2     Englert, just using that one position to come to

3     this conclusion?

4          A     No.

5          MR. RUECKERT:  May I just have a moment, your

6     Honor?

7          THE COURT:  Sure.

8     BY MR. RUECKERT:

9          Q     I am going to show you what's been

10    marked as People's Exhibit No. 36.  Have you

11    seen that before?

12         A     Not in person, no.

13         Q     Well, when was the first -- you saw

14    a picture of this?

15         A     I did see a picture of this.

16         Q     When was the first time that you saw

17    a picture of this?

18         A     A picture was provided on Monday and

19    that's the first time I saw any picture or image of

20    this.

21         Q     Okay.

22               And directing your attention to this

23    spot right here?

24         A     Yes.

QQQ-62

1    STATE OF ILLINOIS      )

2                           ) SS:

3    COUNTY OF C O O K      )

4

5        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

6           COUNTY DEPARTMENT-CRIMINAL DIVISION

7

8                I, Barbara A. Evans, C.S.R., an

9    Official Court Reporter in the Circuit Court of

10   Cook County, County Department, Criminal

11   Division, do hereby certify that I reported in

12   shorthand the proceedings had at the hearing of

13   the aforementioned cause; that I thereafter

14   caused the foregoing to be transcribed, which I

15   hereby certify to be a true and accurate

16   transcript taken to the best of my ability of

17   the proceedings.

18

19

20   _____

                  Official Court Reporter

21

22   Dated February 26, 2015

23   CSR# 084-002722

24

QQQ-135

SUP R 863

1    STATE OF ILLINOIS )
                       ) SS:
2    COUNTY OF COOK    )

3         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
               COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE      )
5    STATE OF ILLINOIS,     )
                            )
6              vs.          )  No. 10 CR 19174
                            )
7    ALLAN KUSTOK.          )

8

9         REPORT OF PROCEEDINGS HAD at the Trial of

10   the above-entitled cause, before the Honorable

11   JOHN J. HYNES, one of the Judges of said

12   Division, on the 11th of March, 2014.

13
               PRESENT:
14
               HON. ANITA M. ALVAREZ
15             STATE'S ATTORNEY OF COOK COUNTY, by
               MS. JENNIFER GONZALEZ, MR. JAMES PAPA
16             and MS. LORNA AMADO-CHEVLIN,
               Assistant State's Attorney,
17                  Appeared on behalf of the People;

18
               MR. RICK BEUKE, MR. RANDY RUECKERT,
19             MS. LAURA MORASK and MR. TIM BLACK,
                    Appeared on behalf of the Defendant.
20

21

22

23
     Barbara A. Evans
24   Official Court Reporter


                         TTT-1

1    The jurors have left the courtroom.  We will

2    take a 15 minute recess for the jurors and then

3    we will hear from the State again.

4                    (WHEREUPON, a brief recess was

5                    had.)

6        THE SHERIFF:  Court is back in session,

7    remain seated and quiet.  Make sure the cell

8    phones are off.

9        THE COURT:  Let's call the matter on

10   trial.  People versus Allan Kustok.  The record

11   will reflect we have the parties present.  Where

12   is Ms. Morask?  All right.  We have all the

13   parties present.  Are we ready to bring back the

14   jury, State?

15       MS. GONZALEZ:  Yes, sir.

16       THE COURT:  Defense?

17       MR. BEUKE:  Yes, sir.

18       THE COURT:  All right.  Let's bring back

19   the jury.

20       THE SHERIFF:  All rise for the jury.

21                    (WHEREUPON, the jurors entered

22                    the courtroom.)

23       THE COURT:  Folks, you may be seated.

24   People wish to make a final closing argument?

                    TTT-104

1          MS. GONZALEZ:  Yes, sir, thank you.

2              Ladies and gentlemen, I just want to

3     bring you back to Courtroom 110.  Because I

4     don't know if the defense just sat through the

5     same trial that you sat through.  What evidence

6     have you heard that Jeanie Kustok shot herself?

7     What evidence have you heard that anyone other

8     than the defendant stood over her and pulled

9     that trigger firing that bullet into her skull?

10         MR. BEUKE:  Objection.

11         THE COURT:  Overruled.

12         MS. GONZALEZ:  Surely the defense is not

13    asking you to think, is not asking you to

14    believe that Jeanie Kustok pointed a gun at her

15    face, inches from her face and tried to uncock

16    it?

17             Surely the defense is not asking you

18    to believe that Jeanie Kustok was somehow trying

19    to put the gun back on the night stand, the gun

20    pointed at her face, inches from her face with

21    her thumb on the trigger, a gun that she doesn't

22    know how to fire or load, a .357-Magnum?  Surely

23    that's not what you are being asked to believe.

24             As my partner points out, the

TTT-105

1  defendant -- as my partner pointed out, he

2  pointed at the defendant -- as the defense

3  pointed out, my partner points at the defendant

4  a lot and he raised his voice.  But you know

5  why?  It's because the defendant murdered Jeanie

6  Kustok.  It's a passionate case.  A 58-year old

7  woman has been killed.

8          And today we had the tears from the

9  defendant, not the last three weeks of the

10  trial, today his tears, not for Jeanie Kustok

11  but for himself.

12          MR. BEUKE:  Objection.

13          THE COURT:  Overruled.

14          MS. GONZALEZ:  For himself, because he

15  faces you in that chair right now.

16          And ladies and gentlemen, you know

17  exactly who shot Jeanie Kustok, the person

18  wearing that gray T-shirt, the shorts, the

19  glasses, the person that was standing on that

20  piece of carpet to Jeanie's left-hand side, the

21  person on the other side of those pillows to

22  Jeanie's left-hand side.  This is not a who done

23  it.  The defendant was the one who was wearing

24  that T-shirt.

TTT-106

1  signs of forced entry.  Is there some crazed

2  killer on the loose that we need to be out there

3  looking for.  He doesn't see any signs of forced

4  entry.

5           He starts looking in windows, could

6  there be other people inside that need medical

7  attention.  He doesn't see anything.  And

8  quickly this case comes down to either Jeanie

9  Kustok shot herself or the defendant shot her.

10 It's only one of two.

11          This is good police work, ladies and

12 gentlemen.  And you know what, let's talk about

13 Rod Englert.  You bet you, we paid him over

14 $100,000.  The guy with over 50 years of --

15          MR. BEUKE:  Objection.

16          THE COURT:  Overruled.

17          MR. BEUKE:  Over $150,000.

18          THE COURT:  Overruled.

19          MS. GONZALEZ:  We paid over $150,000 to

20 bring you the guy that has over 50 years of

21 experience in bloodstain pattern and crime scene

22 reconstruction.  We want the guy who says I

23 don't need a pristine crime scene to be able to

24 read the clues and piece it all together and

TTT-116

1    tell you what happened.  This is not a lab.

2    This is someone's real life.  This is not a

3    classroom.  That is a real bullet that has went

4    into a women's head and killed her.

5              No one testified in this case who has

6    the experience that Rod Englert has.  And the

7    defendant doesn't get a pass just because he

8    choose to commit this crime behind closed doors

9    with no witnesses present.  He doesn't get a

10   pass.  If we have to pay the best guy in the

11   country $150,000 to tell you what happened to

12   Jeanie Kustok then you bet you we are going to

13   do it.

14        MR. BEUKE:  Objection.

15        THE COURT:  Overruled.

16        MS. GONZALEZ:  The defense expert -- you

17   know why he is the best guy?  Because the

18   defense experts don't even bother to look at

19   every piece of evidence.

20             Rod Englert looked at everything.

21   How do you know you are seeing the full picture

22   if you don't even look at everything there is?

23   Isn't that bias at it's most basic form?  You

24   are an expert and you don't look at everything?

TTT-117

1          And if Paul Kish is an expert at

2    recognizing bloodstain patterns, why can't he

3    just look at the characteristics of it, wherever

4    it is and tell us if it's high velocity impact

5    spatter or if it's transfer?  He says that the

6    pinpoint size dots on the T-shirt are

7    transferred.

8          Yet why can't he look at the blood

9    that flaked off the glasses into the envelope?

10   If he says that it was transfer onto the shirt,

11   why can't he look at the flakes that are in the

12   envelope and say this has transfer pattern to it

13   as well.  He doesn't because he doesn't want to

14   look at all the evidence.

15        MR. BEUKE:  Objection.  He testified to

16   all that.

17        THE COURT:  Overruled.

18        MS. GONZALEZ:  Paul Kish told you on his

19   direct examination that high velocity impact

20   spatter is found relatively infrequently.  Those

21   were his words.  It wasn't until my partner

22   pointed out that in his text book he says with

23   suicide victims high velocity impact spatter is

24   detected with the naked eye in 32 percent of

TTT-118

1      cases.

2              Paul Kish responded to my partner,

3      well, that's not my experience.  What

4      experience?  His experience in the classroom?

5      Why aren't his findings in his book?  That's

6      just the reality, ladies and gentlemen.

7              And 32 percent of the time, when the

8      victim commits suicide and I submit to you if

9      she is committing suicide or it's on accident

10     that the victim's hand will be on the gun.

11     32 percent of the time that blow back or high

12     velocity impact spatter is on the victim's

13     hands.  It's not on Jeanie Kustok's hands.  Is

14     the defendant just so unlucky that coupled with

15     everything else in this case he just happened to

16     fall in this statistic?

17             You know, and the way I look at high

18     velocity impact spatter, I think of it as my

19     kids, they jump into a swimming pooling.  Their

20     body goes in, the water splashes out.  That

21     bullet goes in Jeanie Kustok's face, the blood

22     comes out.  It has to go somewhere.  Yet Paul

23     Kish wants to act like it doesn't exist.  It's

24     just not there.  Where does it go?  Absolutely

TTT-119

1    it comes back out.

2              By the way, defense is correct, they

3    have absolutely no burden on this case.  But

4    when they decide to put a case on for you, you

5    get to judge it the exact same way that you

6    judge ours.

7              What is the theory given to you of

8    how Jeanie Kustok shot herself?  You have been

9    given nothing.  She is trying to uncock the gun?

10   That came out through several of the questions.

11   Really?  Or she is trying to lay it back on the

12   night stand, was that what I was trying to

13   understand?  You have been given no theory how

14   she shot herself.

15             While we are talking about Paul Kish,

16   he owes the defense back their money.  This is

17   the man who got up there and said you can't

18   really reconstruct outdoor crime scenes because

19   too many things have changed, there is too many

20   variables with that.  Well, what he should have

21   said is that he can't reconstruct an outdoor

22   crime scene because he doesn't have the

23   experience.  He doesn't know how --

24             MR. BEUKE:  Objection.

TTT-120

1          THE COURT:  Overruled.

2          MS. GONZALEZ:  He doesn't know how to

3     read the clues.  He doesn't know how to read the

4     evidence.  That's what he should have said.  He

5     refused to even try in this case.  There is

6     blood all over the place in this case.  There is

7     blood on almost every piece of evidence that we

8     have down here in this courtroom.  He refused.

9              Read the patterns, Mr. Kish.  Follow

10    the evidence.  Tell us something.  He told you

11    nothing.  He actually conceded at one point that

12    my partner could figure out how to put that

13    mattress back on the bed, how to orient it right

14    and how to put the mattress pad cover back on

15    and the sheet on top of that.  He said even my

16    partner could do that.  Yet he was unwilling to

17    do that.

18              He's the expert here.  He doesn't

19    want to look at the evidence.  He picks and

20    chooses what he wants to show you or talk to you

21    about.  And we heard over and over again how the

22    evidence in this case was somehow comprised or

23    tampered with.  The pillows that were stacked on

24    the floor and that were stacked on top of each

TTT-121

1    STATE OF ILLINOIS     )

2                          ) SS:

3    COUNTY OF C O O K     )

4

5      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

6         COUNTY DEPARTMENT-CRIMINAL DIVISION

7

8             I, Barbara A. Evans, C.S.R., an

9    Official Court Reporter in the Circuit Court of

10   Cook County, County Department, Criminal

11   Division, do hereby certify that I reported in

12   shorthand the proceedings had at the hearing of

13   the aforementioned cause; that I thereafter

14   caused the foregoing to be transcribed, which I

15   hereby certify to be a true and accurate

16   transcript taken to the best of my ability of

17   the proceedings.

18

19

20   _____

                   Official Court Reporter

21

22   Dated February 26, 2015

23   CSR# 084-002722

24

                    TTT-174

SUP R 1040

STATE OF ILLINOIS   )
                    )   SS:
COUNTY OF C O O K   )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) |
| Plaintiff, | ) ) |
| VS. | ) No. 10 CR 19174 ) Charge: Murder |
| ALLAN KUSTOK, | ) ) ) |
| Defendant. | ) |

REPORT OF PROCEEDINGS HAD at the hearing of the above-entitled cause, before the Honorable JOHN J. HYNES, one of the Judges of said Division, on the 22nd day of May, 2014.

PRESENT:

      HON. ANITA M. ALVAREZ,
      STATE'S ATTORNEY OF COOK COUNTY, by
      MDMS. JENNIFER H. GONZALEZ & LORNA T. AMADO-CHEVLIN,
      MR. JAMES J. PAPA,
      Assistant State's Attorneys,
          Appeared on behalf of the People;

      MESSRS. RICHARD M. BEUKE & STEVEN C. REUCKERT,
          Appeared on behalf of the Defendant.

Charles T. Coleman
Official Court Reporter
Circuit Court of Cook County, Illinois
Criminal Division

SUP R 1047

1    THE CLERK:  Allan Kustok.

2    MR. BEUKE:  Good morning, judge.

3         For the record, Rick Beuke and Randy Rueckert.

4 We are here on behalf of Mr. Kustok.

5    MS. GONZALEZ:  Jennifer Gonzalez, Jim Papa, and Lorna

6 Amado-Chevlin on behalf of the State.

7    THE COURT:  All right.  This is up for post-trial motions

8 here and I believe sentencing.  Defense filed several motions.

9 Are we ready to proceed on any of those?

10    MR. BEUKE:  It's actually not up for post-trial motions

11 and sentencing today, judge.  We set that for the 29th.

12    THE COURT:  Okay.

13    MR. BEUKE:  Today it was up for your Honor's decision on

14 whether or not you are were going to allow us to have the

15 pillowcase tested prior to us proceeding on the motion for new

16 trial.

17    THE COURT:  Right.  That was one of the post-trial motions

18 that I was talking about.  All right.

19    MS. GONZALEZ:  If I can real quick.

20    THE COURT:  Go ahead.

21    MS. GONZALEZ:  With regard to that motion for the testing,

22 I think that will have to be done before we address the other

23 things.

24    THE COURT:  All right.  That's fine.

1    MS. GONZALEZ: And the State, we were able to tell

2  Mr. Beuke that we are not going to object to the testing that

3  they want done on the pillowcase. And additionally, the State

4  would like to have that testing done at the Illinois State

5  Crime Lab, and we asked Mr. Beuke if he wants to have his

6  expert present for that. We need to have a copy of his CV so

7  the lab could arrange for testing to done with his expert

8  present.

9         And one final thing. The particular test -- I'm

10  sorry. I can't spell this, but the particular test that the

11  defense asked to be done to the pillowcase is a Sodium

12  Rhodizonate Test, and the State is -- and the court sat through

13  the whole trial. You've seen the pictures. We dealing with a

14  pretty small, dark, spotted area.

15         I told counsel today I would like ask the crime

16  lab to take a very small cutting out of that portion to test

17  for blood and then the remainder of that will be tested for the

18  Sodium Rhodizonate.

19    THE COURT: All right.

20         And if Mr. Beuke's spelling is right on this,

21  Rhodizonate would be R-H-O-D-I-Z-O-N-A-T-E.

22    MR. BEUKE: I did win the 3rd Grade Spelling Bee, judge.

23    THE COURT: You better check those records.

24         In any event, so there is no -- this is just by

SUP R 1049

1    agreement.  We don't have to rule on a motion then, correct?

2        MR. BEUKE:  Just so it's clear, Miss Gonzalez told me this

3    about an hour ago.  So I do not have -- our expert is the one

4    who actually we would like to do the test.  Certainly we are in

5    agreement that it could be done at the Illinois State Police

6    Crime Lab.  Their expert can be present if they want him to be.

7    I don't have any objection to this cutting being done, but it's

8    actually our expert that we requested to do the test.

9            Now I think you remember, judge, our expert is

10   from Oregon.

11       THE COURT:  I thought you had a local expert.

12       MR. BEUKE:  I do have names, judge, but I haven't

13   contacted anybody or retained anybody and we may want to get

14   the gentleman from Oregon who testified at the trial to come in

15   and do it.  Since I learned about it an hour ago, your Honor, I

16   am not in the position to say I can get him here on Monday or

17   Tuesday, but I'd like to try to get if somebody locally who is

18   just as competent perhaps we can use somebody locally and get

19   this done and get the results both to the State and us.

20       MS. GONZALEZ:  Just really quick.  The crime lab is not

21   going to allow their facilities to be used to watch another

22   expert do the testing.  The crime lab analysts that work there

23   and work under the protocol and procedures that are done there

24   are one the ones that would do the testing and defense

SUP R 1050

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT-CRIMINAL DIVISION

I, CHARLES T. COLEMAN, an Official Court Reporter in the Circuit Court of Cook County, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had at the hearing of the aforementioned cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be a true and accurate transcript taken to the best of my ability of the proceedings had before the Honorable JOHN J. HYNES, Judge of said Court.

_____
Official Court Reporter

Dated March 16, 2015
CSR# 084-003101

SUP R 1054

STATE OF ILLINOIS   )
                    )  SS:
COUNTY OF C O O K   )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE           )
STATE OF ILLINOIS,          )
                            )
        Plaintiff,          )
                            )  No.  10 CR 19174
             VS.            )  Charge:  Murder
                            )
ALLAN KUSTOK,               )
                            )
        Defendant.          )

REPORT OF PROCEEDINGS HAD at the hearing of the
above-entitled cause, before the Honorable JOHN J. HYNES; one
of the Judges of said Division, on the 20th day of November,
2014.

PRESENT:

        HON. ANITA M. ALVAREZ,
        STATE'S ATTORNEY OF COOK COUNTY, by
        MDMS. JENNIFER H. GONZALEZ & LORNA T. AMADO-CHEVLIN,
        MR. JAMES J. PAPA,
        Assistant State's Attorneys,
            Appeared on behalf of the People;


        MESSRS. RICHARD M. BEUKE & TIMOTHY M. BLACK,
        MS. LAURA J. MORASK,
            Appeared on behalf of the Defendant.


Charles T. Coleman
Official Court Reporter
Circuit Court of Cook County, Illinois
Criminal Division

1    We are going to ask that he be excluded.

2         THE COURT:  All right, detective.  Motion to exclude will

3    be granted as to both sides.

4         MR. BEUKE:  Our first witness will be Miss Fundell.

5              I don't know if you want me to put her on the

6    stand now.

7         THE COURT:  Are you ready, State?  All right.  Let's call

8    her as your first witness.

9              Come on to the top ledge, raise your right hand

10   to be sworn.

11                    (Witness duly sworn)

12        THE COURT:  Have a seat there.  The microphone should be

13   on.

14                    NICOLE FUNDELL,

15   called as a witness on behalf of the People of the State of

16   Illinois, having been first duly sworn, was examined and

17   testified as follows:

18                    DIRECT EXAMINATION

19                         BY

20                    MS. MORASK

21   BY MS. MORASK:

22        Q    Good afternoon, ma'am.  Could you tell us your full

23   name and spell your last name for the court reporter?

24        A    Nicole Fundell.  F-U-N-D-E-L-L.

FFFF-5

SUP R 1096

1     Q     And what is your occupation or profession?

2     A     I am a forensic scientist specializing in firearm and

3   tool mark examinations.

4     Q     How long have you been so employed?

5     A     Since April 2001.

6     Q     And are you currently assigned to the -- or working

7   at the Illinois State Police Joliet Crime Laboratory?

8     A     That is correct.

9     MS. MORASK:  Judge, at this time, there would be a

10  stipulation between the parties, that being the defendant,

11  Allan Kustok, through his attorneys, Richard Beuke, Laura

12  Morask, Tim Black; and the State's Attorneys, through their

13  attorneys, Jennifer Gonzalez, Jim Papa, and Lorna

14  Amado-Chevlin, than Nicole Fundell is an expert qualified in

15  the area of examination of evidence pertaining to firearm, tool

16  mark, physical match, footwear, tire tracks, reporting results,

17  conclusions, and testifying in court.  So stipulated?

18     MS. GONZALEZ:  So stipulated.

19  BY MS. MORASK:

20     Q     Ma'am, can you tell his Honor Judge Hynes how many

21  times you have been qualified and testified in court as an

22  expert?

23     A     Between 45 and 50 times.

24     Q     And pertaining to the reason you are here today, were

FFFF-6

SUP R 1097

1  you originally involved in the People of the State of Illinois

2  versus Allan Kustok?

3      A    No, I was not.

4      Q    I want to direct your attention to -- let me just ask

5  you when did you become involved?

6      A    May or June of 2013.

7      Q    Okay.  And did you receive --

8      A    2014.  I'm sorry.

9      Q    Did you receive an order to -- or request to test an

10  item of evidence in respect to the case of People versus Allan

11  Kustok?

12      A    Yes, I was.

13      Q    And was that testing done on June 17th?

14      A    Yes, it was.

15      Q    And this pillowcase that you received, can you tell

16  us -- and you may refer to your notes if you need to do so.

17          Can you tell us what exhibit this pillow case

18  was?

19      A    This was our laboratory exhibit number 26.

20      Q    And was there other markings that had other exhibit

21  numbers or is that the exhibit number you worked off?  It's

22  fine if it's 26.  I just wasn't sure because we had so many

23  numbers.

24      A    Just according to the evidence received, it would

SUP R 1098

1  have been agency's exhibit number 7, but I worked on it solely

2  as our laboratory exhibit number 26.

3      Q    And with respect to this pillow case, what were you

4  asked to do?

5      A    I was asked to perform a Sodium Rhodizonate Test on

6  the pillow case for the presence of lead or soot.

7      Q    I'd like to talk about that test for a minute.

8           Are you familiar with that test?

9      A    Yes, I am.

10      Q    And how are you familiar with?

11      A    I was trained in gunshot range determination through

12  my training with the Illinois State Police, and this is a

13  chemical procedure that I was trained in to do in reference to

14  distance determinations.

15      Q    And is it a test that is commonly used and accepted

16  in the scientific field in order to determine whether or not

17  there are cylinder gap gases or soot deposits on an item of

18  evidence after a shooting?

19      A    The Sodium Rhodizonate Test is designed to detect the

20  presence of lead or vaporous lead.  It is true that gases from

21  the cylinder or the muzzle would have vaporous lead present in

22  them.

23           So yes, this test could indicate whether or not

24  there was a cylinder gap present.

SUP R 1099

1    Q    And with respect to determining whether or not a

2  certain item of evidence has lead on it, can that

3  scientifically ever be done just visually?

4    A    It would not be a definitive result by -- you can

5  look at an item and say that the item has what appears to be a

6  grayish deposit, which would then lead to believe that that's

7  possible soot, but it wouldn't be concluded until a Sodium

8  Rhodizonate Test was conducted.

9    Q    So it's fair to say that's the standard test in the

10  field?

11    A    That is correct.

12    Q    How long does the Sodium Rhodizonate Test take

13  physically?

14    A    To actually apply the chemicals, it doesn't take very

15  long.  It just takes an hour or two to make up the chemicals,

16  and then the testing is pretty quick.

17    Q    Is that what you tested this pillowcase for?

18    A    Yes.

19    Q    And do you have an exhibit number -- I am going to

20  reference in your exhibit number -- let me show you what I am

21  marking Defendant's Post-Trial Motion Exhibit 1.  I believe the

22  judge and everybody else has a copy.

23         Is this your June 19th report that you reported

24  out those results?

SUP R 1100

```
 1       A    Yes, it is.

 2       Q    And you also have a copy?

 3       A    That is correct.

 4       Q    Now turning your attention to I believe it is exhibit

 5  or page 31 on that.

 6            Did you -- when you looked at this pillow case

 7  for lead -- I'm sorry.  Is it 31, Miss Fundell?

 8       A    Yes, it is.

 9       MS. MORASK:  I'm sorry, judge.  Did you say you do have a

10  copy?

11       THE COURT:  I have a copy.  I didn't print out everything,

12  but I think I have the pertinent stuff.  If I don't have it, I

13  will let you know.

14  BY MS. MORASK:

15       Q    And can you tell his Honor what page number 31 shows?

16       MS. GONZALEZ:  Judge, I have full copies if you'd like

17  them.  I made extra copies.

18       THE COURT:  All right.  I will take an extra copy.

19       MR. BEUKE:  Maybe we can label it as Group Exhibit

20  Number 1.

21       THE COURT:  That's fine.

22  BY MS. MORASK:

23       Q    This was the pillow case in question, correct?

24       A    That is correct.
```

SUP R 1101

1    On page 31, the top picture indicates the pillow

2 case in question, this is after I have cut the pillow case

3 along the bottom seam, the side seams that I could lay the

4 pillow case flat. And this is prior to any chemicals being

5 applied to the pillow case.

6    The area within the circle is the area that is

7 in question.

8    Q    Okay. And can you tell us how you determined the

9 area in question?

10    A    When I was originally court ordered to perform the

11 Sodium Rhodizonate Test, I received some pictures that

12 indicated what area on the pillow that was in question.

13    So using those pillows and what was being

14 indicated, that's the area that I tested.

15    Q    Okay. And the bottom picture on page 31, what does

16 that show?

17    A    The bottom picture shows the testing of the pillow

18 case, and that there was positive results for the presence of

19 lead.

20    So this picture is indicating the pillow case

21 after the Sodium Rhodizonate has been applied.

22    Q    Okay. So let's talk about the picture, 31, at the

23 bottom, and tell us -- tell first of all your Honor how many

24 areas of this pillow case had lead deposits?

SUP R 1102

1     A     On the pillow case, I saw three separate areas that

2  had a positive result for the presence of lead.

3     Q     And were they significant to you?

4     A     What do you mean by significant?

5     Q     Was it significant -- were two of them -- let me

6  rephrase that.

7               What conclusions did you reach from seeing

8  those?  What did you do next?

9     A     In regards to the three areas that reacted

10 positively, I had one area that -- and it's the middle one --

11 had a higher concentration of purple color.

12               Diagonally off to the right was a faint purple

13 cloud, and then slightly off to the left was a real faint

14 purple color.

15    Q     Okay.  So let's talk about the heavy concentration.

16 When sodium rhodizonate reacts with lead, does it turn purple?

17    A     That is correct.

18    Q     And the darker the area, the more lead there is?

19    A     Usually, yes.  Correct.

20    Q     And did you determine that dark area to be consistent

21 with what is commonly known as cylinder gap gases, and if you

22 did, how did you do that?

23    A     By looking at the positive results, it did appear to

24 be what would be considered a cylinder gap.  I was using it in

SUP R 1103

1    conjunction with the faint cloud using those two together.

2                That concentrated area would be what would be

3    from the cylinder gap, and then it puts like a muzzle at the

4    other end.  So using that high concentration would be where the

5    gases from the cylinder would have escaped.

6        Q    So we are all clear that we are referring to a

7    revolver, right?

8        A    Correct.

9        Q    And when you say cylinder gap, just briefly explain

10   what a cylinder gap gas is and how you get it?

11       A    Okay.  On a revolver, the cartridges are loaded into

12   the cylinder.  And when the cylinder is locked into the frame

13   of the revolver, there is a small gap between the cylinder and

14   the barrel.

15               So when you fire the revolver, the bullet

16   actually jumps from the cylinder into the barrel and there is a

17   little bit of a gap and that's where the gases that are

18   expelling the bullet will escape from.

19       Q    And then you said there is a cloud area where a

20   muzzle would be?

21       A    Correct.

22       Q    What is that phenomenon?

23       A    That once the -- because the gases is what is used to

24   propel the bullet down the barrel.

SUP R 1104

1          Once the barrel leaves the bullet -- or once the
2  bullet leaves the barrel, there is gases behind it and that's
3  what is escaping and leaving the muzzle cloud.

4          Q    Okay.  And so now you found the these deposits of
5  lead in three areas, right?

6          A    Correct.

7          Q    With respect to the concentrated area, what was the
8  measurement of that area?

9          A    That measured -- and I am going to refer to page 32.
10 That dimension was approximately two inches and 4/16 by 8/16 of
11 an inch.

12         Q    What was the dimension of the cloud area?

13         A    The cloud was approximately two inches by 14/16
14 inches.

15         Q    Then you said that there was a third area that was
16 fainter, I believe?

17         A    That is correct.

18         Q    Okay.  What was the dimensions of that?

19         A    Because it was so faint, I did get a measurement.  It
20 was 14/16 by 8/16.

21         Q    Let me ask you, Miss Fundell.  Was there -- when you
22 did this test and you saw this pattern, was it significant or
23 surprising to you?

24         A    Can you rephrase that?

FFFF-14

SUP R 1105

1    Q    Well, did it have some significance?  Did it cause

2   you to do anything else?

3    A    Once I determined that there was the presence of lead

4   there that it appeared to show up in a pattern that it looked

5   like a cylinder gap and a muzzle flash, it led me -- how far

6   was the firearm at the time that that pattern was deposited on

7   the pillow case.

8    Q    Was that pattern unusual to you?  Had you seen a

9   pattern like that previously?

10   A    When I first visually examined the pillow case, I did

11  notice a small rectangular-shaped object, gray in color.  I had

12  not seen a soot pattern like that before where it was almost a

13  perfect rectangular.

14          So I wanted to see -- I grabbed a reference

15  collection firearm, a Smith & Wesson revolver, kind of similar

16  to the revolver in the case, and just did some test shots with

17  that to see if I could determine what part of that firearm,

18  when it was being discharged, if it would produce a rectangular

19  shape and what part of that revolver was producing it.  Just

20  for curiosity because I had never seen that before.

21   Q    And were you able to determine it at that point?

22   A    I kind of had an idea that it was coming from the

23  cylinder gap, but I didn't know exactly the distances yet.

24   Q    And as you said, how many examinations of this nature

SUP R 1106

1    did that lead reproduce on the -- both on the outside of the

2    pillow protector, the inside of the pillow protector, the

3    out -- let me start over.

4                Outside of the pillowcase, inside of the

5    pillowcase, pillow protector, and pillow?

6         A    Yes.

7         Q    All three?

8         A    Correct.

9         Q    Went through all those layers?

10        A    Correct.

11        Q    Okay.  Was that able to be done at four?

12        A    No.

13        Q    Okay.  And so the results that you obtained from

14   this, is it fair to say, Miss Fundell, that to a reasonable

15   degree of scientific certainty that the gun that you test

16   fired, which is the gun, was held at a 2- to 3-inch distance or

17   consistent with a 2- to 3-inch distance less than 3 -- between

18   2 and 3?

19        A    Well, my conclusion was that it was greater than

20   contact but less than six inches.  My testing showed that there

21   was no set pattern at four; however at three inches, it did

22   produce a pattern similar.

23                But within the field of training that I was

24   trained under, you do bracket the range.  So that's why I went

SUP R 1118

1    out --

2        Q    Can you briefly explain to his Honor what that means,

3    like why we are going to six if it showed basically less than

4    four?

5        A    When I did my preliminary testing on just the cotton

6    twill and I did 3, 6, 12, at six inches I didn't see anything.

7    At three inches, I did.

8              So I know that when I get to six inches, I am

9    not seeing any other pattern outside of six.  I know it had to

10   be less than six.

11             But at four inches was I holding it -- you know,

12   that barrel right at four inches?  Did I tip it down a little

13   bit?  Did I raise it up because it's measured, and then the

14   other examiner walks away, I pull the trigger.  So do I hold

15   the gun perfectly still at four inches?  You know, that's what

16   that bracket gives.  We weigh for is did the muzzle move at all

17   prior to me shooting it?

18             Plus there is other factors with the pillow

19   giving and raising and lowering and that, so that's why that

20   bracket is in there.

21             So we just know that at six inches there is

22   nothing, so it has to be less than six.  And it definitely did

23   not produce the same pattern at contact, so it has to be

24   greater than contact.  That's why I bracket it.

SUP R 1119

1   But his testimony was when he did the reconstruction in

2   October, he knew all about these glasses and everything had to

3   fit.

4           So for all those reasons, your Honor, I think

5   that it's not the defense fault, and it's certainly not the

6   defense that has injected Miss Stevenson well beyond a member

7   of the prosecution team.  And even if a prosecution team has

8   knowledge, and evidence that is exculpatory to a defendant,

9   whether they be a prosecutor or the DNA expert, it should be

10  given to the defense, and this is just such a case.

11          And for those reasons and because there is

12  absolutely no prejudice, what possible prejudice could there be

13  to turn that over?  Thank you.

14      THE COURT:  Thank you.  Go ahead.

15      MR. PAPA:  Judge, I mean no disrespect to Miss Morask, but

16  it appeared that her argument was in February of 2014 was the

17  first time that the defense became aware of this possible soot

18  on a pillow case and Mr. Englert's examination of that

19  evidence, and I know your Honor recalls the testimony in very

20  specific detail, but it was actually part of my

21  cross-examination of Mr. Kish when he was testifying regarding

22  Mr. Englert's April 2012 report, and then on page 82 of the

23  report, it says "Second examination of one item of evidence,"

24  and it's dated March 28th of 2012 and it shows that we all went

1  gun greater than contact less than six inches at discharge.

2      Q    And most consistent with three?

3      A    The examination I did at three inches did show

4  similar size and pattern than the evidence, correct.

5      Q    What I am asking you here is if you learned that that

6  pillow had been placed in a reconstruction under a pillow that

7  the victim was lying on when she was shot, is that a possibly

8  physical thing to have happened?

9      A    If I am understanding you right, it was the victim

10 and then there was a pillow underneath that victim, and then

11 there was this other pillow --

12     Q    Correct.

13     A    -- directly underneath it, so no part of that pillow

14 was exposed during the time of the firearm being discharged,

15 there would be no soot being deposited on it at the same time

16 that the shots being fired.

17     Q    Okay.  And similarly, all of your testing was done

18 with your hand or arm on this pillow; is that right?

19     A    Correct.

20     Q    Would you ever have been able to get the pattern that

21 is indisputably on the evidence pillow from standing at a

22 distance of four feet away from that pillow case?

23     A    Like I said in my results, that the firearm has to be

24 less than six inches from the pillow, but greater than contact

SUP R 1127

1  to O'Hare Airport.

2         It says, "On March 28, 2012, analyst Englert met

3  with the above listed individuals to reexamine Exhibit 7, a

4  white pillow case. This examination was based on a review of

5  the photographs where it appeared there was soot on the pillow

6  case."

7         I don't know how anybody could possibly stand up

8  here and say the first time that the defense became aware of a

9  particular piece of evidence was during the trial itself when a

10  report that Mr. Englert had generated was, in fact, signed by

11  Mr. Beuke on August 24, 2012, being in receipt of. He's also

12  in receipt of through signed evidence -- discovery receipts all

13  of the photographs that were ever in the State's possession,

14  through compact disks that were labeled A, B, C, D, E, F, G, H

15  and I. J, K, L, M, N, and O. All were in their possession at

16  least a year and a half or so before we ever went to trial.

17  All before they had I believe their experts testifying or

18  examining any pieces of evidence.

19         If you recall Mr. Kish's testimony, he said he

20  just didn't even remember looking or seeing this examination at

21  O'Hare by Mr. Englert. Mr. Kish never asked for any of the

22  particular -- or this particular piece of evidence, the pillow

23  case. He said he could have; he just didn't do it. Didn't

24  think it was important.

SUP R 1150

1   done out of the blue, like for a whim, that we wanted to

2   subject ourselves to testing we didn't know the answer to in

3   the middle of a trial.  We couldn't have sent that photo to our

4   expert because we didn't have it.

5           And so, we believe that her notes and her file

6   would be relevant to that.  Thank you.

7       THE COURT:  Thank you.

8           I've had an opportunity to review in detail the

9   motion.  I reviewed my notes.  I reviewed the evidence that was

10  presented.  I reviewed the testimony of various witnesses,

11  including Mr. Kish, the defense expert.

12          The defendant's reasoning here I think in their

13  motion around paragraph five, they allege and have continued to

14  allege the crux of their allegations here is that they received

15  these 400 pages of notes from the State expert, Rod Englert, on

16  February 10th, and nested within those is a notation Englert

17  received this e-mail from Miss Stefanson on March 22nd of 2012

18  containing a picture of the pillow case at issue, and voicing

19  her concern that the pillow case contained a lead deposit that

20  is an issue for the post-trial motion here.

21          Defendant cites this Exhibit 1 where they have

22  Rod Englert's billing notes there, but nowhere in those billing

23  notes does it say anything about Kara Stefanson being anywhere

24  involved in that.  But the defense then goes on to argue here

1   that the State had every opportunity to test the pillow case

2   before the trial, but declined to do so, and analyze it in part

3   because of Kara Stefanson's expertise.

4   Once again, as counsel has read that the

5   notations in that exhibit, the billing exhibit, nowhere does

6   her name come up in that exhibits, even if there is some

7   evidence that she sent the e-mail or that there is no

8   indication she did any analysis or in any way attempted to

9   interject her opinion into Englert's analysis.

10  Additionally, the defense makes certain

11  conclusions in their motion, specifically around paragraphs 12

12  through 15, and these are not backed up by the evidence that

13  was presented in this case.  These are pure speculation and the

14  defendant has proved any support to bolster their claims.

15  Under Supreme Court Rule 412, it states in

16  pertinent part under the subsection (j), which is entitled,

17  "Matters Not Subject to Disclosure," small "i" there, "Work

18  Product."  "Disclosure under this rule and Rule 413 shall not

19  be required of legal research or of records, correspondence,

20  reports, or memoranda to the extent that they contain the

21  opinions, theories, or conclusions of the State or members of

22  its legal or investigative staffs, or of defense counsel or his

23  staff."

24  Pursuant to the defense previous request, the

1   State had tendered all Miss Stefanson's notes and reports

2   pertaining to the case.  I have reviewed these notes again and

3   as I did when they were originally -- the defense original

4   request was made, and I find that there is nothing in these

5   notes to support the allegation that Miss Stefanson played a

6   role in the decision as to whether or not to test the stain on

7   the pillow case examined by Mr. Englert on March 28, 2012.  And

8   it goes for any of the other conclusions by any of the experts.

9           Furthermore, there is nothing in the notes to

10  support defendant's broader allegations in the motions.  It's

11  clear that Miss Stefanson's role was to assist the attorneys in

12  understanding the scientific evidence.  As such, her notes are

13  work product and not subject to disclosure under Supreme Court

14  Rule 412 (j)(i).  This situation is analogous to what happens

15  all the time by its civil law firms.  Most of these civil law

16  firms have on staff doctors, nurses, engineers, et cetera who

17  help lawyers evaluate and understand evidence, and help the

18  lawyers in determining what testing needs to be done.  Their

19  opinions, theories, and conclusions are work product and not

20  subject to disclosure.

21          But I want to also address this broader premise

22  that the defense rest their claims in the motion on for new

23  trial and for this motion here.  The defense claims that the

24  State did not identify the photo of the pillow case that

1  Mr. Englert looked at on March 28, 2012, until right before

2  Englert testified.  They have argued here that until they saw

3  the photo, they had no reason to believe the pillow case, which

4  I think was People's Exhibit 36, contains soot.  Consequently,

5  that the court here erred by not allowing the testing to be

6  done mid-trial.  These allegations are just not supported by

7  the evidence and the testimony in the trial.

8            During the direct examination of Paul Kish, who

9  indicated that he was hired by the defense on May 11, 2012, and

10  he received various items from the defense on May 22, 2012.

11  Included in these documents was Englert's report dated

12  April 10, 2012.  This report included Englert's examination of

13  the pillow on March 28, 2012.  And the report as Mr. Papa has

14  indicated, analyst Englert determined it was thought to be soot

15  and the photograph was actually a blood clot on the pillow case

16  within that report.

17            On direct examination, Mr. Kish was shown the

18  photos of the pillow in question.  He indicated that they

19  visually looked like black deposition and not bloodstain.  That

20  the black deposition is consistent with cylinder gap gases.  He

21  further opined that the black deposition should have been

22  tested for cylinder gap gases, such as Sodium Rhodizonate Test.

23            On cross-examination, Mr. Kish admitted that he

24  was given access to all the evidence in the case on

SUP R 1157

November 15, 2012.  He admitted that he would have been allowed

to see any piece of evidence he requested.  He also admitted

that he read Englert's report before examining the evidence on

November 15th, and that the report included, it included

Englert's findings on March 28th.

He also admitted that he never asked to see the

pillow case in question despite the potential significance of

the soot on the pillowcase.  He admitted he didn't recall the

March 28th examination and Englert's report despite the fact

that he reviewed the report and made notes on the report.

It is clear to me in this case, that the defense

had ample opportunity and ample notice that there was a

question regarding the soot on the pillow case.  Defense had

Englert's report, final report, shortly after April 10, 2012.

But even after being reviewed by the expert, chose to do

nothing regarding that.  Defense expert Paul Kish had his

report on May 22, 2012.  He took notes on that report, but

failed to make any further inquiry regarding the pillow case

until he was shown a photo mid-trial.  Kish was given full

access to all the evidence, including the pillow case on

November 15, 2012, despite the potential significance he did

not ask to see the pillow case in question.

The defense claims that they did not know the

potential soot on the pillow case until they were shown the

SUP R 1159

1  photo of the pillow is disingenuous.  This is not the State's

2  fault.  There is no discovery violation.  Similarly, this is

3  not the court's fault for not allowing the test to be done in

4  mid-trial.  I asked the parties for case law.  I asked the

5  parties.  I gave the parties ample opportunity to present any

6  case law that would allow testing in mid-trial, and I did not

7  receive any case law to that effect.

8          The defense was on notice that the potential

9  evidence existed since April 12th -- since April of 2012, more

10  than a year and a half prior to trial.  Whether it was

11  Mr. Kish's inadvertence as he kind of testified to, or some

12  other reason, the defense chose not to do anything about it.

13  They had the ability and opportunity to inquire further and to

14  request that the pillow case be tested, but they did not.  That

15  is why we had to test at this stage in the proceedings.

16          For all those reasons, the defense supplemental

17  motion to compel disclosure is denied.

18      MR. BEUKE:  Thank you.

19      THE COURT:  All right.

20          Now on December 4th, we will have Mr. Noedel's

21  testimony, and I would like to proceed to argue the

22  significance or are you going to have any rebuttal testimony?

23      MS. GONZALEZ:  We don't anticipate that.

24      THE COURT:  I'd like to argue this evidence then on that

FFFF-68

STATE OF ILLINOIS  )
                      ) SS:
COUNTY OF C O O K  )

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT-CRIMINAL DIVISION

    I, CHARLES T. COLEMAN, an Official Court Reporter in the

Circuit Court of Cook County, County Department, Criminal

Division, do hereby certify that I reported in shorthand the

proceedings had at the hearing of the aforementioned cause;

that I thereafter caused the foregoing to be transcribed, which

I hereby certify to be a true and accurate transcript taken to

the best of my ability of the proceedings had before the

Honorable JOHN J. HYNES, Judge of said Court.

 

_____
Official Court Reporter

Dated March 16, 2015
CSR# 084-003101

```
1    STATE OF ILLINOIS )
                       )  SS
2    COUNTY OF COOK    )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
        MUNICIPAL DEPARTMENT-FIFTH MUNICIPAL DISTRICT
4

5    THE PEOPLE OF THE )
     STATE OF ILLINOIS,)
6          Plaintiff,)
                       )
7       vs.           )    No. 10-CR-19174
                       )
8    ALLAN KUSTOK,     )    Jury Trial
           Defendant.)    Morning Session
9

10            REPORT OF PROCEEDINGS had at the hearing

11   of the above-entitled cause, before the Honorable

12   JOHN JOSEPH HYNES, one of the Judges of said

13   District, on the 7th day of March, 2014.

14
              APPEARANCES:
15               HON. ANITA M. ALVAREZ,
                    Cook County State's Attorney, by:
16               MS. LORNA AMADO-CHEVLIN, MR. JAMES PAPA,
                 MS. JENNIFER GONZALEZ,
17                  Assistant State's Attorneys,
                    on behalf of the Plaintiff;
18
                 MR. RICK BEUKE,
19               MR. STEVEN RUECKERT,
                 MS. LAURA MORASK,
20               MR. TIM BLACK,
                    on behalf of the Defendant.
21
     Elizabeth A. Proietti
22   CSR #084-002544
     10220 S. 76th Avenue
23   Bridgeview, IL   60455

24
```

SUP R 2319

```
 1                         (Whereupon, the following

 2                         proceedings were had in the

 3                         presence and hearing of the

 4                         Jury:)

 5        THE COURT:  Good morning, everyone.  Have a

 6   seat.

 7        THE JURORS:  Good morning.

 8        THE COURT:  All right, I think, uh, both sides

 9   are ready to proceed.  So, defense, if you want to

10   continue on with your questioning of Mr. Kish?

11        MS. MORASK:  Thank you, your Honor.

12                         (Witness previously sworn.)

13                    PAUL KISH,

14   Called as a witness on behalf of the Defense

15   herein, having been previously duly sworn, was

16   examined and testified as follows:

17             CONTINUED DIRECT EXAMINATION

18                         BY

19                    MS. MORASK:

20        Q    Good morning, Mr. Kish.

21        A    Good morning.

22        Q    We left off yesterday with the T-shirt.  I

23   want to go back, um, for a little while.  You had

24   testified previously that you had reviewed some
```

PPP-5

1          This particular eyeglasses, when I

2   examined them, this is a photograph, an overall

3   photograph of the glasses when I examined them, I

4   didn't identify any bloodstains on the particular

5   glasses at -- at my time of examination.  I

6   identified, um, what appeared to be water-like

7   spatter stains or some kind of a clear translucent

8   type staining, whether it was blood or some other

9   substance.  It wasn't blood like, that were on the

10  particular glasses, they were just kind of dirty.

11       Q    Okay.

12       A    Um, with this kind of translucent

13  coloration.

14       Q    Did you eventually, in this case, receive

15  some data and information from McCrone Lab?

16       A    Yes.

17       Q    And did you also receive some information

18  and data from LabCorp, a DNA analysis?

19       A    Yes.

20       Q    All right.  And did you learn that these --

21  that an examination of the glasses had taken place at

22  McCrone Lab?

23       A    Yes.

24       Q    And that the dot -- that some dots on these

PPP-51

1    glasses, that were in a white envelope, were

2    transient, did you learn that?

3        A    Yes.

4        Q    So, having learned that and doing your

5    visual examination, what significance does that have

6    to you?  Does it have any evidentiary value once

7    you've heard or learned that item of evidence is

8    transient?

9        A    It has no bloodstain pattern analysis

10   value.

11       Q    And why?

12       A    In this particular case, these

13   transient -- let me define this so we're clear on

14   that.  It means they're not adhering.  They're --

15   they're moveable.  They're moveable particular

16   items, you know, small fragments of -- of red brown

17   substance.  Okay, they're moveable.  Some were

18   located in -- and these -- where it's actually

19   taken out of the evidence container within that

20   particular area.  The issue is, there's no way to

21   determine, when we know there's transient pieces

22   like that, there's no way to determine where those

23   particular items were on the glasses, if they were

24   on the glasses.  All we know is they're transient

PPP-52

1    pieces of debris that's in the bottom of the

2    glasses -- not in the bottom of glasses, in the

3    bottom of the envelope in which the glasses were --

4    were located.  I need to visually see the pattern.

5    I need to see -- be able to see the -- the physical

6    characteristics and the pattern, you know, through

7    photomicrographs or through something where I can

8    see the distribution of stains.  With -- with this,

9    it -- it's just too variable.

10            You know, and here's an issue with it.

11   If I had the ability to look at flecks of blood, in

12   other words, small fragments, like in this case,

13   from the envelope, with that particular issue, and

14   be able to tell you -- and I knew that the -- and I

15   knew it was a shooting case, and I knew this

16   particular person was wearing it, and they scraped

17   something off and these flecks came to my lab, I'd

18   be like, flecks of blood.  Flecks of red --

19   actually flecks of red brown substance.  That's all

20   I'd be able to tell you.  There's no bloodstain

21   pattern analysis.  There's no pattern.  You just

22   have -- there's no scientific validity to determine

23   how a -- these transient pieces were ever deposited

24   on the particular items they were deposited on, or,

SUP R 2370

1   for me, in this case, to be able to tell you with

2   certainty the exact item they came off from.

3               An example being, these transient

4   pieces of -- of blood that were identified in this

5   particular place on the glasses as well as in the

6   envelope, could have -- could have simply come from

7   glasses -- from another blood source, they're

8   transient, they're already dried small fragment

9   pieces, end up on the glasses, end up into the

10  envelope.  Or maybe they were in the -- as part of

11  the handling issue, the small transient fragments

12  pieces get into the envelope.  There's a multitude

13  of answers.  That's why, basically, I don't know of

14  a State run laboratory that will test transient

15  pieces of evidence in the bottom of a bag for DNA

16  because they don't know where it came from.

17              In my classes, one of the more -- one

18  of the ones that we see this on, plastic bags.

19  Like your trash bags or your bags you get from the

20  shop -- from Walmart, from a shopping store type

21  issue.  When blood gets on those particular bags,

22  they're not wet able and the blood pops right off.

23  So I teach my students, because of that surface

24  texture characteristic, that you want to make sure

PPP-54

1    you take really good photographs of those,

2    immediately, and you also need to take a sample off

3    from it immediately because when the lab gets it,

4    if there was stuff on it, chances are, these chunks

5    of blood may -- may well be in the bottom of the

6    bag, and they won't test it, because we know that

7    with plastic.

8              So let's step back on the glass, for an

9    example.  Glass is not like those plastic bags.

10    Blood adheres excessively well to glass.  Many of

11    you that -- that -- if you wear glasses, you

12    realize you get something on it, you've got to

13    scrub to get it off when there are small specks of

14    material gets on particular glasses.  I know it

15    from working in a lab setting, when we teach

16    bloodstain pattern analysis, when a -- when the

17    students get spatter stains, and we use glass

18    plates because there's a uniform smooth surface,

19    they get spatter stains on that glass issue, you

20    know, tiny ones, it's almost to the point of, if

21    they let `em dry completely, you have two chances

22    of getting it off.  One, you put it in the bucket

23    of water with cleanser and let it just soak for a

24    while to come off, or you take a razor blade to pop

SUP R 2372

1    them off.  The smaller the stains are on the glass,

2    the better they adhere.  It's just -- it's just a

3    fact.  The better they adhere from my experience

4    with working with a lot of glass.

5         Q    All right.  So, is it fair to say, Mr. Kish,

6    that the opinion you heard regard -- expressed in

7    this courtroom in the last few days with respect to

8    impact or blowback spatter being on those glasses, is

9    you absolutely disagree with -- to a reasonable

10   degree of scientific certainty?

11        A    It's simply an unreasonable opinion based

12   upon the facts of this case.  And the data we have,

13   it's -- it's unreasonable.

14        Q    Okay.  Now, if we can move to Exhibit

15   No. 96N.

16             And tell us what we're looking at here?

17        A    Uh, 96N depicts the flannel pillow case

18   that was collected at the hospital, and it had

19   the -- the bullet defect within it, had saturation

20   and transfer stains, a variety of stain patterns on

21   the outer surface of it.

22        Q    Okay.  And can you give us the next photo,

23   which I believe is the back of that, 96O?

24        A    Yes.

PPP-56

SUP R 2373

1      Q   And what are we seeing that's significant?

2      A   Uh, the back of the overall pillow here,

3  we see other -- a large amount of saturation, a

4  lot -- lot more clotted blood.  We have areas Q1

5  and Q2 where there were samples that were taken

6  out.  We have some -- some blood clots up in that

7  particular area as well.

8      Q   And the photographs that you're seeing of Q1

9  and Q2, can you make any opinion as with respect to

10  those areas and the mechanism of deposition?

11     A   Q1 and Q2 -- we'll go to Q1 more

12  particularly for the stain to look at there.  One

13  piece of staining that was located in Q1 prior to

14  testing was actually a -- a clot fragment in that

15  particular area.  The other issue about Q1, they

16  were small -- they were small blood spots that

17  almost seemed like they mirrored each other,

18  there's a line between them.  So, they had -- they

19  definitely had spatter characteristics.  I couldn't

20  rule out spatter for those particular stains

21  because they're shaped the way that they soak down

22  into the overall weave issue, but I have some

23  concern with it because it looks like there's

24  somewhat of overlay.  In other words, where the one

PPP-57

1    soaked into another type area with it, where

2    something was compressed with that area.  And it's

3    also a very limited amount of staining in that

4    particular location on the overall pillow.

5           And the other part about it, uh, as far

6    as significance in the particular case, it really

7    does haven't any at all.

8    Q    Why?

9    A    Because it was wrapped around her --

10    the -- the decedent's head and was transported to

11    the hospital.  And a couple of spots like that,

12    there's -- there's a large number of ways that you

13    could produce.  I don't know that they're a direct

14    result from the shooting incident at all.

15    There's -- there's a high likelihood it was a

16    post-shooting event that created those stains.

17    Q    Well, and did you also learn, within the

18    past week and being here, uh, per the testimony, that

19    this pillow case was wrapped up and discovered within

20    a larger flannel sheet, both of which had been

21    recovered wet with blood?

22    A    Yes.

23    Q    And would that affect how patterns are left

24    on items of evidence?

PPP-58

1      A   As I previously stated, when wet stains

2   come in contact with wet stains, it's just an

3   unknown variable.  You just don't know how much,

4   how little staining would have been created.

5      Q   Okay.  So, can we turn to 96P, which I think

6   are the blue scrub pants.  Did you find anything of

7   significance here?

8      A   Uh, on the blue scrub pants, on the lower

9   left leg area, um, of the particular pants we see

10  a -- a couple of transfer stains.  And there's --

11  the yellow rectangle, this is a subset of that

12  area, okay.  So we have a staining here, and we

13  have more staining down in the lower portion of

14  this.  And then I've taken another subset of this

15  particular stain.  And what you notice on the -- on

16  the blue scrubs, as well, is more of that

17  three-dimensional clot fragment.  And I -- I show

18  this to illustrate that I found this -- these small

19  clot fragments on many different items of evidence

20  during the overall examination.  So they're fairly

21  prevalent as far as in location within this

22  particular scene.

23     Q   And that leads to what I was about to ask

24  you.  The clot fragments that you see on, was

PPP-59

1    purportedly the defendant's scrub pants, that were

2    put on after the shooting, are those similar and

3    consistent to some of the clot fragments you

4    discussed yesterday on the T-shirt?

5        A   Yeah, they're -- they're -- they all vary

6    as far as size, okay.  Obviously, they're going to

7    not all be the same size or same shape because it's

8    an irregular mechanism when it breaks off and so

9    forth from one item to the next.  But as far as

10    the -- they are all similar.  They're all deposited

11    on the T-shirt, on the scrubs, on the bed linens,

12    on the pillows from coming in contact with regions

13    after blood has already coagulated and then touches

14    those areas and part of the clot just -- because

15    remember I told you, they're relatively sticky;

16    adheres to the fabric.

17        Q   Okay.  And can we continue and go to 96P?

18        THE COURT:  P or is this Q?

19        MS. MORASK:  P.  No, I'm sorry, Q.  Thank you.

20        Q   Tell us what we're looking at?

21        A   This is a pillow -- one of the -- the

22    second pillow case that was recovered with

23    Mrs. Kustok from the hospital.

24        Q   And what was significant about this?

SUP R 2377

1        A    This particular pillow case had a great

2    area of saturation staining on it, as well as some

3    other staining that I can show you a little bit

4    closer, I believe.

5        Q    All right, so let's take a look at the

6    close-up in 96R?

7              All right, and what are we seeing here?

8        A    In the close-up of 96R, clearly -- this

9    was not a photograph taken by me.  It was a

10   photograph I believe taken by law enforcement, so

11   clearly they identified something of interest with

12   it as well.

13             In this particular photograph, the

14   close-up, we can see the upper portion in the area

15   between the 3 and the 4.  We saw see there, again,

16   another small piece of clot material is located

17   there.  Overall, we see a lot of -- of saturation,

18   but we go back to this area and the -- and the

19   region of say, oh, three and a half to down near

20   five and a half, six, we -- we see a -- a black

21   deposition.

22       Q    Well, and let's take a closer look at that

23   black deposition in 96S.

24             And, first of all, Mr. Kish, are we

PPP-61

1    looking at the area you just described that has the

2    close depo -- the deposition of black?

3        A    Yes.

4        Q    And what's significant about this?

5        A    It's -- it's significant in the fact that

6    we're -- one, we're doing a shooting case.  And,

7    two, that this is a black deposition, that this --

8    this has no physical qualities of being blood.

9    That black deposition is deposited by something

10   other than -- it's not a bloodstain.  It is not

11   consistent with being a bloodstain at all visually.

12       Q    And you can make that opinion to a

13   reasonable degree of scientific certainty, correct?

14       A    Yes.

15       Q    And, uh, that deposition is -- can you

16   estimate on the scale that is surrounding it?  The

17   size?

18       A    Um, I would say it's -- it's three to four

19   centimeters in overall size, so you're looking

20   at -- there's 2.5 -- 4 centimeters in an inch, so

21   you're looking at little over an inch in -- in

22   length.

23       Q    And is that little clot that you had seen,

24   is that within that area?

PPP-62

1      A   No, the actual clot is above it.  Remember

2    when I showed you the clotted stuff in everything

3    I've shown you, the clotted stuff typically is

4    three-dimensional.  Has a three-dimensional issue

5    with it.  You'll notice this black deposition, you

6    can see it extends up here a little bit where

7    there's no blood.  So you can clearly see that

8    it's -- it's not the blood.  And you also can

9    clearly see that it has nothing to do with the clot

10   because, one, it has no characteristics of clot.

11   It has no data points to suggest that black

12   deposition would have ever been a clot.

13       Q   And you said that it was significant because

14   also it was a shooting, right?

15       A   Yes.

16       Q   All right, so being a shooting, are you

17   familiar with cylinder gap gases?

18       A   Yes.

19       Q   And what are cylinder gap gases?

20       A   Cylinder gap gases, at the time of

21   discharge, you can have, when the projectile

22   explodes and goes out of the individual cylinder

23   into -- into the -- into the barrel, there's a --

24   there's a small gap there.  You can hold the gun

PPP-63

SUP R 2380

1    up, you can see that particular gap, and sometimes

2    the gases will escape in that -- out left and right

3    from that particular area. If the -- if the

4    firearm is close enough to a particular object at

5    the time that that escapes, then that can just make

6    a deposit on particular items of evidence.

7        Q    And -- all right. Have you seen cylinder --

8    cylinder gap gases depositions before?

9        A    Yes.

10       Q    All right. And, in your opinion, is this

11   visually consistent with being cylinder gap gases?

12       A    It's visually consistent with a black

13   deposition. It's consistent enough that it should

14   be tested.

15       Q    And when you say it should be tested, what

16   are the tests for cylinder gap gases?

17       A    Well, basically you're looking at chemical

18   deposition issues there. They may do scanning

19   electron microscopy on it. A sodium rhodizonate

20   test. A sodium rhodizonate test, for the presence

21   of -- of a led maybe tested onto, which is just a

22   quick chemical test with it. But it's -- it's an

23   analytical area. That testing is beyond my area of

24   expertise, so that's why I said I would recommend

PPP-64

SUP R 2381

```
 1    it.  I can say visually, I've seen that type of

 2    thing before, but then it would be a firearms

 3    examiner to further that opinion.

 4         Q    And, sir, we had talked about yesterday, in

 5    the items you had received, that you had received

 6    some notes a few weeks back with respect to the

 7    billing statement of Mr. Englert, is that correct,

 8    along with some new sets of notes?

 9         A    Yes.

10         Q    And did you learn that Mr. Englert had flown

11    out in March of 2012 to look at this particular

12    pillow case at the United Airline Club?

13         A    I recently learned that this was the

14    pillow case that he looked at.

15         Q    That's what I -- I meant.  And you recently

16    learned that within the last week, is that correct?

17         A    Um, it -- it all came together on -- on

18    Monday (sic).

19         Q    Okay.  And --

20         A    Of this week.

21         Q    -- did you, uh -- when you were looking at

22    Mr. Englert's notes and the billing summary, did you

23    learn that he had visually examined this piece of

24    evidence and determined it to be a clot, and not any
```

1    type of soot or cylinder gas gap -- gap deposition?

2         A    Yes, I heard him testify to it.

3         Q    Right.  And, in your opinion, that should

4    have been tested for further analysis with the sodium

5    rhodizonate, is that correct?

6         A    Yes, or another commensurate test based

7    upon the examiner.

8         Q    Is there several kinds of absolute tests?

9         A    There's -- there's more than one way to do it.

10        Q    Okay.  And now, sir, if you can continue and

11   if you can go to 96T, I believe we have another slide

12   that I'd like to show you.

13             What are we seeing here?

14        A    As I understand it, it's a reconstruction

15   photograph, or I think called a recreation

16   photograph that Mr. Englert had taken utilizing

17   pillows and the bed linen -- bed linens in this

18   particular case.

19        Q    Okay.  Now, speaking of the pillows, had you

20   actually analyzed and reviewed the pillows in this

21   case?

22        A    Yes, I -- I had examined these particular

23   pillow -- the ones that we can see visually in this

24   case.

PPP-66

1      Q    And with respect to -- first of all, did you

2    analyze four pillows in a case that you had received

3    and talked about yesterday as Mr. Englert's Exhibits

4    19A through 19D?

5      A    Yes.

6      Q    And those were all packaged together, right?

7      A    Yes.

8      Q    When you look at this recreation or

9    re-enactment, do you see pillow 19D in there?

10     A    No, I don't.

11     Q    Okay.  So, is it fair to say, in your

12   opinion, pillow 19D was not used in this recreation?

13     A    Uh, not in this portion of it, no.

14     Q    Okay.  And, also, did you view a -- we've

15   already talked about the pillow that you can see in

16   there that has those arrows marked, which was -- do

17   you see that in -- in this photo?

18     A    Yes.

19     Q    Okay.  And so you heard the testimony, and,

20   in your opinion, is there any way to reconstruct and

21   put back together these bloodstains based on the

22   bloodstains?

23     A    To any degree of accuracy, no.

24     Q    Why?

PPP-67

SUP R 2384

1       A   The reason being this:

2           The bottom sheet in which they're all

3   placed upon, as far as for the initial lining up of

4   the overall pillows, was collected with Mrs. Kustok

5   in the hospital, saturated with blood.  We don't

6   know to what degree of saturation on the sheet

7   occurred while she's in transit to the hospital,

8   while she's at the hospital.  Because that stain

9   can continually become replenished, as far as for

10   the overall soaking and the overall alteration of

11   it.  We don't know what the true and accurate

12   appearance of that particular sheet was at the time

13   Mrs. Kustok would have been on it at the time of

14   the actual shooting because it simply was altered

15   by balling, you know, wrapping her up in it to take

16   her to the hospital.  So -- so that's one point.

17           The second point with this is that I

18   don't have -- I don't know how you would be able to

19   put these in the exact location which they were.

20   We take like the top pillow, the one with the

21   bullet hole in it.  That pillow could easily be

22   over here, six inches, over here six inches.  It

23   could have had another pillow pushed up behind it a

24   little bit at some point in time way in the back

PPP-68

```
 1    STATE OF ILLINOIS    )
                           )  SS
 2    COUNTY OF COOK       )

 3

 4

 5         I, Elizabeth A. Proietti, Official Shorthand

 6    Reporter of the Circuit Court of Cook County,

 7    Illinois, hereby certify that I reported in

 8    stenographic notes the proceedings had in the

 9    above-entitled cause, and that the foregoing is a

10    true and accurate transcript of the proceedings had

11    on this date.

12

13                         _____

14                         Elizabeth A. Proietti
                           Official Shorthand Reporter
15                         Circuit Court of Cook County
                           No. 084-002544
16

17

18

19

20

21

22

23

24    Dated February 20, 2015
```

PPP-184

STATE OF ILLINOIS  )
                 )  SS:
COUNTY OF C O O K  )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) |
| Plaintiff, | ) ) |
| VS. | ) No. 10 CR 19174 ) Charge: Murder |
| ALLAN KUSTOK, | ) ) |
| Defendant. | ) |

REPORT OF PROCEEDINGS HAD at the hearing of the above-entitled cause, before the Honorable JOHN J. HYNES, one of the Judges of said Division, on the 31st day of July, 2013.

PRESENT:

        HON. ANITA M. ALVAREZ,
        STATE'S ATTORNEY OF COOK COUNTY, by
        MDMS. JENNIFER H. GONZALEZ & LORNA T. AMADO-CHEVLIN,
        MR. JAMES J. PAPA,
           Assistant State's Attorneys,
             Appeared on behalf of the People;

        MESSRS. RICHARD M. BEUKE, STEVEN C. RUECKERT, and
        ERNEST A. DiBENEDETTO,
             Appeared on behalf of the Defendant.

Charles T. Coleman
Official Court Reporter
Circuit Court of Cook County, Illinois
Criminal Division

SUP R 2670

1　on.　If you pull the microphone down, it will pick up your

2　voice.

3　　　　　　　　　　DR. ELIZABETH HATFIELD,

4　called as a witness on behalf of the People of the State of

5　Illinois, having been first duly sworn, was examined and

6　testified as follows:

7　　　　　　　　　　DIRECT EXAMINATION

8　　　　　　　　　　　　　BY

9　　　　　　　　　　MS. GONZALEZ

10　BY MS. GONZALEZ:

11　　　Q　　Doctor, in a loud, clear voice, could you please

12　state your name for the record and spell your last name?

13　　　A　　Elizabeth Hatfield, H-A-T-F-I-E-L-D.

14　　　Q　　And, doctor, what is your occupation?

15　　　A　　I am a physician.

16　　　Q　　And how long have you been a physician?

17　　　A　　I have been a physician for over 20 years.

18　　　Q　　Are you board certified in a certain area?

19　　　A　　Yes.　Emergency medicine.

20　　　Q　　And are you licensed to practice medicine in the

21　State of Illinois?

22　　　A　　Yes.

23　　　Q　　Are you licensed to practice in the area of emergency

24　room medicine in the State of Illinois?

OO-4

1     A    Yes.

2     Q    Where are you currently employed?

3     A    Palos Hospital.

4     Q    And which department do you work in?

5     A    Emergency Department.

6     Q    How long have you been worked at Palos Hospital?

7     A    Over 11 years.

8     Q    Have you spent your entire time there in the

9 emergency room?

10    A    Yes.

11    Q    Doctor, were you working on September 29, 2010?

12    A    Yes.

13    Q    Do you recall what your hours were that day?

14    A    I worked the 6:00 a.m. to 3:00 shift.  6:00 a.m. to

15 3:00 p.m.

16    Q    So does that mean you were working about 6:50 a.m. on

17 September 29, 2010?

18    A    Yes.

19    Q    Around that time, were you notified that a new

20 patient was coming in to the emergency room?

21    A    Yes.  I saw a patient being wrapped up in sheets and

22 blankets being quickly brought into the emergency room by a

23 wheelchair into a bed, yes.

24    Q    And what did you do when you saw that?

SUP R 2673

1    Q    I am going to show you what's previously been marked

2    as People's Exhibit Number 1.

3              Can you tell me what this is?

4    A    This is the medical record.  My dictated report.

5    Q    For who, whose medical record?

6    A    For Allan Kustok.

7    Q    Do you see your dictated report that you signed off

8    on within that medical record?

9    A    Yes.

10   Q    Could you please read to the court what it is that

11   you wrote with regard to your conversation Allan Kustok in room

12   15?

13   A    The patient is a 59-year old who brought in his wife

14   in by car.  He said she shot herself this morning.  He brought

15   her in wrapped in sheets and a blanket by car.

16              He states he did not call police or paramedics

17   at all.  When asked why, he said this would cause too much

18   commotion.  He states he did not bring her in for several hours

19   after the shooting.  When asked why he did not call 9-1-1 or

20   bring her in right away, he said he wanted to spend time with

21   her knowing she was dead, and that he would not see her again.

22   "She is my life" quote-unquote.

23              He states he thought of taking a gun -- the gun

24   and shooting himself killing himself.  He said he shot the

· SUP R 2685

1   remaining bullets as he did not want to shoot himself.  He

2   denied suicidal ideation at this time.  States he had not been

3   depressed.  No psych problems.  He has been doing well.

4              States he cleaned up at home prior to coming in.

5   Denies any physical complaints.

6       Q    Doctor, at some point that morning, did you decide to

7   admit Allan Kustok as patient in the ER?

8       A    This is what I -- this is when I saw him as a patient

9   in the ER, yes.

10      Q    Do you know what time he was admitted as a patient

11  himself into the ER?

12      A    It was after I finished seeing her.  I believe -- I

13  would believe it was sometime between 7:10 and 7:30.

14      Q    A.m.?

15      A    A.m.

16      Q    Do you recall what the defendant was wearing when you

17  saw him initially in the emergency room?

18      A    He had blue scrubs on.

19      Q    Tops and bottoms?

20      A    Yes.

21      Q    Could you tell if he had anything on under the

22  scrubs?

23      A    I believe he had like a T-shirt.

24      Q    And do you recall anything about any accessories, in

SUP R 2686

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

I, CHARLES T. COLEMAN, an Official Court Reporter in the Circuit Court of Cook County, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had at the hearing of the aforementioned cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be a true and accurate transcript taken to the best of my ability of the proceedings had before the Honorable JOHN J. HYNES, Judge of said Court.

_____
Official Court Reporter

Dated March 16, 2015
CSR# 084-003101

SUP R 2765

```
 1    STATE OF ILLINOIS )
                        )  SS
 2    COUNTY OF COOK    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          MUNICIPAL DEPARTMENT-FIFTH MUNICIPAL DISTRICT
 4

 5    THE PEOPLE OF THE )
      STATE OF ILLINOIS,)
 6           Plaintiff,)
                        )
 7        vs.           )    No. 10-CR-19174
                        )
 8    ALLAN KUSTOK,     )    Jury Trial
             Defendant.)     Morning Session
 9

10            REPORT OF PROCEEDINGS had at the hearing

11    of the above-entitled cause, before the Honorable

12    JOHN JOSEPH HYNES, one of the Judges of said

13    District, on the 24th day of February, 2014.

14
                 APPEARANCES:
15                  HON. ANITA M. ALVAREZ,
                       Cook County State's Attorney, by:
16                  MS. LORNA AMADO-CHEVLIN, MR. JAMES PAPA,
                    MS. JENNIFER GONZALEZ,
17                     Assistant State's Attorneys,
                       on behalf of the Plaintiff;
18
                    MR. RICK BEUKE,
19                  MR. STEVEN RUECKERT,
                    MS. LAURA MORASK,
20                  MR. TIM BLACK,
                       on behalf of the Defendant.
21
      Elizabeth A. Proietti
22    CSR #084-002544
      10220 S. 76th Avenue
23    Bridgeview, IL   60455

24
```

CCC-1

SUP R 2983

```
 1          THE COURT:  You can have a seat there.  And

 2     microphone should pick up your voice.

 3          THE WITNESS:  Okay.

 4                    PATRICIA ANN FLEMING,

 5     Called as a witness on behalf of the People herein,

 6     having been first duly sworn, was examined and

 7     testified as follows:

 8                    DIRECT EXAMINATION

 9                         BY

10                    MS. GONZALEZ:

11          Q    Ma'am, in a loud, clear voice, could you

12     please state your name for the record, and spell your

13     last name?

14          A    My name is Patricia Ann Fleming.  My last

15     name is F-l-e-m-i-n-g.

16          Q    And what's your occupation, ma'am?

17          A    I'm a registered nurse with the State of

18     Illinois.

19          Q    How long have you been a registered nurse?

20          A    Since -- since March of `04.

21          Q    And are you registered and licensed in the

22     State of Illinois?

23          A    Yes, I am.

24          Q    How long have you been so licensed?
```

SUP R 3036

1    of a body, what was it that you saw?

2        A    I saw the figure of a body wrapped in

3    blankets.

4        Q    Okay.  Did it appear to be more than one

5    blanket?

6        A    It -- at that point I don't believe that

7    it appeared more to be one, it just appeared as the

8    shape of a blanket.  I couldn't tell you how many

9    blankets at that point.

10       Q    Okay.  Did you see a vehicle in the area?

11       A    I did.

12       Q    Do you remember what color it was?

13       A    I remember it being a lighter color.

14       Q    Okay.  When you were outside of the car, um,

15   you mentioned the two other nurses that were with

16   you, the defendant, was there anyone else that was

17   out there?

18       A    There was a security guard.

19       Q    Okay.  And this is about 6:50 in the

20   morning?

21       A    Um, approximately 6:50.

22       Q    Okay.

23       A    We're in the ER at 6:50, I know that.

24       Q    What did you say to the defendant, and what

CCC-61

1    did he say to you when you're outside near the car

2    area?

3        A    My recollection, when I came out there, he

4    had told me that his wife had shot herself.  At the

5    time I had asked him was his wife alive or dead.

6    And I did not get a straight answer as to whether

7    she was alive or dead.  He was very upset, and he

8    was saying -- repeating that she had shot herself.

9        Q    Okay.  What did you do with the person that

10   was wrapped up in the sheet or the blanket?

11       A    We proceeded to move her into the ER for

12   treatment.

13       Q    Did the defendant go inside with you?

14       A    He did.

15       Q    And once you got into, um, the patient room,

16   what did you do with regard to the person wrapped up

17   in the sheet?

18       A    Um, when we got into the patient room,

19   there were several staff members in the room.  She

20   was placed on the bed.  I was more with Mr. Kustok.

21   At the time that we're in the ER, it's the ER bed,

22   cart as we refer to it.  I'm at the foot of the

23   bed, and Mr. -- kind of like this, Mrs. Kustok is

24   here, and Mr. Kustok is to the side behind me.

CCC-62

SUP R 3042

1    Q    Okay.  What were you doing with regard to
2·   the defendant?
3         A    I was asking him to step out of the room
4    with me.
5         Q    Did he?
6         A    No, he did not want -- he didn't want to
7    step out.
8         Q    When -- did you see Mrs. Kustok get
9    unwrapped from the sheets?
10        A    I did.  It took a few minutes to unwrap
11   Mrs. Kustok because there were -- there were
12   several layers, but I did see her once she was
13   unwrapped.
14        Q    Once she was unwrapped, could you see a sign
15   of injury to her body?
16        A    I could.
17        Q    What did you see?
18        A    I saw a bullet wound to her cheek.
19        Q    Did she have any signs of life at that
20   point?
21        A    No.
22        Q    At some point did you get the defendant to
23   step out of the room?
24        A    After the ER doctor had told the --

CCC-63

1    Q    You see the monitor being placed on, you see

2    that it's flat lined, correct?

3    A    That is correct.

4    Q    And Mr. Kustok was still in the room,

5    correct?

6    A    Yes.

7    Q    Now, you indicated back out on the -- at the

8    entranceway, when you came out there, you recall

9    hearing Mr. Kustok say something, correct?

10   A    Yes, I do.

11   Q    Now, I think your testimony was that you

12   recall Mr. Kustok saying my wife shot herself,

13   correct?

14   A    That would be correct, sir.

15   Q    I mean, you remember that, correct?

16   A    It's in my documentation.

17   Q    Well, my question is, you remembered that,

18   correct?

19   A    His specific words?

20   Q    Yes.

21   A    I remember Mr. Kustok being very upset,

22   and I remember, yes, he said she shot herself.

23   Q    Very upset, I mean, he was tearful?

24   A    Yes, he was.

SUP R 3076

1  Q He was crying, correct?

2  A Yes, he was.

3  Q And do you remember when he said that?

4 Specifically?  Was it outside in the emergency room

5 driveway?

6  A That he had said that she had shot

7 herself?

8  Q If you remember.

9  A Yes, sir.

10  Q Okay.  And he actually said it more than one

11 time, correct?

12  A Yes, he did, sir.

13  Q And I think you testified that you asked him

14 is she alive or dead, correct?

15  A That would be correct, sir.

16  Q And Mr. Kustok gave you a response, correct?

17  A Yes.

18  Q Now, again, you remember -- you specifically

19 remember that, correct?

20  A I specifically remember that.

21  Q You don't remember seeing who took

22 Mrs. Kustok out of the car, correct?

23  A That is correct.

24  Q You don't remember who put her in the

SUP R 3077

```
 1    wheelchair, correct?

 2         A    Yes.

 3         MS. GONZALEZ:  Objection, asked and answered.

 4         THE COURT:  All right.  Overruled.  You can

 5    answer that.

 6    BY MR. BEUKE:

 7         Q    Or any of those things as to how she was

 8    transported to the ER, correct?

 9         A    How she came to the ER?

10         Q    You don't remember any of that stuff?

11         A    No, I do remember that part, sir.  I

12    remember, as we started en route back to the ER, I

13    do remember that clearly.

14         Q    Well, okay, who was pushing the wheelchair?

15         A    I'm assuming that part --

16         Q    I'm not asking you to assume?

17         A    Okay, I --

18         Q    Who was pushing the wheelchair?

19         A    Staff.

20         Q    Huh?

21         A    Staff would be pushing.

22         Q    Who?  There were four of you out there?

23         A    I'm in front of Mrs. Kustok, and I'm

24    carrying her legs, and I'm moving forward, I'm not
```

SUP R 3078

```
 1    STATE OF ILLINOIS    )
                           )  SS
 2    COUNTY OF COOK       )

 3

 4

 5         I, Elizabeth A. Proietti, Official Shorthand

 6    Reporter of the Circuit Court of Cook County,

 7    Illinois, hereby certify that I reported in

 8    stenographic notes the proceedings had in the

 9    above-entitled cause, and that the foregoing is a

10    true and accurate transcript of the proceedings had

11    on this date.

12

13

14                         Elizabeth A. Proietti
                           Official Shorthand Reporter
15                         Circuit Court of Cook County
                           No. 084-002544
16

17

18

19

20

21

22

23

24    Dated February 20, 2015
```

CCC-179

SUP R 3158

```
 1     STATE OF ILLINOIS )
                         )  SS
 2     COUNTY OF COOK    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          MUNICIPAL DEPARTMENT-FIFTH MUNICIPAL DISTRICT
 4

 5     THE PEOPLE OF THE       )
       STATE OF ILLINOIS,      )
 6         Plaintiff/Respondent,)
                               )
 7         vs.                 )No. 10-CR-19174
                               )
 8     ALLAN KUSTOK,           )Continued Motion New Trial
           Defendant/Petitioner.)
 9

10              REPORT OF PROCEEDINGS had at the hearing

11     of the above-entitled cause, before the Honorable

12     JOHN JOSEPH HYNES, one of the Judges of said

13     District, on the 4th day of December, 2014.

14
                    APPEARANCES:
15                    HON. ANITA M. ALVAREZ,
                        Cook County State's Attorney, by:
16                    MS. LORNA AMADO-CHEVLIN, MR. JAMES PAPA,
                      MS. JENNIFER GONZALEZ,
17                      Assistant State's Attorneys,
                        on behalf of the Plaintiff;
18
                      MR. RICK BEUKE,
19                    MR. STEVEN RUECKERT,
                      MS. LAURA MORASK,
20                    MR. TIM BLACK,
                        on behalf of the Defendant.
21
       Elizabeth A. Proietti
22     CSR #084-002544
       10220 S. 76th Avenue
23     Bridgeview, IL   60455

24
```

SUP R 3161

<pre>
 1                    MATTHEW NOEDEL,
 2   Called as a witness on behalf of the
 3   Defendant/Petitioner herein, having been first duly
 4   sworn, was examined and testified as follows:
 5                 DIRECT EXAMINATION
 6                        BY
 7                  MR. BLACK:
 8        Q    Good afternoon, Mr. Noedel.  Could you
 9   please introduce yourself, and spell your name for
10   the court reporter?
11        A    Matthew Noedel, M-a-t-t-h-e-w N-o-e-d-e-l.
12        Q    Mr. Noedel, how are you currently employed?
13        A    I am a forensic consultant, self-employed
14   doing my company called Noedel Scientific.
15        Q    And did you previously testify in this case
16   on March 7th, 2014?
17        A    Yes, I did.
18        Q    And, at that time, were you qualified as an
19   expert in crime scene reconstruction and ballistics?
20        A    Yes, I was.
21        MR. BLACK:  Your Honor, at this time, um, I'd
22   like to tender Mr. Noedel as continuing as an
23   expert in crime scene reconstruction ballistics?
24        THE COURT:  Any objection?
</pre>

 1         MR. PAPA:  No objection.

 2         THE COURT:  All right, he will be considered

 3    an expert in that field.  As such, he can refer to

 4    his notes.

 5    BY MR. BLACK:

 6         Q    Just to refresh our memory, Mr. Noedel, this

 7    case isn't the only case where you've testified as an

 8    expert in crime scene reconstruction and blood -- and

 9    ballistics, is it?

10         A    No, it's not.

11         Q    And how many other cases have you testified

12    in that capacity?

13         A    Um, in -- in -- in recent time, uh, I've

14    testified about oh, eight -- eight to twelve times

15    a year.  So -- so, uh, 60 times or so in the last 5

16    years in that capacity.

17         Q    And out of those 60 or so times, how many

18    times have you testified on behalf of the State?

19         A    Um, a little under half.  About half of

20    the testimonies I've been retained by the State.

21    Um, and -- and somewhere around 40 -- 40 percent

22    for the State, 60 percent for defense.

23         Q    Okay.  And, as a matter of fact, just prior

24    to testifying in this case, uh, were you employed --

GGGG-6

```
 1    were you -- were you employed under a contract in
 2    Reno, Nevada?
 3         A    Yes, uh, I've had a number of contracts
 4    with -- with, um, law enforcement agencies.  At the
 5    time of the original testimony, I was under
 6    contract with the Washoe County Sheriff's Crime
 7    Laboratory.  I was training a new forensic
 8    examiner, and also doing forensic analysis for the
 9    laboratory system on backlog cases that became a
10    source of a lot of prosecutorial work, and that
11    contract has since ended.
12         Q    And since your testimony in -- in the Kustok
13    matter, were you employed by a prosecution team in
14    Jamaica?
15         A    Oh, yes.
16         Q    Um, now, at some point you were contacted
17    about this case, is that correct?
18         A    After the testimony, yes.
19         Q    Okay.  And when was that?
20         A    Um, I -- I don't recall the exact date
21    that, uh, that information was -- was sent to me.
22         Q    Well, when were you originally contacted to
23    testify or to -- to be an expert in this case?
24         A    Originally in November of 2012 was my
```

GGGG-7

1    first official -- when I was officially hired as a

2    consultant on this case.

3        Q   Okay.  And what were you hired to consult?

4        A   Primarily, it -- the responsibility was

5    given a shooting scene reconstruction and ballistic

6    examinations, anything related to the firearm

7    assessments in this event.

8        Q   Okay.  And did you -- did you review

9    anything in order to prepare for that --

10       A   Yes, I did.

11       Q   -- job?

12           What did you review?

13       A   Uh, there was a series of -- of

14   photographs, police reports, autopsy reports,

15   photo -- um, autopsy photographs, scene

16   photographs, and a report from a prosecution expert

17   about a reconstruction event.

18       Q   And what was the prosecution expert's name?

19       A   Mr. Rod Englert.

20       Q   Okay.  After reviewing all those documents

21   and photos and reports, did you write a report of

22   your own?

23       A   I did.

24       Q   And, um, in that report, did you come to

1    some opinions about this matter?

2        A    I did.

3        Q    Okay.  And what was the date -- just to

4    refresh everybody's memory, what was the date of that

5    report?

6        A    April 1st, 2013.

7        Q    And did you -- after that -- or before your

8    testimony, did you provide a supplemental report?

9        A    Yes, I did.

10       Q    And what was the date on that?

11       A    February 26th, 2014.

12       Q    Okay.  And, since then, have you issued a

13   third report?

14       A    I have.

15       Q    Okay.  And what sparked you to issue the

16   third report?

17       A    Um, I -- I was contacted, uh, by the

18   defense team via e-mail about the potential to have

19   an article tested in the Illinois State Police

20   Laboratory.  And, um, it began with what types

21   of -- general inquiries about what type of tests

22   should be asked for, what's the names of the tests,

23   and who are some reference people that might --

24   that we might want to reach out to at the ISP

GGGG-9

1    Laboratory to conduct such testing.  That's where

2    it started, um, considering the after -- after the

3    testimony.

4        Q    Okay.  And was that the -- when you talk

5    about evidence that needed to be tested, can you be a

6    little bit more specific?

7        A    Yes, specifically, what had occurred

8    during -- during -- just prior to my testimony was

9    a photograph was presented with an article that had

10   a dark stain depicted on a pillowcase in the

11   photograph as something that was collected as

12   physical evidence in the -- along with other

13   exhibits of -- of physical evidence.

14             And so, initially, um, I -- when I

15   first saw the photograph, I suggested, yes, this is

16   a stain that would warrant further testing.

17   Certainly, you can't tell from a photograph if it's

18   grease or soot or something -- something else.

19             So at that time I suggested we could

20   conduct a test, it's a simple color test, and --

21   and see if it's something we need to consider

22   further, or if we just let it go and -- and it

23   can -- we don't know what the results will be, but

24   we can conduct that test.

SUP R 3169

1          And so, during my -- my first

2   appearance, I brought the chemicals with me from --

3   I'm based near Seattle, Washington.  I brought the

4   chemicals with me to conduct that test, and it

5   turns out we were not -- we were not going to -- we

6   were determined we're not going to conduct that

7   test while -- at that time.

8       Q    Okay.  Um, I want to bring you back a little

9   bit to your -- your April 1st report, April 1st of --

10  of 2013.  In that report, did you offer any opinions

11  about cylinder gap gases?

12      A    Yes, I did.

13      Q    And what were those opinions?

14      A    Um, well, basically, um, the -- the

15  opinion was that cylinder gap gases, because they

16  are not as robust as the types of gases that follow

17  the bullet, they're gases from gunshot residue that

18  eject sideways, and cylinder gap gases can be

19  difficult to detect.  And in this case we had a lot

20  of very blood saturated pieces of evidence in the

21  form of pillows and sheets and clothing.  Um, so I

22  felt it was appropriate to address the idea of

23  cylinder gap gases in my report, and actually did

24  some test shots of my own, along with some other

SUP R 3170

1    prior testing that I had done and presented at a

2    conference about how far do these cylinder gas --

3    gases expand from the side of the firearm.  And so

4    that played into me offering an -- an opinion about

5    the cylinder gap gases, because I had also read in

6    a report that there was a smudge on a pillow that

7    was visually cleared without doing any of the --

8    the traditional tests for residues.

9        Q   Did you offer an opinion in -- in that

10   report about a test that could be done to determine

11   if that black smudge, as you called it, was indeed

12   cylinder gap gas?

13       A   Yes, in my report I referenced the

14   chemical test called the sodium rhodizonate test.

15   That's a long name for a very simple test for lead.

16       Q   Okay.  And, to your understanding, before

17   you testified in this trial, was that test ever

18   conducted on that piece of evidence?

19       A   No, that test had not been conducted.

20       Q   Okay.  And based on your understanding of

21   the facts, at that time, when you wrote your report

22   in April of 2013, did you determine where the gun was

23   in relation to, um, the bedding or the evidence that

24   that existed in this case?

GGGG-12

1        A    Um, I would -- I would reverse it and say

2    more about where the gun wasn't.  Because, at that

3    time, since we had no reports of cylinder gap gases

4    or residues on any of the bedding, and, in fact, it

5    had been reported that those did not exist, um, my

6    opinion was that the firearm was therefore at least

7    two inches or greater from any adjacent surfaces.

8        Q    Okay.  And as you sit here today, is -- is

9    it still -- is that still your opinion?

10       A    No.  We -- we have to absolutely reverse

11   that now, because now a test has been conducted

12   that's confirmed that there are gunshot residue

13   gases on the pillowcase in question.  We now have

14   to incorporate that into the analysis.  It's new

15   information and new data that needs to be

16   considered in context with the -- the whole of the

17   scene.  So, now we know that, uh, there was a

18   discharge of a firearm that's, in my opinion,

19   likely closer than two inches.  I don't know, but

20   in that zone.  So that's consistent with cylinder

21   gap gases.

22       Q    Can we break that down just a little bit.

23   You -- in preparation for your newest report, your

24   November 29th, 2014 report, did you review reports

GGGG-13

1    generated by Nicole Fundell in relation to this case?

2        A    That's correct.

3        Q    All right.  And in those reports, do you

4    recall what the distance determination was in her

5    report, that being how far the gun was from the

6    soot -- soot mark on the pillow?

7        A    I -- I believe she was talking about

8    distances of six inches or closer.  Um, and maybe,

9    specifically, with cylinder gap, four inches or

10   closer.

11       Q    Okay.  And I believe you just told the Court

12   that you determined, based on test firing, that it

13   was more likely two inches or closer.  Can you

14   explain that?

15       A    Well, again, I did not have the actual

16   firearm to consider nor the actual ammunition.  Um,

17   but -- but I've studied cylinder gap before, and

18   it's always the question is how far to the side

19   will it actually expel.  And so, in my experience

20   and with my test shots, to see a dark sooty deposit

21   that's visual in photographs, you have to be much

22   closer than the maximum range.  We can detect

23   cylinder gap gases using the chemicals out farther

24   than one or two inches, but for there to be an

SUP R 3173

1    actual visible heavy soot stain is usually

2    indicative of -- of being inside that range and

3    relatively close to the surface and intercepts

4    those gases.

5        Q    Was there anything with regards to the way

6    the test was conducted by -- by Nicole Fundell that

7    might make the range greater than the range that you

8    determined?

9        A    Um, well, the one thing that I noted in

10   reviewing her -- I received her reports and notes,

11   is that in her photographic documentation of the

12   revolver, because now, by this time, multiple shots

13   have been delivered through the revolver and I

14   don't think the revolver was ever cleaned.  So what

15   can occur is the revolver keeps accumulating soot

16   with each successive shot, and the gun is

17   essentially getting dirtier and dirtier.  So later

18   on in that testing might be a heavier deposit at --

19   at farther ranges because there's more residues to

20   blast out than a brand new clean gun.  Let's say if

21   we go all the way back to the day of the -- the

22   actual shooting event where the gun was in the

23   photographs doesn't have these residues on the

24   sides and things, the gun is relatively clean.  So

GGGG-15

1     that's one thing that can influence over time, the

2     accumulation of soot.  And I know a number of

3     multiple -- multiple test shots were delivered in

4     order to evaluate the -- the residues.

5         Q   So, just to be clear, um, as, you know,

6     taking into consideration the reports from Nicole

7     Fundell and your own test shots, in your own

8     expertise, what do you -- did you come to a range

9     determination for --. for the gun from the pillow?

10        A   I did.

11        Q   And what was that determination?

12        A   I think to have a deposit like that, that

13     you're certainly three inches or closer.  Two or --

14     two or three inches.  It's a range, again, because

15     there's a lot of variables involved with cylinder

16     gap production.

17        Q   Okay.  Now, I'd like to take you back again

18     to your April 1st, 2013 report.  Did you offer any

19     opinions in that report, um, about the bullet

20     trajectory regarding the bullet that struck

21     Mrs. Kustok?

22        A   Yes, I did.

23        Q   And what were those opinions?

24        A   Um, generally speaking, my -- my opinion

GGGG—16

1   was that while the path through the wound track is

2   fixed, that has a specific entry and exit, fixing

3   the individual -- fixing Miss Kustok within the

4   scene is not fixed, and Miss Kustok would have the

5   ability to rotate and move up and down, move her

6   torso.  So, while the bullet path needs to be

7   straight through her head, where we put her head in

8   three-dimensional space in -- in the room is

9   unknown and remains unknown and we don't have to

10  exactly position the pillow against her head.  What

11  we know is a bullet exited, and was -- ultimately

12  hit the pillow.  Alls we know is that the pillow is

13  somewhere behind her.  And so those are -- and both

14  of those objects, Miss Kustok and the pillow behind

15  her, absolutely moved from the time documentation

16  of the scene began.  So we know that those are

17  objects that moved.  So we can't put them back

18  accurately in three-dimensional space of the room.

19      Q   Um, knowing what you know now with the

20  results of the -- the sodium rhodizonate test coming

21  back positive on Pillow 19D, has your opinion changed

22  at all with regards to the trajectory of the bullet?

23      A   Um, not so much with the trajectory of the

24  bullet, again, the path through her -- her wound

GGGG—17

1    track is constant, but it reinforces my original

2    thought is that you cannot specifically place one

3    pillow in one position in that room, and then build

4    the rest of the reconstruction around it. Because

5    we know that pillow can move, we know that there

6    doesn't have to be direct contact. It's not a

7    fixed -- the way I -- I speak about it in -- in

8    scientific terms, it's -- it's a trajectory that's

9    not in fixed objects. It's a straight line, but

10   you can move that straight line a number of

11   different orientations and still fit all the

12   criteria documented in the room.

13       Q    All right. Um, I want to talk a little bit

14   about the -- the test, how the test on the pillow,

15   and how that might effect the guilt or innocence of

16   Mr. Kustok. When did you first learn that a test was

17   going to be performed on Pillow 19D?

18       A    Um, a -- a chemical test?

19       Q    That's correct.

20       A    Or a visual test?

21       Q    A chemical test?

22       A    Uh, shortly after the -- after the --

23   after my testimony in the Kustok trial, um, I was

24   made aware that -- that efforts were being made to

GGGG—18

1    organize the test be conducted at the ISP Crime

2    Laboratory.  I don't recall the date.

3        Q    Okay.  And was that the first time that this

4    pillow, in your understanding of the -- of the facts

5    of this case, is that the first time that this pillow

6    was ever examined?

7        A    No, it was examined.  Um, it was visually

8    examined prior to the ISP Laboratory testing.

9        Q    And visually examined by who?

10       A    Um, it's referenced twice in the record

11   from Mr. Englert, that he did a visual examination

12   of the pillow on two separate occasions.

13       Q    Okay.  And do you recall when those

14   occasions were?

15       A    Uh, the first occasion was in December, I

16   believe it's 2012.  I'm not sure of the year.  Uh,

17   but it was in December.  Um, and then approximately

18   a year later the -- the same object was -- was

19   secondarily examined again in the same manner.

20       Q    Would the first examination have been in

21   December of 2010?

22       A    2010, thank you.  I -- I -- I misplaced

23   the date.  2010.

24       Q    All right.  And as a -- as a scientist, as

GGGG-19

SUP R 3178

1    an expert in ballistics and crime scene

2    reconstruction, um, is that -- is the visual test of

3    evidence like that, is that the appropriate test to

4    conduct?

5        A   It's the appropriate first test, look at

6    it, what does it look like, but it's not an

7    appropriate confirmatory test.  If -- if you

8    suspect that a stain -- in a shooting related case,

9    if you suspect that a stain may be associated with

10   gunshot residue, we have this very simple

11   rhodizonate test to -- to validate that or refute

12   that and then we can act on whatever the results

13   are.

14       Q   As a scientist in your field, what if --

15   what if you suspect that it may not be, um, it may

16   not be soot or cylinder gap gas?

17       A   In reconstruction, we want as much

18   information as possible.  It doesn't matter what

19   the result is.  The test should be done.  Because

20   that way we know what are the facts that we can use

21   to build a reconstruction, and we can then know the

22   limits of the reconstruction.  So, there's no

23   reason not to do that test, um, if you recognize

24   that it may have value in reconstructing the event.

1      Q   Okay.  And as I -- as you noted before, you

2   created, um, a report dated November 29th, 2014 with

3   regard to the testing that was conducted on -- on the

4   pillow, is that correct?

5      A   That's correct.

6      Q   All right.  I'm going to take you through

7   some of the, um -- some of your opinions in that --

8   in that report.

9           First, in your report, you speak a little

10   bit about confirmation bias.  Can you tell us how

11   the -- the positive test results in this case effect

12   confirmation bias?

13      A   Yes.  Confirmation bias is a -- it's a

14   type of scientific error that occurs when you seek

15   out information that just supports one -- one

16   avenue.  In forensics we constantly fight against

17   being effected by confirmation bias because we

18   don't want to simply select objects or items or

19   results that help us and ignore the ones that

20   don't.  In a reconstruction we have to consider all

21   of the information, and see how it fits based on --

22   based on the available physical evidence.

23           Um, my thought on this, once I found

24   out that the results of the pillow that had been

SUP R 3180

1    incorrectly designated as not being gunshot

2    residue, related twice before by the -- by

3    Mr. Englert, now are positive.  And that became a

4    game changer, in my opinion, as we consider, now we

5    have to reconstruct with this pillow as involved in

6    the event.

7            When I went back through the -- the

8    record and through the sequence of events, I wanted

9    to find out how was it -- why was it that we didn't

10   conduct this simple test at some point along the

11   line.  And I saw that the -- initially, in October

12   of 2010, a reconstruction was done.  A pre

13   reconstruction, where people were positioned in the

14   bedroom of Mr. Kustok.  And then it wasn't `til two

15   months later then the physical evidence was

16   beginning to be analyzed.  Um, lists were made of

17   things that needed to be further tested, which did

18   not include the pillowcase.  Then another

19   reconstruction was attempted after the viewing of

20   the physical evidence which supported the initial

21   one.  And that -- that, uh, view carried through --

22   all the way through to the final report at the end.

23           So what I'm looking for is how is it

24   that we have such certainty in the testimony

SUP R 3181

1    that -- I was offered the testimony of

2    Mr. Englert -- how can he be so certain that

3    it's -- that the pillows -- the pillowcase that has

4    soot and residues on it is not involved when we now

5    know it was involved.  So that creates this -- this

6    problem with the reconstruction.  Because we have

7    to reconsider the entire reconstruction now because

8    somehow it has to incorporate this pillow.  And

9    that was -- it was testified to that the pillow

10   cannot be involved with this event, and was

11   actually placed under another pillow during the

12   reconstruction efforts.

13        Q    Let me ask you:  You said that -- that what

14   you called the confirmation bias carried all the way

15   through to his final report.  Mr. Englert's final

16   report.  Do you recall it -- was it April 10th, 2012?

17        A    That's my recollection, yes.

18        Q    Okay.  And did -- did -- you're aware of

19   a -- of a meeting between Mr. Englert and this --

20   members of the State, um, at the O'Hare United Club,

21   is that correct?

22        A    That's correct.

23        Q    And when did that take place?

24        A    Um, again, I -- I don't recall, but it

GGGG-23

1    was -- I believe it was a year or more after the

2    December 2010 reconstruction efforts.

3         Q    If it was March 28th, 2013, does that ring a

4    bell?

5         A    That -- that sounds accurate.

6         Q    Okay.  Which is after his final report, is

7    that correct?

8         MR. PAPA:  Judge, I'm going to object to the

9    misstatement by Mr. Black as to the date of the

10   O'Hare meeting.

11        MR. BLACK:  I'm sorry, March 28th, 2012.

12        Q    And how did -- how did the confirmation bias

13   that you described play into that meeting?

14        A    Well, to me, that -- that meeting was a

15   big red flag.  Because at that -- at that instance,

16   no other objects were brought to Mr. Englert for

17   assessment.  So, it -- it appears to me that there

18   was importance given to this pillowcase and to the

19   stain on the pillowcase in order to initiate a

20   completely -- a re examination.  And, again, for

21   me, that there is such concern about this -- this

22   pillow to have the -- the expert reconsider, um,

23   that there was concern about this, tells me that,

24   as an expert, you should have just advised, well,

GGGG-24

1    let's just do the test, um, and have it -- have it

2    conducted, but the opposite was -- was offered.

3    And the -- the visual assessment, we now know, was

4    incorrect, was called a blood clot, by someone who

5    is a -- a proclaimed bloodstain pattern expert, in

6    fact, it is not a blood clot, that was wrong.  And

7    reconstruction built upon that then is wrong.  And

8    so that's a source of potential confirmation bias.

9    If that comes up positive, all the prior work would

10   have to be reconsidered into how we incorporate

11   this pillow that we now know was associated with

12   the discharge of a gun.

13        Q    So, you know, with that, a little bit.

14   Mr. Englert recreated the -- he created a recreation

15   of what he thought the crime scene looked like at the

16   time of Mrs. Kustok's death, is that correct?

17        A    Yes, he did.

18        Q    Okay.  And do you know what sort of methods

19   he used to recreate the bed situation, at that time?

20        A    Well -- well, based on -- based on the

21   record I have available, is he attempted to do a

22   type of pattern matching of pillows that had been

23   removed from the bed, and repositioned them in

24   places on the surface of the bed in association

SUP R 3184

1    with a bloodstained sheet.  So he repositioned the

2    sheet that had bloodstains and contours on it, and

3    then he attempted to fit pillows around the -- the

4    contours in an attempt to -- essentially a physical

5    match between a stain on a pillow and where it

6    would have continued on to the sheet.

7         Q    Based on your expertise, in addition to what

8    you know now to be soot on one of the pillows in

9    Mr. Englert's recreation, how does -- how does that

10   effect his pattern matching of the pillows?

11        A    Well, it -- it -- it indicates that his

12   pattern matching, the matching that he had

13   documented, has to be wrong.  It is wrong.  And

14   it's wrong because the -- a pillow -- a heavily

15   blood-stained pillow also has cylinder gap type

16   gases and gunshot residue deposits on the surface.

17   He put that pillow under the pillow that had

18   received the bullet hole, and that simply cannot be

19   because the -- the -- we would have problems with

20   the trajectory.  There is no bullet hole in the

21   backside of that pillow.  It simply doesn't work

22   with the reconstruction as -- as documented and

23   photographed in the -- in the efforts from October

24   and December of 2010.

GGGG-26

1      Q   Now, uh, Mr. Englert also opined about not

2   only bloodstains on the bed, but bloodstains on the

3   revolver.  Um, do you recall his opinions on that?

4      A   Yes, he, uh -- in general, he offered

5   testimony to say that the revolver had to be up in

6   three-dimensional space because he believed that it

7   had received spatter on either side of the -- of

8   the revolver, which would indicate that the

9   revolver couldn't have been at or adjacent to an

10   intervening surface like another pillow.  We now

11   know that we do have another pillow that has to be

12   considered in this, and that statement might be

13   completely wrong.

14      Q   If I could, in your preparation for this

15   case, did you review transcripts of Mr. Englert's

16   testimony?

17      A   Yes, I did.

18      Q   Did you review a transcript of his testimony

19   on the 19th of February, 2014?

20      A   I did.

21      Q   Okay.  Um, I'm going to read you a -- a

22   passage of what he testified to at -- at that

23   hearing, and I'd like you to comment on -- on how

24   that plays in with the -- the new -- the results of

1    the new test.

2              So, on April -- or February 19th, 2014,

3    Rod Englert said:

4              "And, if you can see in the recess of the

5    cyl" -- I'm sorry, on Page 43, Line 9 he says:

6              "And if you can see in the recess of the

7    cylinder, there is a little stain.  There's a very

8    small stain going from back to front, front to back

9    that is going slightly upward.

10             That's a close-up of that same stain?

11             Yes.

12             Question:  And what was -- and was a

13   stain similar to that found on the opposite side of

14   that cylinder?

15             Answer:  On the opposite side of the

16   cylinder, on the face of the cylinder was another

17   bloodstain.

18             Question:  And what is the significance

19   of those two bloodstains on opposite sides of the

20   cylinder?

21             Answer:  That you couldn't get it.  If

22   this were very close to the pillow, that you would

23   not be able to get stains on both sides?"

24

GGGG--28

1        Knowing now that there's a positive test

2   for lead on the pillow, could that testimony be true?

3        A    Um, if -- if the residues are associated

4   with that, with the shots that it -- it involved

5   pillows on the bed, that can't be true, um, and it

6   puts in question as to whether or not the deposits

7   observed are actually back spatter or spatter from

8   the shooting versus other transfers that were --

9   were known to be on the -- on the revolver.

10       Q    Similarly, did you review transcripts of

11  Mr. Englert's testimony at trial?

12       A    I did.

13       Q    Did you review a transcript from the morning

14  of March 4th, 2014?

15       A    Yes, I did.

16       Q    And -- and in that transcript, on Page 113,

17  Line 6 Mr. Englert says:

18            "And the other stain, what is significant

19  about this, this is on the opposite side of the one

20  inside the cylinder gap.  So we have it on both sides

21  of that gun.  That's important.

22            Question:  What does that mean?

23            Answer:  That means that the shot is

24  fired and the weapon is laying sort of on the surface

GGGG-29

SUP R 3188

1    of the bedding, no matter which side, you're not

2    going to get it on both sides?"

3              Knowing what you know now about the

4    testing of the pillow, is what he said -- what he

5    testified to possible?

6        A    That -- that -- the implication is -- is

7    that that's -- that's not supported.  That's --

8    it's -- you can't say it's impossible, but the idea

9    that the -- the gun is not adjacent to a pillow is

10   reiterated in that passage, and the testimony

11   reflects that the gun has to be in

12   three-dimensional space, which we know for this

13   shot was -- was not.  It has to be near an adjacent

14   object for the shot to -- that eclipses a pillow.

15       Q    Knowing now that there's cylinder gap gas on

16   one of the pillows, in your review of the

17   photographs -- you've never -- have you ever reviewed

18   the physical evidence in this case?

19       A    No.

20       Q    You've only reviewed photographs, is that

21   right?

22       A    That's correct.

23       Q    All right.  Based on your review of the

24   photographs of the physical evidence in this case, is

GGGG-30

1    there any other evidence that, based on that review,

2    that you would suggest be tested?

3         A    Um, yes, there is one -- at least one

4    exhibit that I would suggest.

5         Q    And what was that?

6         A    Um, there is a pajama top that in the --

7    at least in the photographs has a very dark linear

8    deposit that, visually, in a photograph, looks

9    similar to the deposit on the pillowcase.  Knowing

10   now that the Englert assessment of the pillowcase

11   was incorrect, I think that the pajama top becomes

12   important, something that needs to be considered.

13   Again, regardless of the result of the test, it's

14   information that we should be using to try to

15   reconstruct the event.

16        Q    Based on your memory, was there testimony

17   from Rod Englert about that mark on the pajama top?

18        A    Yes.

19        Q    And what was that testimony?

20        A    Um, my recollection is that Mr. Englert

21   dismissed that as being potentially associated with

22   gunshot residues or cylinder gap because of its

23   position on -- primarily because of its position on

24   the shirt itself.  And he felt that that was in a

GGGG-31

1    position that could not receive cylinder gap gases.

2        Q    All right.  And knowing that Mr. Englert was

3    wrong about the pillow, what's your opinion on the

4    testing of the pajama top?

5        A·   We should test that pajama top to

6    determine whether or not it's residue, whether or

7    not it needs to be incorporated into any kind of

8    reconstruction that -- that one might attempt.

9        Q    Now, in preparation for not only testimony

10   here today but your testimony at the trial, did you

11   review Mr. Englert's final report?

12       A    Yes, I did.

13       Q    Okay.  I'd like to ask you about some of the

14   opinions that he offered in his report, and I want

15   you to think about those in context with the -- the

16   new testing that showed a positive for lead on the

17   pillow?

18       A    Okay.

19       Q    I'm going to ask you a couple questions.

20            On Page 83 of Mr. Englert's April 10th,

21   2012 report he stated that:

22            "The spatter stains on Allan Kustok's

23   T-shirt and blue mesh shorts are consistent with him

24   being upright and in close proximity, within three to

SUP R 3191

1    four feet of Anita Kustok's head at the time the shot

2    was fired."

3                Knowing what you know now about the stain

4    on the pillow, could that be true?

5        A    Um, that -- as it's stated, that, uh --

6    it's not true when you consider that in conjunction

7    with the image that he generates from that.  The

8    mere distance doesn't talk about how far away from

9    an adjacent object, but the photographs of that

10   description show the gun up in three-dimensional

11   space.  That cannot be true if associating that

12   shot with the -- the fatal shot to Anita Kustok.

13       MR. BLACK:  Your Honor, may I approach the

14   witness?

15       THE COURT:  Sure.

16   BY MR. BLACK:

17       Q    Showing what you is marked as Defendant's

18   Exhibit 1.

19       THE COURT:  We're on 4 now.

20   BY MR. BLACK:

21       Q    Defendant's Exhibit 4.  Do you recognize

22   that?

23       A    Yes, I do.

24       Q    What do you recognize that to be?

1        A    This is a page from Mr. Englert's report.

2        Q    Okay.  And what is -- is there a photograph

3    contained on that page?

4        A    There is.

5        Q    And is that the photograph you were just

6    referring to?

7        A    It's -- it's one of a number of

8    photographs of similar -- from different angles

9    showing similar situation.

10       Q    And when you say a similar situation, what

11   is it depicting?

12       A    Uh, it's depicting a -- an actor holding

13   the revolver, and it's positioned along a

14   predetermined bullet path that was -- was trying to

15   be achieved in re-enacting the -- the scene with

16   the pillows and -- and the -- the predetermined

17   trajectory.

18       THE COURT:  Does that have a page number on

19   there, Mr. Noedel?

20       THE WITNESS:  Yes, sir, it's -- on the Englert

21   report, it's Page 80.

22       THE COURT:  Thank you.

23   BY MR. BLACK:

24       Q    And knowing what you know now, based on the

1    result of the lead test, is that a possible scenario

2    as depicted in that picture for the -- the shooting

3    death of Mrs. Kustok?

4         A    No, because the pillow with residue is

5    under a second pillow.  That pillow cannot possibly

6    receive residues in the orientation that's depicted

7    in this -- in this image.

8         Q    Um, additionally, in -- in Mr. Englert's

9    report on the April 10th, 2012, on Page 83, he opined

10   that, quote:

11             "The spatter stains on Allan Kustok's

12   T-shirt and blue mesh shorts are not consistent with

13   him lying on his back in bed next to Anita Kustok or

14   facing north or south at the time the shot was

15   fired."

16             Knowing what you know now, considering

17   the testing on the pillow, is this true?

18        A    Um, for the same reason as before, it

19   positions a gun in three-dimensional space with no

20   adjacent objects, and we know we have to consider a

21   pillow being adjacent to the revolver at the time

22   it was discharged.  And so that's -- that's not a

23   true statement as supported by the physical

24   evidence.

GGGG--35

1      Q  Now, moving to another opinion offered by

2  Mr. Englert on the April 10th, 2012, the bottom of

3  Page 83, he says, quote:

4        "Based upon the review of investigative

5  reports, laboratory reports, autopsy reports,

6  photographs, the review and analysis of the evidence

7  and reconstruction scenarios, it is possible that

8  Anita Kustok was in bed on her back with her head

9  turned slightly to the left with the shooter standing

10  near her head, standing near her head on the north

11  side of the bed when the shot was fired."

12        Knowing what you know now based on the

13  testing of the pillow, is that true?

14      A  The -- the images that support that

15  statement show the gun in three-dimensional space,

16  which is not a -- is not supported by the physical

17  evidence because the pillow, again, is not involved

18  with proximity to the revolver.

19      Q  Now, when you mention images supporting that

20  opinion, that Defendant's Exhibit 4, is that an

21  example of an image supporting that opinion?

22      A  Yes, it's the same opinion.

23      Q  Okay.  Now, on the next page of

24  Mr. Englert's report, on Page 84, he says, quote:

1              "The weapon was being held at the time it

2      discharged, otherwise a void pattern mirroring the

3      weapon would be present on the bedding.  No void

4      pattern mirroring the revolver was present on the

5      bedding."

6              Knowing what you know now about the

7      testing of the pillow, could that be true?

8      A    Um, a void on the bedding would be more to

9      the purview of -- of bloodstain pattern analysis, I

10     believe that's referring to deposition of blood,

11     which I did not consider.  Uh, the -- the -- bot --

12     the basis is that the pillow -- knowing that it has

13     intercepted gunshot residues needs to be considered

14     in conjunction with all these opinions where the --

15     the -- the reconstruction has been built on the

16     idea that no pillow receive residues.  And from

17     that piece of information, the rest of the pillows

18     were positioned, actors were positioned,

19     photographed, documented, and testified about.  And

20     so all of these events that don't include the now

21     known positive pillow, uh, are erroneous in -- in

22     their -- in their assumptions because they -- they

23     have not considered what we now know to be true.

24     Residue was intercepted by a pillow.

SUP R 3196

1      Q    To -- to that point, um, on -- on March 4th,

2    2014, in the morning of Mr. Englert's testimony on

3    Page 45, Line 21 he states:

4            "We tried every different way that those

5    pillows may have been, and this is the only way that

6    it was that the piece of the puzzle that fit very

7    close to each other."

8            Knowing what you know now, is that true?

9      A    Can't be true.

10     Q    Similarly, on Page 74, Line 13 he said he --

11    he was asked:

12            "Did you test all the scenarios to

13    determine all possible things that could account for

14    the physical evidence that you identified in this

15    case?

16            Answer:  Not only myself, but other

17    members using a, you know, a think tank."

18            Knowing what you know now, could that be

19    true?

20     A    I think the -- the think tank was, and the

21    assessments were incorrect because it did not

22    consider this residue on the pillow as being

23    involved with this event.

24     Q    Okay.  I'd like to take you back to -- to

GGGG-38

SUP R 3197

1    Mr. Englert's April 10th report, on Page 84, he

2    opined that:

3            "Based on the fan-shaped pattern of back

4    spatter present on the pillow near Anita Kustok's

5    head, if the weapon had been lying on the pillow at

6    the time the shot was fired, back spatter stains

7    would be present on the face of the grip and back

8    strap."

9            Knowing what you know now, could that be

10   true?

11       A    That -- that can't be true just because of

12   what pieces are described.  The back strap is

13   behind the gun.  The other description is the front

14   of the gun.  That would imply that residues would

15   be wrapping around.  So that statement is untrue

16   with or without the residues, but it certainly

17   references that there's no residues adjacent to

18   that discharge.

19       Q    Similarly, in his report Mr. Englert stated:

20           "The revolver was not lying on the bed at

21   the time of discharge.  There was no visible powder

22   burned patterns on the pillows and or bedding from

23   the gases escaping the cylinder or muzzle."

24

GGGG--39

1        Knowing what you know now based on the

2   testing of the pillow, is this true?

3        A    That's untrue.

4        Q    And, um, finally, from that same report,

5   Mr. Englert stated:

6             "The back spatter stains on the opposite

7   sides of the cylinder of the 357 revolver are not

8   consistent with the weapon lying on the bed at the

9   time the shot was fired."

10            Knowing what you know now, could that be

11  true?

12       A    If -- if the pillow is involved with

13  the -- the shot to, uh -- fatal shot, then that

14  cannot -- that also cannot be true.

15       Q    Now, finally, I just have a -- a -- a few

16  more questions.

17            On -- during Mr. Englert's testimony on

18  March 4th, um, on Page 127 of the transcript, Line

19  22, he's asked the question:

20            "Question:  You also -- you looked at

21  every piece of bedding for that burn mark or that

22  soot mark, right?

23            Answer:  Yes, ma'am.

24            Question:  Did you find any such burn or

GGGG-40

1    soot mark on any piece of bedding?

2                        Answer:  No.

3                        Question:  What does that tell you?

4                        Answer:  That tells me that the gun was

5    elevated, and the gun wasn't close to the bed."

6                        Knowing what you know now, is that true?

7         A    That's an erroneous analysis, and it is

8    not true.

9         Q    Considering all of Mr. Englert's erroneous

10   analyses, what are the consequences of those

11   erroneous analyses?

12        MR. PAPA:  Objection.

13   BY MR. BLACK:

14        Q    In your opinion, what are the --

15        THE COURT:  All right, that objection

16   sustained.  Go ahead.

17   BY MR. BLACK:

18        Q    In your opinion, Mr. -- Mr. Noedel, based on

19   all of Mr. Englert's erroneous analyses, what are the

20   consequences with regards to his reconstruction and

21   analysis of this case, what are the consequences of

22   his erroneous analyses?

23        A    The -- we can't measure all of the

24   consequences because we don't know because only one

SUP R 3200

1    you are -- you are believed to be able to

2    understand and recognize independently things that

3    you're claiming expertise in.  So when you sit in

4    the chair, people have to believe you because you

5    have this expertise.  And so if you -- if you plow

6    through the evidence or -- or overlook something,

7    especially something simple that can be tested, um,

8    then we have to figure out why is that happening.

9    So is it the -- is it confirmation bias because

10   you've already established where you think the shot

11   originated from and you're looking for evidence to

12   back fill it, we don't know.  But it's unethical,

13   in our field, to, um, purport some -- to -- to talk

14   about something you should know about, that this

15   smudge should be subject to a simple test.  It's

16   unethical not to -- not to test that, confirm it or

17   refute it, and then -- then go with whatever the

18   results are.  We should be scientifically driven in

19   a -- in a reconstruction.  It shouldn't just be, I

20   looked at it, and it looks like this to me.  Has to

21   be based on something.  Has to be based on

22   scientific evidence and physical evidence.  And --

23   and when that step is neglected, then we run into a

24   situation like this where the reconstruction is

SUP R 3201

1    flawed.

2         MR. BLACK:  Your Honor, can I have a moment,

3    please?

4         THE COURT:  Sure.

5         MR. BLACK:  No further questions.

6         THE COURT:  All right.  Cross examination.

7         MR. BEUKE:  Just think with respect to

8    Mr. Noedel's new report, I wonder if we should mark

9    that as an exhibit, also, if we haven't.  Just to

10   make it part of the record.

11        THE COURT:  Do you want to mark that as

12   Defense Exhibit No. 5?

13        MR. BEUKE:  Yes, your Honor.

14        MR. BLACK:  Yes.

15        THE COURT:  That's the November 29th, report?

16        MR. BEUKE:  Yes, your Honor.

17        THE COURT:  All right, very good.

18        Anything else, defense?

19        MR. BEUKE:  No, your Honor.

20        THE COURT:  State?

21        MR. PAPA:  Thank you, Judge.

22

23

24

```
 1    STATE OF ILLINOIS )
                        )  SS
 2    COUNTY OF COOK    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          MUNICIPAL DEPARTMENT-FIFTH MUNICIPAL DISTRICT
 4

 5    THE PEOPLE OF THE      )
      STATE OF ILLINOIS,     )   No. 10-CR-19174
 6        People/Respondent, )
                             )   Before HON. JOHN JOSEPH HYNES
 7        vs.                )
                             )   December 4th, 2014
 8    ALLAN KUSTOK,          )
          Defendant/Petitioner.)  2:45  P.M.
 9

10            Court convened pursuant to recess.

11
              APPEARANCES:
12              HON. ANITA M. ALVAREZ,
                   Cook County State's Attorney, by:
13              MS. LORNA AMADO-CHEVLIN, MR. JAMES PAPA,
                MS. JENNIFER GONZALEZ,
14                 Assistant State's Attorneys,
                   on behalf of the Plaintiff;
15
                MR. RICK BEUKE,
16              MR. STEVEN RUECKERT,
                MS. LAURA MORASK,
17              MR. TIM BLACK,
                   on behalf of the Defendant.
18

19

20

21

22    Elizabeth A. Proietti
      CSR #084-002544
23    10220 S. 76th Avenue
      Bridgeview, IL   60455
24
```

SUP R 3232

```
 1    contain thousands of -- of photographs.  I don't

 2    want, you know, to continue this case for the

 3    purposes of continuing the case.  That's not our --

 4    our position here, Judge.  And I don't want to put,

 5    uh, a lawyer on the witness stand for any ill

 6    purpose or to get Miss Gonzalez off the case.  I

 7    have too much respect for her to do that.  But I'd

 8    like to make it clear, uh, that this is something

 9    that we feel, as a defense team, is essential to

10    make sure it is not only in the record, but it's

11    clear for anybody who wants to look at this.  And

12    those conversations are absolutely crucial, Judge.

13    There was -- there's specific requests to be shown

14    a particular item of evidence, and that item of

15    evidence is the photograph.  And it was never

16    shown.

17         THE COURT:  Well, once again, um, we're --

18    you're zeroing in on the time during trial, but it

19    is clear from the defense experts, both Mr. Noedel

20    and Mr. Kish, that they knew about Mr. Englert's

21    opinion and determination when they received the

22    evidence, when they received his report, his April

23    10th report.  They both had that.  They, for

24    whatever reason, did not note that of any
```

GGGG-82

1    particular -- make any particular note of that

2    evidence.  They had that from the time that they

3    got into the case.

4        And I think Mr. Kish said he got into the case

5    sometime around November of, uh -- or, excuse me,

6    May of 2012.  He actually, in November of 2012 Kish

7    went to the Orland Park Police Department and

8    viewed the evidence.  He had every opportunity to

9    ask for every piece of evidence that he could look

10   at.  He said he took notes on that report.  He had

11   an opportunity to, uh, review that -- anything he

12   wanted, and he did not do so.

13       Uh, then Noedel testified today and has

14   testified that he had Englert's report with that

15   information in there.  They had the opportunity to

16   request the defense -- or to request additional

17   testing.  That was not done.

18       The fact that all of a sudden, someone, right

19   at trial, said, oh, this is important, that does

20   not show due diligence.  So I am not going to have

21   you call lawyers to basically snipe back and forth

22   as to what he said or what she said during the middle

23   or right before trial.  This was known to both

24   sides prior to trial.  The testing was not done.

SUP R 3242

1       MR. BEUKE: It wasn't, Judge, it wasn't known.

2       THE COURT: It was. It was in the report so.

3       MR. BEUKE: What's in the report --

4       THE COURT: So I'm going to deny your request

5  to call Miss Gonzalez. I don't need to hear from

6  Miss Morask because that is in the report -- in

7  your post-trial motion, and let's proceed further.

8       MR. BEUKE: Well, okay. Judge, then I don't

9  know that we -- we'd like to supplement the record

10  with the disks and photographs, but.

11       THE COURT: You can impound those at -- at a

12  later date.

13       MR. BEUKE: Yeah. In terms of live witnesses,

14  then, Judge, we don't have any more.

15       THE COURT: All right. State, do you have any

16  live witnesses?

17       MS. GONZALEZ: No, sir.

18       THE COURT: I'll listen to argument, then. As

19  to post-trial motions. Um, if you want to start

20  out with just what we've done here, and then you

21  can -- I'll allow you to go into the other stuff,

22  or if you want to do everything right now, it's up

23  to you.

24       MR. BEUKE: Well, I'm not sure what you mean,

1    your Honor.

2         THE COURT:  Well, I mean, if you want to --

3    you've got a -- your post-trial motion sets forth

4    quite a few points, not just related to the testing

5    of this pillowcase.  So that's why I say if you

6    want to just argue this -- the significance of the

7    testing and the pillowcase, we can do that, and

8    then you can argue the rest of it, the motion, or

9    you can argue it altogether.

10        MR. BEUKE:  Judge, I'd like to argue it

11   altogether.

12        THE COURT:  All right.

13                   CLOSING ARGUMENT

14                        BY

15                   MR. BEUKE:

16        Judge, we have, uh, set forth in our Motion

17   for New Trial a number of points and positions that

18   we believe require Mr. Kustok to be given a new

19   trial.  And, just so it's clear, your Honor, with

20   respect to our position, this is not uh -- this is

21   Mr. Kustok's trial.  This is Mr. Kustok's defense.

22   This is Mr. Kustok's case.  It's not the case of --

23   of any of the lawyers.  It's not the case of any of

24   the Judges.  It's not the case of anybody other

1    matter anyway. Well, that wasn't and isn't their

2    job. That's the job of the jury, to be given all

3    of the facts in this case. And I submit to you,

4    what Mr. Noedel told you from the witness stand

5    today, he gave you 12 different reasons why this

6    would have an effect on the fact finder. Why it

7    absolutely conclusively proves Mr. Englert is 100

8    percent wrong in several of his opinions. And is

9    that important enough evidence for the jury to have

10   had? I submit to the Court, without question.

11        With all due respect, Judge, we could ask you

12   to grant our motion.

13        THE COURT: Thank you.

14        I've had an opportunity to listen to the

15   arguments of Counsel. I have reviewed my notes and

16   some of the transcripts of the testimony here, and,

17   uh, also, I remember the rulings -- prior rulings,

18   and I'm ready to make the following findings of

19   fact and conclusions of law:

20        First, I'll address the general arguments that

21   the defense has made. Any arguments that they did

22   not orally make, I will rely on Court's prior

23   rulings in that regard.

24

GGGG—136

1  And I think each one of these issues has been

2  thoroughly discussed and thoroughly argued by both

3  sides here.

4  First of all, um, the defense argument here is

5  that the Court erred in failing to suppress the

6  statements to the medical personnel based on the

7  mental health record confidentiality and physician

8  patient confidentiality.

9  Once again, I think there's an exception here

10  to the -- that, and that has to do with the -- when

11  you're dealing with an offense of murder.  And we

12  addressed these in length prior to these` -- the

13  admissibility of these statements, and I believe

14  the Court ruled appropriately and I standby those

15  prior rulings.

16  With regards to the defense argument, with

17  regards to the proof of other crimes evidence, the

18  admissibility of the prior affairs of the

19  defendant, clearly we had multiple times that the

20  defense sought to preclude this information, and

21  the Court went through these prior incidents.  The

22  Court looked at each one of these, decided that

23  there were several that would be admissible.

24  Several more that would not be admissible.  It's

GGGG-137

SUP R 3296

1    clear that the ruling -- it's clear that the

2    witnesses who did testify all had something to say,

3    and it went to the defendant's motive, his intent,

4    his state of mind.  The statements by these

5    witnesses was important to show the defendant's

6    state of mind.

7         Furthermore, and these other issues, the

8    nature of these events.  This is a situation where

9    the defendant had a long term relationship with one

10   woman, and sometime shortly before -- not shortly

11   but about a little more than a year before this

12   incident, these -- the proclivity to look for other

13   women escalated.  Went to web sites looking for

14   married women who were willing to have sex outside

15   of marriage.  Each one of these encounters, you

16   know, some of which were testified to.  He told

17   people that he was getting out of a marriage, he

18   was getting a divorce, et cetera.  And then the

19   frequency with which and the boldness with which

20   these occurred escalated up until the date of

21   Jeanie Kustok's death.  And clearly it shows the

22   defendant's motive, his state of mind, his intent,

23   and clearly these were admissible and I standby the

24   Court's prior rulings as to all of that.

GGGG-138

1        With regards to the issue of what -- Zak

2   Kustok and his press conference.  Both sides had

3   Zak Kustok as a witness listed on there.  I don't

4   know who was responsible for watching him during

5   the course of this trial.  I don't think either

6   side was responsible.  He made a statement that he

7   should not have made based on the Court's prior

8   order in this matter, however when this was brought

9   to the Court's attention, um, and the defense made

10  the request for a mistrial, the Court went through

11  and voir dired this jury.  And throughout the

12  course of this trial repeatedly, every day,

13  numerous times every day, I informed this jury not

14  to look at anything on t.v., listen to anything,

15  overhear anything, read anything, stay away from

16  the Internet, and that was repeatedly given to the

17  jurors each day.

18       I observed these jurors.  They were very

19  attentive throughout the course of this trial.

20  They were listening to the Court's instructions.

21  And when I voir dired them after this incident,

22  they all said that they did not hear anything, read

23  anything, or see anything about this.  And the

24  Court, in my mind, believed the jury because that's

GGGG-139

1    what they did.  And I noticed and I watched them

2    throughout the course of these proceedings, and

3    they took these proceedings very seriously.

4         With regards to the Defendant's Motion For

5    Mistrial and the lack of the videotaped statement

6    and admissibility of that, number one, the reason

7    that was not allowed, because it was a --

8    potentially a self-serving statement and hearsay

9    under the rules of evidence.  So, um, this was

10   something that everyone is -- the rules of evidence

11   are the building blocks of each one of these cases,

12   and everyone is bound by the rules of evidence,

13   including the defense.  So when I did not allow the

14   defense to go into that, it was because of the

15   rules of evidence, and I did weigh the probative

16   value, prejudicial effect, everything involved

17   here, and I determined that that was not

18   appropriate based upon the rules of evidence.

19        However, Mr. Beuke was extensively allowed to

20   argue what inference that could be drawn from the

21   State's failure to show this video.  And that went

22   on for quite awhile.  This jury was not mistaken as

23   to the significance, at least from the defense

24   point of view, of this information.

GGGG-140

1    Similarly, with regards to the opening

2    statements by the State, the jury was extensively

3    told by Mr. Beuke the errors or the reasons that

4    they should consider that, even though opening

5    statements are not evidence and are not to be

6    considered by the ev -- jurors as evidence, they

7    were repeatedly told about the significance, the

8    weaknesses that means in the State's case, and the

9    jurors were left with no doubt that the defense

10    contested that and the jurors had that at their

11    disposal.

12    With regards to the issues that were brought

13    forth today, with regards to the post-trial motion

14    and the testimony that was brought forth, first of

15    all, I want to discuss this case, the State -- or

16    the defense has presented here, the Golf case.  And

17    that case, I believe, is not on point because,

18    first, that case -- the issue in that case is

19    whether the State -- or the Court should have

20    allowed the defense to reopen a case with a readily

21    available witness.  That is not what we had here.

22    We were -- the problem in this case is that

23    the defense wanted to have a scientific test mid

24    trial.  And I asked both sides if there was any

GGGG-141

1    case law on that.  Neither side could present any.

2    I also looked through the case law myself during

3    the course of this.  Could not find anything that

4    would allow this.  So, I think the cases are not --

5    Golf case is not on point, and, of course, that was

6    not presented to me during trial so I would have

7    had an opportunity to consider that.

8        But be that as it may, these last few days,

9    the hearings we've had, show why allowing the test

10   mid trial would have been a mistake.  If I had

11   allowed the sodium rhodizonate test mid trial,

12   neither side would have had the time and the

13   ability to assess the significance of that

14   evidence.

15       As in this case, the sodium rhodizonate, after

16   trial, we had the testing for the lead, and then

17   both sides agreed to the test firing of the gun at

18   various distances by Nicole Fundell from the State

19   Police.  That put it in perspective.  We did not

20   have the luxury of time for that mid trial.  So,

21   consequently, the jury may have been left with

22   improper inferences that were not based on

23   scientific testing.  That is the reason that, under

24   the discovery rules, these tests and the expert

GGGG-142

1    opinion should be disclosed prior to trial.

2         And, also, this trial went for almost four

3    weeks.  With several interruptions during the

4    course of this.  This would have delayed the trial

5    even longer.  When the parties originally told me,

6    and I believe I told the jury that this would be

7    about a two week trial.  The jury was very, very

8    attentive during the time.  They were very, uh,

9    understanding, but, once again, this was something

10   that was -- no case law was presented to me, and it

11   was something that could not be put in perspective

12   until post-trial here what we have.

13        Now, with regards to the significance of this

14   evidence, and whether or not it's sufficient to

15   grant a new trial.  In Illinois, newly discovered

16   evidence warrants a new trial when, one, it has

17   been discovered since trial.  Second, it is of such

18   a character it could not have been discovered prior

19   to trial by the exercise of due diligence.  Third,

20   it is material to the issue and not merely

21   cumulative.  And, fourth, it is of such a

22   conclusive character that will probably change the

23   result on trial.

24

SUP R 3302

```
 1          Going through these factors, first, it has
 2     been discovered since trial.  Well that's clear.
 3     We didn't have this test at trial.  We didn't have
 4     the additional testing of the weapon at trial.  So
 5     that factor is met.
 6          But next is whether or not it is such a
 7     character that it could not have been discovered
 8     prior to trial by the exercise of due diligence.
 9     And as I have stated before and will restate again,
10     Englert's final report was April 10th of 2012,
11     which was tendered to the defense shortly
12     thereafter.  The defense expert, Paul Kish, and now
13     Mr. Noedel, indicated that in that report they had
14     that information of the -- of the pillowcase that
15     was viewed by Rod Englert on or about March 28th,
16     2012 at O'Hare Airport.  That was there.  That was
17     out there for both sides.  Kish was given full
18     access to all the evidence, including the
19     pillowcase on November 15th of 2012, and despite
20     the potential significance, he did not ask for the
21     pillowcase in question.  Today Noedel indicated
22     that he had the report, and he could have looked at
23     any piece of evidence himself.
24
```

GGGG-144

SUP R 3303

1      The defense was on notice that potential

2  evidence existed since April of 2012, more than a

3  year and a half prior to trial, whether it was

4  inadvertence, a matter of trial strategy, the

5  defense chose not to do anything about it.  This

6  whole idea that, all of a sudden, days before

7  trial, this becomes significant is disingenuous.

8  Because this information was out there.  And the

9  mountains of evidence that they talk about,

10  everybody had that.  But the fact that it was

11  overlooked until the time of trial is something

12  that, with due diligence, the defense could have

13  discovered.  And I find that the evidence could

14  have been discovered prior to trial with the

15  exercise of due diligence.

16      With regard to the third factor, whether or

17  not it's material to the issue and not merely

18  cumulative, this jury was fully apprised of the

19  defense theory that Englert's theories and his

20  methodology were unreliable.  He was on the stand

21  for two and a half days, most of which was cross

22  examination.  Mr. Noedel and Mr. Kish both disputed

23  his opinions, his methodology.  Both indicated the

24  sodium rhodizonate test could have made this

SUP R 3304

1    determination on this pillowcase, and they brought

2    that to the attention of the jury.

3        Furthermore, Mr. Noedel testified that -- and

4    Mr. Kish testified that, uh, the victim in this

5    matter would have been on the bed at the time of

6    death.  Death would have been instantaneous.  And

7    they substantially corroborated the other expert

8    witnesses that the defense -- that the State had.

9        Miss Fundell, in her testimony here, stated

10    that she couldn't recreate the exact pattern of

11    what occurred.  That she couldn't, uh -- did not

12    know if the pattern that was on the pillowcase

13    after the sodium rhodizonate test was made by the

14    fatal shot or was one that was placed into the

15    armoire.

16        Noedel testified today that he's in agreement

17    with Miss Fundell's testing.  And that he was --

18    said that this pillowcase and the position of these

19    area and levels could have been the result of one

20    firing or three firings.  That you could not tell

21    whether or not it was one or three firings.  He

22    also understood and knew that Miss Fundell could

23    not replicate the exact pattern.  That the distance

24    between the two major deposits of seven inches was

SUP R 3305

1    not, uh -- between the muzzle and the cylinder gap

2    was not the same as the actual gun, which was four

3    inches.  And the lead -- and she also indicated

4    that Miss Fundell could never replicate the exact

5    rectangular shape deposit.  And when asked by the

6    State about, uh, how this could happen and the --

7    whether or not these pillows and how you could

8    recreate this, the firing on the gun, he said there

9    were tons of variables where the pillowcases could

10   have been positioned or could not have been

11   positioned on it.

12       So what are we to draw from that?  We're to

13   draw that, at best, these competing expert opinions

14   cancel each other out.  Nobody can say how this

15   happened.  No expert that testified can say how

16   this happened.  And, in such, that is exactly what

17   was testified to by the defense experts.  They

18   testified that there were other ways that they

19   believed or other explanations how it could

20   potentially be a suicide.  But the jury had this at

21   their disposal.  Clearly, this type of evidence was

22   merely cumulative and not of such a character that

23   it would change the trial.

24

SUP R 3306

1      And that brings me to the last point here

2    under the analysis is whether or not this is such

3    conclusive character that it would be -- probably

4    change the result on retrial.  First of all, once

5    again, there was overwhelming evidence that was

6    presented outside of the expert testimony of Kish,

7    Noedel and Englert.  Englert, unlike Mr. -- what

8    Mr. Beuke would say, is not the star witness in

9    this case.  The star witnesses in this case were

10   the people who pieced together the incident before

11   and after what happened.

12      First of all, with regards to the other

13   evidence, taking aside the experts, you've got the

14   issue here, once again, of motive.  And the

15   witnesses on both sides testified as to Jeanie

16   Kustok's demeanor, her -- how she felt at and

17   around the time.  She was a person who was happy,

18   was planning for the future, had no reason to

19   commit suicide.  No reason.  Although the State --

20   or the defense brought in the fact that she was cut

21   down on her hours for jobs, uh, there might have

22   been some health issues and or she was afraid to be

23   alone, these do not rise to what I would believe to

24   be something that would give a motive for her to

1    kill herself.

2        You contrast that to the defendant. And his

3    secret life, philandering, the talk about his

4    unhappy marriage, getting a divorce, and

5    increasingly more frequent and bold encounters he

6    had with these women. Couple that with the

7    defendant's inconsistent actions afterwards.

8        After the shooting, after he hears the shots,

9    he doesn't call the police. Doesn't call an

10    ambulance. He sits there for a period of time with

11    Jeanie Kustok. Whether it's 45 minutes, like the

12    defense will have you believe, or an hour and a

13    half, like the State will have you believe, these

14    are not the actions of an innocent person who did

15    not commit a crime. A reasonable person would have

16    done something different.

17        Couple that with the fact that he shot into

18    the armoire five times claiming he didn't want to

19    kill himself. Once again, unbelievable, and not

20    the actions of a reasonable person.

21        Coupled with the fact that he seriously

22    disturbed the crime scene after the incident. He

23    was the one -- everyone talks about the experts and

24    what they can and can't do. He was the one who

SUP R 3308

1    stacked the pillows.  He was the one who took bed

2    sheets off.  He was the one who left evidence where

3    it was left, and did what he can do.  Once again,

4    not the actions of a person innocent of a crime.

5         Couple that with his statements to the medical

6    personnel and the different statements there and

7    the police.

8         And then, once again, you look at the weapon

9    involved here.  Now, the defendant said that he

10   bought that weapon for her protection, because she

11   was afraid.  However, he signed a federal document

12   or -- or told the personnel from Chuck's Gun Shop

13   that he was getting the gun for target practice.

14        Most of the witnesses, almost all of them, for

15   the State, testified they didn't know anything

16   about a gun.  That's family members, close friends.

17   And that gun, when the police were looking through

18   the house, the ammo that was found for that gun and

19   the box that housed that gun were found in an area

20   where the defendant would be.  That is in a work

21   area, workbench with tools.

22        Furthermore, you look at the general size of

23   that gun.  That's a 357.  It's not the type of gun

24   you would buy for a woman of Jeanie Kustok's size

GGGG-150

1    if she wanted to use for self-defense.  It was

2    testified to it's hard to handle.  It's huge.  One

3    handed or two handed.  The recoil on that is

4    significant.  The trigger pull is significant.

5    These are all circumstances take into account.

6         Furthermore, we had the GSR that was on the

7    defendant's hand, and none that was on the victim's

8    hand.  And that was explained away, and it's

9    clearly not the end all beat all, but it is a

10   clearly circumstantial evidence as to how this

11   happened.

12        You also have the testimony of the medical

13   examiner.  That, based on the stippling on the

14   victim's eye and the fact that there was no soot,

15   the gun was at least six inches from her left

16   cheek.  Further, that the gun is -- the farther

17   away from that gun was from Jeanie's face, the less

18   likely it is that she could have killed herself.

19   And that is one of the considerations.  And the

20   doctor testified that she considered all possible

21   scenarios, accident, suicide, and came to the

22   conclusion that this is a homicide.

23        Finally, we get to the fact as to the

24   impossibility or difficulty of the victim shooting

SUP R 3310

1    herself.  Either purposely or accidentally shooting

2    herself.  And all of the witnesses, including the

3    defense witnesses, testified to the fact that it

4    would be hard for her, especially if she was

5    right-handed, to point that gun in a way in which

6    she could kill herself in the manner and with the

7    trajectory of that bullet that went through her

8    skull.  Defense experts said that.  State experts

9    said that.

10    Also, the defense experts, although, came up

11    with possibilities, there was no real theory as to

12    how she could have done this and committed suicide.

13    Once again, given the trajectory of the bullet, the

14    gun itself, there was some talk about two hands

15    being able to be used to kill herself, but she

16    would have had to be pointing the gun at her face

17    when she did it.

18    Finally, Mr. Noedel talked a little bit about,

19    in his testimony at trial, uh, the fact that it

20    could have been accidental discharge with the

21    single action versus double action here.  But, once

22    again, on cross examination, he admitted that if

23    this was a situation where she was trying to de

24    cock the gun, she would have been pointing it at

GGGG-152

SUP R 3311

1       her own face.

2            Clearly, this evidence is not such a

3       conclusive character that it would probably change

4       the results on trial.

5            For these reasons and for all the reasons that

6       I previously stated and for the -- all the reasons

7       stated during trial, defendant's Motion for New

8       Trial will be denied.

9            MR. BEUKE:  Judge, can we have a short date

10      for sentencing?

11           THE COURT:  Or we can do it tomorrow

12      afternoon.  I'm available after about 2:00.

13           MR. BEUKE:  Could we go into next week, Judge?

14           THE COURT:  I don't know that I have the --

15           MR. BEUKE:  Could you just give us -- I don't

16      believe there's going to be any live witnesses from

17      the defense perspective.

18           THE COURT:  Do you have any idea how many

19      witnesses or any witnesses, if you're going to have

20      any witnesses, State?

21           MS. GONZALEZ:  The State just has a couple of

22      victim impact statements.  We're ready to proceed

23      whenever the Court is ready.

24           THE COURT:  I'm sorry?

```
 1    STATE OF ILLINOIS    )
                           )  SS
 2    COUNTY OF COOK       )

 3

 4

 5         I, Elizabeth A. Proietti, Official Shorthand

 6    Reporter of the Circuit Court of Cook County,

 7    Illinois, hereby certify that I reported in

 8    stenographic notes the proceedings had in the

 9    above-entitled cause, and that the foregoing is a

10    true and accurate transcript of the proceedings had

11    on this date.

12

13                        _____

14                        Elizabeth A. Proietti
                          Official Shorthand Reporter
15                        Circuit Court of Cook County
                          No. 084-002544
16

17

18

19

20

21

22

23

24    Dated February 20, 2015
```

GGGG-156

```
 1   STATE OF ILLINOIS )
                       ) SS:
 2   COUNTY OF COOK    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
     THE PEOPLE OF THE        )
 5   STATE OF ILLINOIS,       )
                              )
 6              vs.           )  No. 10 CR 19174
                              )
 7   ALLAN KUSTOK.           )

 8

 9        REPORT OF PROCEEDINGS HAD at the Trial of

10   the above-entitled cause, before the Honorable

11   JOHN HYNES, one of the Judges of said Division,

12   on the 21st of February, 2014.

13
               PRESENT:
14
               HON. ANITA M. ALVAREZ
15             STATE'S ATTORNEY OF COOK COUNTY, by
               MS. JENNIFER GONZALEZ, MR JAMES PAPA
16             and MS. LORNA AMADO-CHEVLIN,
               Assistant State's Attorneys,
17                  Appeared on behalf of the People;

18
               MR. RICK BEUKE, MR. STEVEN RUECKERT,
19             MS. LAURA MORASK and MR. TIM BLACK
                    Appeared on behalf of the Defendant.
20

21

22

23
     Barbara A. Evans
24   Official Court Reporter
```

BBB-1

SUP R 3347

1           A    I don't believe she ever knew nor did I.

2           MS. GONZALEZ:  Nothing further.

3           THE COURT:  Any recross?

4           MR. BEUKE:  No.  Thank you, John.

5           THE COURT:  Thank you for your testimony.

6                     Can I have the parties up here for a

7      second just for scheduling.

8                          (WHEREUPON, a discussion was

9                           had off the record.)

10          THE COURT:  State, why don't you call

11     your next witness?  Sir, if you can come around

12     there, remain standing.  I will ask you to raise

13     your right hand and be sworn.

14                     (Witness duly sworn.)

15          THE COURT:  Sir, you can have a seat.

16     The microphone is on so it will pick up your

17     voice.

18                     BALBINO ASEVES,

19     called as a witness, having been first duly

20     sworn, was examined and testified as follows:

21                     DIRECT EXAMINATION

22                     BY

23                     MR. PAPA:

24          Q    Sir, in a loud, clear voice please

                          BBB-119

1    state your name, your first and last name and

2    please spell both.

3         A    First name Balbino, B-a-l-b-i-n-o.  Last

4    name is Aseves, A-s-e, V as in Victor, e-s.

5         Q    And Mr. Aseves, how old are you?

6         A    54.

7         Q    You live in the Chicago land area?

8         A    I live in a southwestern suburb of

9    Chicago.

10        Q    And Mr. Aseves, are you currently

11   employed?

12        A    Yes, sir, I am.

13        Q    What do you do for a living.

14        A    I am a Public Safety Officer for Palos

15   Community Hospital.

16        Q    First of all, let's talk about what

17   it means to be a Public Safety Officer.

18        A    I provide security for the hospital,

19   safety for patients, visitors, hospital staff.  I

20   monitor their resources, which would be their people,

21   their building, the property.

22        Q    And how long have you been a Public

23   Safety Officer for the Palos Community Hospital?

24        A    Eight years, sir.

BBB-120

1    shirt and the pants or was it one or the other?

2         A    They were the shirt and the pants.

3         Q    The shirt and the pants.

4              When you saw that, Mr. Aseves, what

5    did you think?

6         A    I thought he was a doctor.

7         Q    At that time did the defendant say

8    anything to you?

9         A    I asked him if he needed a wheelchair and

10   then at that time he stated; my wife is dead, she shot

11   herself.

12        Q    Now, Mr. Aseves, at that point after

13   the defendant made that statement to you did you

14   do anything?

15        A    Yes, sir.  I immediately went back inside

16   the little cove that we have and called the emergency

17   room and told them I needed nursing assistants out.

18        Q    After you placed that phone call did

19   you remain, I think you said a cove?

20        A    It's between the two doorways.

21        Q    From the outside to the inside of

22   the hospital?

23        A    Correct.

24        Q    Did you remain in that area or did

BBB-125

```
1    STATE OF ILLINOIS      )
2                           ) SS:
3    COUNTY OF C O O K      )
4
5       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
6           COUNTY DEPARTMENT-CRIMINAL DIVISION
7
8                I, Barbara A. Evans, C.S.R., an
9    Official Court Reporter in the Circuit Court of
10   Cook County, County Department, Criminal
11   Division, do hereby certify that I reported in
12   shorthand the proceedings had at the hearing of
13   the aforementioned cause; that I thereafter
14   caused the foregoing to be transcribed, which I
15   hereby certify to be a true and accurate
16   transcript taken to the best of my ability of
17   the proceedings.
18
19
20   _____
                Official Court Reporter
21
22   Dated February 25, 2015
23   CSR# 084-002722
24
```

BBB-298

SUP R 3643

```
 1    STATE OF ILLINOIS )
                        )  SS
 2    COUNTY OF COOK    )

 3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
         MUNICIPAL DEPARTMENT-FIFTH MUNICIPAL DISTRICT
 4

 5    THE PEOPLE OF THE )
      STATE OF ILLINOIS,)
 6          Plaintiff,)
                        )
 7       vs.            )   No. 10-CR-19174
                        )
 8    ALLAN KUSTOK,     )   Jury Trial
            Defendant.)    Afternoon Session
 9

10            REPORT OF PROCEEDINGS had at the hearing

11    of the above-entitled cause, before the Honorable

12    JOHN JOSEPH HYNES, one of the Judges of said

13    District, on the 4th day of March, 2014.

14
                 APPEARANCES:
15             . HON. ANITA M. ALVAREZ,
                   Cook County State's Attorney, by:
16               MS. LORNA AMADO-CHEVLIN,
                 MS. JENNIFER GONZALEZ and
17               MR. JAMES PAPA,
                   Assistant State's Attorneys,
18                 on behalf of the Plaintiff;

19               MR. RICK BEUKE,
                 MR. STEVEN RUECKERT,
20               MS. LAURA MORASK, and
                 MR. TIM BLACK,
21                 on behalf of the Defendant.

22    Elizabeth A. Proietti
      CSR #084-002544
23    10220 S. 76th Avenue
      Bridgeview, IL   60455
24
```

SUP R 3794

1       Hopefully it was agreeable.  Um, I believe we're

2       ready to proceed again.

3            State, if you want to proceed, then.

4            MS. GONZALEZ:  Thank you.

5                          (Witness previously sworn.)

6                          ROD ENGLERT,

7       Called as a witness on behalf of the People herein,

8       having been previously duly sworn, was examined and

9       testified as follows:

10                 CONTINUED DIRECT EXAMINATION

11                          BY

12                      MS. GONZALEZ:

13           Q    Sir, I believe we left off, we were going to

14      be talking about some of the bedding; particularly,

15      the pillows.  I'm going to show you what I've marked

16      as People's Exhibit No. 201?

17           A    May I step down again, your Honor?

18           THE COURT:  Yes.

19      BY MS. GONZALEZ:

20           Q    Can I ask you first, we see some arrows on

21      this photograph, is that fair to say?

22           A    Yes.

23           Q    Did you place those there?

24           A    Yes, I did.

1       A    No, because the head is fixed and the

2   direction of the spatter's going this direction,

3   and spatter just does not -- impact spatter does

4   not reverse and come and land on -- it just doesn't

5   happen.  And land on the shirt.

6       Q    I'm showing you what I'll mark as People's

7   Exhibit No. 238.  Why did you do this?

8       A    This is to see if there's another possible

9   position in order to get the blowback.  Everything

10  is changed here.  This is just trying every, even

11  to the ridiculous, position that it could happen.

12  Because you never know.  You could run across

13  something, wait, you never thought of that.  And we

14  tried every position, it's just one of those

15  positions that, uh, it changes the bullet path into

16  the pillow.  It changes everything that's here, and

17  it doesn't fit.  If there was blowback, you could

18  see that some of those areas would be blocked.

19      Q    So in this --

20      A    And there's nothing in this particular

21  area.

22      Q    So in this particular position, is that the

23  only way you could get that high velocity impact

24  spatter on the T-shirt from Allan Kustok laying on

SUP R 3842

1    the left side of the bed?

2         A    You cannot get it.  Did you say can get it?

3         Q    Well, I said, this is the only way you could

4    position the models so that he could have gotten it

5    on his T-shirt if he were on the left side of the

6    bed?

7         A    That's correct.

8         Q    But do you know that it -- that Jeanie

9    Kustok was not in this position?

10        A    She wasn't because it would change the

11   direction through the face.  The position would

12   have to come over and shoot from this direction or

13   put her head down.  When -- when that head moves,

14   if you -- if you put the head on a rod and it moves

15   either way, you can see the things just do not fit.

16        Q    I believe you can have a seat again, sir.

17                  (Witness resuming stand.)

18        Q    Now, sir, you were actually in the Kustok

19   residence in that master bedroom?

20        A    Yes.

21        Q    Where was the bathroom, the master bathroom

22   in relation to the bed where Jeanie Kustok was shot?

23        A    Little over 20 feet to the east of the

24   bed.

KKK-51

SUP R 3843

1      Q    Is it possible the defendant was in the

2  bathroom at the time Jeanie Kustok was shot?

3      A    No.

4      Q    Why not?

5      A    Because you -- he's got a pattern of blood

6  on the shirt that is consistent with a volatile

7  event in the bedroom, gunshot, and that pattern

8  that is going back on the shirt, uh, means he could

9  not have been in the bathroom when that shot was

10  fired.

11      Q    Sir, based on all of your experiences, your

12  training, your review of all the evidence, the

13  photographs, the statements, everything in this case,

14  did you form some opinions with regard to a -- with

15  regard to your consultation on this case based on a

16  reasonable degree of scientific certainty?

17      A    I did.

18      Q    I'm going to ask you to put up on the screen

19  People's Exhibit No. 229.  Do you have an opinion as

20  to the significance of the high velocity impact

21  spatter on the -- on the gray T-shirt and on the blue

22  shorts in this case?

23      A    And on the glasses, yes.

24      Q    What is your opinion with regard to those?

KKK-52

1    A    That Jeanie Kustok is shot in the left

2    side of the face.  And emitting from that entrance

3    wound, going back towards where the shot came from,

4    on two pillows, are tiny little stains, impact

5    spatters, consistent with high energy.  That those

6    stains are also on a weapon that is held above the

7    pillows.  And, in addition to the weapon above the

8    pillows, not only on the pillows, but on the

9    weapon, but then those projected stains are on a

10   pair of shorts that are within the view of that

11   blowback, those projected stains are on a gray

12   T-shirt, multiple stains that are within the zone

13   of that blowback, and there's a pair of glasses

14   that have those multiple stains, those tiny specs,

15   all of them being the same, not transfers, not hair

16   patterns, nothing, just these tiny little energized

17   mist type stains blowing back against where the

18   shot came from.  Again, on the pillows, gun,

19   T-shirt, pants, and glasses.

20   Q    Do you have an opinion as to whether, um,

21   the person that shot Jeanie Kustok was standing

22   upright versus laying down?

23   A    In my opinion, the person that shot

24   Kustok -- or Mrs. Kustok, could have been crouched

KKK-53

```
1    over, but in a position where those arms, uh, were

2    in a position where the pants are exposed, crouched

3    over but not kneeling down because that would take

4    the pants out of it, but in a position where those

5    garments were exposed, T-shirt and pants and

6    glasses and the gun, to go back.  If you're

7    kneeling down or behind the bed, it's going to

8    block it.  Standing up is the most probable

9    position based upon the reconstruction as we see

10   here.

11        Q    Do you have an opinion to the proximity of

12   the person that shot Jeanie Kustok to her -- to her

13   body, to her face where she was shot?

14        A    Based upon the medical examiner, six

15   inches.  But we went conservative, four to six

16   inches.  In my opinion, based upon the large

17   stippling pattern, that it would be more consistent

18   with beyond four inches to close to what the

19   medical examiner advised.

20        Q    What you're talking about there is the

21   distance of the gun from her face, is that right?

22        A    That's correct.

23        Q    Do you have an opinion as to the distance of

24   the person that shot Jeanie Kustok?
```

1      A    Within four feet, yes.

2      Q    Do you have an opinion as to whether the

3  person that shot Jeanie Kustok could have been laying

4  on the bed on the victim's right side at the time she

5  was shot?

6      A    No.  Was not.

7      Q    Do you have an opinion as to what caused the

8  bloodstains that you identified on the gray T-shirt

9  in the circled areas A through I?

10     A    That is blowback from the gunshot.

11     Q    Do you have an opinion as to what caused the

12  fan-shaped blood pattern on the pillow that we saw?

13     A    That is consistent with exit type or

14  blowback type spatter that goes in a fan-shape back

15  towards where the bullet came from and towards

16  anything that might be within that zone and within

17  four feet.

18     Q    Do you have an opinion as to whether the,

19  um, high velocity impact spatter that's in the

20  fan-shape on the pillow is similar to the high

21  velocity impact spatter that you saw on the

22  defendant -- on the gray T-shirt that you circled the

23  areas?

24     A    They are the same.

KKK-55

1       Q   Do you have an opinion as to Jeanie

2   Kustok -- or Jeanie Kustok's positioning in the bed

3   when she was shot?

4       A   That her position is fixed, based upon the

5   bullet defect into the pillow case and the pillow,

6   and the path of the bullet through her head and the

7   pooling of blood that occurs for immediate

8   incapacitation, that that's where her head was when

9   she was shot.

10      Q   Do you have an opinion as to whether or not

11   Jeanie Kustok remained stationary in that bed for

12   some period of time after she was shot?

13      A   Based upon the blood, she remained

14   stationary and bled large pooling.  And there was

15   no pooling over on any area on the bed aside from

16   where the large pooling was that we were able to

17   put back together.

18      Q   In your 50 years plus of experience in going

19   to crime scenes and being consulted on cases, um, is

20   the evidence that you reviewed in this case

21   consistent with Jeanie Kustok committing suicide by

22   shooting herself?

23      A   No.

24      Q   Why not?

SUP R 3848

1    A    Because of the awkwardness, the distance,

2    the stippling, the atypical location of the wound

3    on her face.  Usually that's heart, temple, mouth

4    or forehead.  And most always, in suicide, it's

5    contact.  It's close contact to one of those

6    typical sites, heart, temple, mouth, and this is

7    rare, which is the forehead.  And that's where I've

8    seen all of those over the many years that I've

9    gone to suicide and self-inflicted scenes versus

10    homicides.

11    Q    Is it consistent with Jeanie Kustok

12    accidentally shooting herself?

13    A    No, it is not.

14    Q    Why not?

15    A    Because there's no evidence of how it

16    could accidentally happen.  For instance, to -- for

17    it to be an accident, the gun would have to be

18    laying on the pillow.  And based upon blood on both

19    sides, one of those sides shouldn't get that

20    blowback on it.  The absence of soot.  The absence,

21    if it's laying on the pillow, of fire.  I mean,

22    fire actually comes out that can burn, that can

23    start a little burning on the pillow itself, and

24    there's no evidence whatsoever that you would

1    expect to see, based upon experimentation, knowing

2    what guns do and having been injured myself in

3    shooting them, that the gun was laying on a pillow

4    or pillows when it accidentally discharged.

5    Q   What if it's not laying on pillows?  What if

6    she ac -- could she have accidentally shot herself,

7    um, and the only position I believe you said that she

8    could get the right angle was with one or both thumbs

9    pulling the trigger?

10    A   That's correct.

11    Q   How do you know that's not how it happened?

12    A   The evidence is not on her hands.  I mean,

13    there's no evidence that she held it up.  That

14    would be very awkward to accidentally do it.  Guns

15    don't accidentally discharge.

16    MS. MORASK:  Objection.

17    THE COURT:  Sustained.

18    BY MS. GONZALEZ:

19    Q   If her hand had been up in that position,

20    would she have blocked the high velocity impact

21    spatter on -- in the fan-shaped pattern on the

22    pillow?

23    A   Yes.

24    Q   Without identifying a person, can you tell

SUP R 3850

1    this jury, um, who used that gun to fire the bullet

2    into Jeanie Kustok's face that killed her?

3          MS. MORASK:  Objection.

4          THE COURT:  Overruled.

5          THE WITNESS:  The person wearing the gray

6    T-shirt.  And the blue shorts and the glasses.

7          MS. GONZALEZ:  Can I have just one moment?

8          Nothing further.

9          THE COURT:  Cross examination.

10         MS. MORASK:  Yes.

11                    CROSS EXAMINATION

12                         BY

13                    MS. MORASK:

14         Q    Mr. Englert, you just gave, um, a litany of

15    opinions that I just want to -- the last view that

16    you gave, those opinions are not encompassed in your

17    report?

18         A    The litany is not.

19         Q    Is that correct?

20         MS. GONZALEZ:  Judge, I'm going to object to

21    the form of the question.

22         MS. MORASK:  I'll make it more specific.

23         THE COURT:  All right.  Sustained.

24

KKK-59

```
 1    STATE OF ILLINOIS    )
                           )  SS
 2    COUNTY OF COOK       )

 3

 4

 5         I, Elizabeth A. Proietti, Official Shorthand

 6    Reporter of the Circuit Court of Cook County,

 7    Illinois, hereby certify that I reported in

 8    stenographic notes the proceedings had in the

 9    above-entitled cause, and that the foregoing is a

10    true and accurate transcript of the proceedings had

11    on this date.

12

13    _____

14    Elizabeth A. Proietti
      Official Shorthand Reporter
15    Circuit Court of Cook County
      No. 084-002544

16

17

18

19

20

21

22

23

24    Dated February 20, 2015
```

KKK-95

1  STATE OF ILLINOIS )
                     ) SS:
2  COUNTY OF COOK    )

3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT-CRIMINAL DIVISION
4
   THE PEOPLE OF THE      )
5  STATE OF ILLINOIS,     )
                          )
6            vs.          )   No. 10 CR 19174
                          )
7  ALLAN KUSTOK.          )

8

9      REPORT OF PROCEEDINGS HAD at the Trial of

10  the above-entitled cause, before the Honorable

11  JOHN J. HYNES, one of the Judges of said

12  Division, on the 5th of March, 2014.

13

14          PRESENT:

15  HON. ANITA M. ALVAREZ
    STATE'S ATTORNEY OF COOK COUNTY, by
16  MS. JENNIFER GONZALEZ, MR. JAMES PAPA
    and MS. LORNA AMADO-CHEVLIN,
17  Assistant State's Attorney,
           Appeared on behalf of the People;

18
    MR. RICK BEUKE, MR. RANDY RUECKERT,
19  MS. LAURA MORASK and MR. TIM BLACK,
           Appeared on behalf of the Defendant.
20

21

22

23
    Barbara A. Evans
24  Official Court Reporter

                    LLL-1

1     THE COURT:  All right, folks, you may be

2    seated.  I apologize for the late start.  It

3    seems the weather has caused havoc on all of us

4    getting here today.  So, that accounts for kind

5    of our tardy start.  Ms. Morask, do you want to

6    continue with your questioning?

7          MS. MORASK:  Thank you.

8          THE COURT:  Good morning, Mr. Englert.

9          THE WITNESS:  Good morning, ma'am.  Good

10   morning.

11               ROD ENGLERT,

12   called as a witness, having been previously duly

13   sworn, was examined and testified as follows:

14               CONTINUED CROSS EXAMINATION

15               BY

16               MS. MORASK:

17     Q     Sir, we left off where you had

18   established, and I am going to show you what has

19   previously been marked as People's Exhibit No.

20   224 that was displayed on the big screen by Ms.

21   Gonzalez.  And I will hold that up to the

22   jurors.  That's the photo of Doni Miller?

23     A     Doni Miller, D-o-n-i.

24     Q     And that shows how you had her

LLL-8

1   A  That's correct.

2   Q  And you had testified at length

3 yesterday to some additional opinions that you

4 agreed were not reflected in your report; is

5 that correct?

6   A  Would you restate those opinions?

7   Q  Sure.

8   A  What I was referring to?

9   Q  Sure.  That the opinion, that the

10 absence of soot caused you to be able to

11 determine these various scenarios that were not

12 applicable to this case?

13   A  We did not find soot in our examination

14 with our magnification.

15   Q  That wasn't my question.  Did you

16 render an opinion yesterday in court before the

17 ladies and gentlemen of the jury that the

18 scenario of either Anita Kustok self-inflicting

19 or accidentally inflicting the bullet hole could

20 not have happened because of the absence of

21 soot?

22   A  I will repeat, that's what we did not

23 find.  We looked for it and did not find it and I gave

24 that opinion yesterday.

1        Q     That wasn't my question.  Did you

2   give that opinion yesterday?

3        A     Yes, ma'am, that's what I said.  I gave

4   that opinion yesterday.

5        Q     And that opinion is not referenced

6   in Defendant's No. 35, is it?

7        A     My report?

8        Q     Your report?

9        A     I think it's in there that I had that

10  meeting, but there is nothing in there about it's in

11  my notes that we had the meeting but it was not soot.

12       Q     Sir, again, if you don't mind just

13  answering my question, is that opinion in your

14  report?

15       A     No.

16       Q     Okay.

17             And then someone calls you or how

18  does this meeting take place?

19       A     I was contacted by the prosecutor, Ms.

20  Jennifer Gonzalez, that they were looking at all the

21  photographs and there was a substance on that

22  pillowcase, Item No. 7, that appeared to be dark and

23  could it be soot.  And so I agreed that they would

24  meet with me at the United Club.  I was traveling

LLL-17

1   across the country and we met and looked at it and

2   determined that it was not and that's about how simple

3   it is.

4          Q     Well, Mr. Englert you testified

5   yesterday that you had examined everything in

6   this case; is that right?

7          A     And I re-examined that because that was

8   something that was a question that came up based upon

9   them looking at the photographs.

10         Q     And so you didn't have any question

11  about it at all?

12         A     I didn't recognize it at the time that we

13  looked at Item 7 as there being any soot on it,

14  but if you look at the photographs, the photograph had

15  a dark spot that looked like it had a possibility and

16  we wanted to clarify that and that was the best way to

17  do it.

18         Q     So, everybody is clear, the item

19  that you are referencing, Exhibit 7, is a

20  flannel pillowcase found at the hospital with

21  Ms. Kustok's bedding; is that right?

22         A     That's correct, it did not have a pillow

23  in it.

24         Q     I"m sorry?

LLL-18

1      A      It did not have a pillow in it.  It was a

2   flannel pillowcase, Item No. 7.

3      Q      And you did not examine that on

4   December 15th when you examined all the other

5   evidence in this case; is that right?

6      A      No.

7      Q      And on December 16th you marked that

8   you opened it, right?

9      A      It came out of evidence.  I do not know

10  where it was.  It was not given to us on the 15th.

11  So, when he came out I wanted to look at it and we did

12  that inside of that garage and took photographs of

13  that.

14     Q      On the 16th?

15     A      Yes, ma'am.

16     Q      And so now you are saying that you

17  examined it extensively on the 16th?

18     A      I did.  I looked at it visually and took

19  photographs of it and related it to the pillow that it

20  belonged to.

21     Q      Did you use that pillow in your

22  recreation?

23     A      Yes, ma'am.

24     Q      Which pillow is that?

LLL-19

1        A    19D.

2        Q    But where on the bed is that pillow?

3        A    Underneath, it's in the pool underneath

4   the pillow with the defect in it, bullet defect.

5        Q    It is underneath Miss Kustok's, the

6   second pillow underneath Miss Kustok's head; is

7   that correct?

8        A    Yes.

9        Q    So, if that pillow had soot on it

10  that would be a really important fact, right?

11       A    If it had soot but we did not find soot

12  because we had examined that pillow previously the day

13  before until midnight.

14       Q    I'm sorry.  You had previously the

15  day before on December 15th?

16       A    Yes, the pillow.  You said the pillow.

17  Maybe you are talking about the pillowcase.

18       Q    I am talking about the pillowcase.

19       A    No, that wasn't done until the next

20  morning.

21       Q    And on the next morning when you

22  examined it you are confident that there is no

23  soot?

24       A    Yes, ma'am, there was no soot observed.

LLL-20

1          Q     Yet you fly across the country or

2    you're here on some other business and fly to

3    also do that at Ms. Gonzalez's request to meet

4    in the United Airlines Club; is that right?

5          A     Yes, ma'am.

6          Q     And tell us what that test, what you

7    re-examined it for?  What did you do?

8          A     Because of the photograph that looked like

9    it could be soot and recognized as possibly being

10   soot, I certainly wanted to re-evaluate it and look at

11   it, so we agreed to meet there.  And in that short

12   period of time the evidence was brought there.  They

13   were escorted beyond security and we met in a private

14   room in the United Club.  It was taken out by

15   Detective Joe Czarnowski and we opened it up and

16   looked at it visually and I had a Proscope that I

17   looked at it and it was clotted blood, it was dark

18   blood, it was not soot.

19         Q     So you looked at it visually, that's

20   all that you did?

21         A     Yes, ma'am.

22         Q     You know that the definitive test

23   for soot or cylinder gases is Sodium Rhodizonate

24   Test?

LLL-21

1        A    If you can't visually see it that's

2  correct, that's when you use Sodium Rohdizonate is

3  when you visually can't see --

4        Q    But you couldn't visually see it?

5        MS. GONZALEZ:  Judge, if the witness can

6  be allowed to answer the question?

7        THE COURT:  Let him --

8        THE WITNESS:  When you can't visually see

9  it, ma'am, the soot is very recognizable, and

10  this was obviously clotted blood.  And it was

11  like a long, about three inches long dark stain

12  of clotted blood on the pillow.  There was no

13  soot that I saw.

14  BY MS. MORASK:

15        Q    But you just said, so we are clear

16  that the color test, which is what Sodium

17  Rhodizonate is, is used when you can't see soot

18  if you are concerned about the presence or

19  absence of soot; is that right?

20        A    Yes, ma'am.

21        Q    Okay.

22        And that's about a five-minute test,

23  right, color test?

24        A    Could be, depending on the lab person that

LLL-22

1    does it.  I do not do it.  That's a laboratory

2    examination.

3         Q    And you didn't do it that day in the

4    United Club?

5         A    Nor did I recommend that it be done

6    because it was obviously clotted blood.

7         Q    In fact, you didn't ever recommend

8    that any of the items be tested for cylinder

9    gases which can easily be obscured by dirt,

10   blood and other debris at the scene; is that

11   right?

12        A    No, I did not.

13        Q    And so you then are telling us that

14   you had this meeting at the United Club merely

15   because Ms. Gonzalez had a question about that

16   pillowcase?

17        A    I do not know who she was talking to about

18   it, if anybody, but yes, she had a question and the

19   best way to resolve it quickly was for me to look at

20   it and the best thing to do was to fly into Chicago

21   which I was already doing and to look at it.

22        Q    And I will show you Defendant's 38,

23   which is your billing summary.  And does it

24   reflect your entry for March 22nd receipt via

LLL-23

SUP R 3909

```
 1    STATE OF ILLINOIS      )
 2                           ) SS:
 3    COUNTY OF C O O K      )
 4
 5       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 6           COUNTY DEPARTMENT-CRIMINAL DIVISION
 7
 8               I, Barbara A. Evans, C.S.R., an
 9    Official Court Reporter in the Circuit Court of
10    Cook County, County Department, Criminal
11    Division, do hereby certify that I reported in
12    shorthand the proceedings had at the hearing of
13    the aforementioned cause; that I thereafter
14    caused the foregoing to be transcribed, which I
15    hereby certify to be a true and accurate
16    transcript taken to the best of my ability of
17    the proceedings.
18
19
20    _____
                      Official Court Reporter
21
22    Dated February 26, 2015
23    CSR# 084-002722
24
```

LLL-126

SUP R 4012

1    STATE OF ILLINOIS )
                      ) SS:
2    COUNTY OF COOK   )

3         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                  COUNTY DEPARTMENT-CRIMINAL DIVISION
4
      THE PEOPLE OF THE        )
5     STATE OF ILLINOIS,       )
                               )
6                  vs.         )  No. 10 CR 19174
                               )
7     ALLAN KUSTOK.            )

8

9         REPORT OF PROCEEDINGS HAD at the Trial

10   of the above-entitled cause, before the

11   Honorable JOHN J. HYNES, one of the Judges of

12   said Division, on the 6th of March, 2014.

13             PRESENT:
14
               HON. ANITA M. ALVAREZ
15             STATE'S ATTORNEY OF COOK COUNTY, by
               MS. JENNIFER GONZALEZ, MR. JAMES PAPA
16             and MS. LORNA AMADO-CHEVLIN,
               Assistant State's Attorney,
17                  Appeared on behalf of the People;

18
               MR. RICK BEUKE, MR. RANDY RUECKERT, MS.
19             LAURA MORASK and MR. TIM BLACK,
                    Appeared on behalf of the Defendant.
20

21

22

23
     Barbara A. Evans
24   Official Court Reporter


                        NNN-1

SUP R 4496

```
 1    good morning jurors.
 2                    ROD ENGLERT,
 3    called as a witness, having been first duly
 4    sworn, was examined and testified as follows:
 5                    CROSS EXAMINATION
 6                    BY
 7                    MS. MORASK:
 8         Q     Sir, I want to direct your attention
 9    to December 16th when we had the re-creation at
10    the Orland Park Police Department garage,
11    correct?
12         A     Yes.
13         Q     Okay.
14               And prior to that re-creation you had
15    set that up with the State's Attorneys; is that
16    right?
17         A     Yes.
18         Q     And you had also set that up or had
19    the State's Attorney set it up with Orland Park?
20         A     Yes, ma'am.
21         Q     Okay.
22               And did you find the model or did the
23    State's Attorneys find the model?
24         A     The State's Attorneys found the model or
```

1    right?

2          A    Yes.

3          Q    How did you know that?

4          A    Because my initials are, and the date is

5    on it.  It is up here 12-16-10 and it wasn't opened at

6    that time.  And on 12-15 it was.  12-15.  Then on

7    3-28-12 I re-opened it.

8          Q    Okay.

9               So, you had already looked at this

10   piece of evidence, right?

11         A    I did.

12         Q    You did not identify anything on it

13   in December that you thought looked like any

14   sort of soot or burn mark, right?

15         A    That's correct.

16         Q    Tell the jury -- there is a

17   difference between soot and a burn mark, right?

18         A    That's correct.

19         Q    Tell us what the difference is.

20         A    Soot is, when you looked at the video that

21   I showed, you saw that black cloud that's dust like

22   material.  It's called soot.  And it comes out but

23   fire also comes out.  Fire comes out of the barrel and

24   this is three and a half lengths in this barrel to

NNN-138

1    where you have a cylinder gap.  And that's where there

2    is a space between when that bullet ignites, fire

3    comes out of the side and anything close to that fire,

4    like one when I was the range I burnt my hand, or if

5    it was lying on cloth, it would actually burn the

6    cloth and cause a defect, because it's very hot,

7    intense fire, quicker than the blink of an eye, very

8    fast.  And those two are different.

9           Q    When you examined this pillowcase, I

10   will show you in just a second, when you

11   examined the pillowcase, you examined both sides

12   of it, right?

13          A    Inside and out, yes.

14          Q    And the darker stain that we saw in

15   the picture, there is darker stains that appear

16   on both sides of that pillowcase, is that fair

17   to say?

18          A    Yes, dried stains.

19          Q    Is it possible for soot or a burn

20   mark to appear at the same time on both sides of

21   the pillowcase?

22          A    No, that dusty soot does not go through

23   material that I have ever seen.

24          Q    And based on your reconstruction,

SUP R 4633

1    remind us where was the pillow, this pillowcase

2    was on, where was that in the reconstruction?

3         A    That was in the materials at the hospital.

4    That was a pillowcase absent the pillow, that was in

5    the bag with another pillowcase and the glasses at the

6    hospital.

7         Q    When you do the reconstruction of

8    the pillows on December 16th, 2010, that pillow

9    is underneath the pillow, with the bullet hole

10   in it?

11        A    That is correct.

12        Q    So, neither side of that pillow, top

13   or bottom of the pillowcase is going to be

14   visible to get soot or a burn mark on it?

15        A    That's correct.  That would be under where

16   the shot was fired.

17        Q    And it's laying under Jeanie's body?

18        A    That's correct.

19        Q    You have also had the opportunity to

20   examine every piece of evidence, you said that.

21   You also examined Jeanie Kustok's pajama shirt

22   that she was wearing that night in bed when she

23   was shot?

24        A    I did.

NNN-140

SUP R 4634

1          MS. MORASK:  Objection.  This is beyond

2     the scope.

3          THE COURT:  Sustained.

4     BY MS. GONZALEZ:

5          Q    Are there other pieces of evidence

6     that you examined that have those same dark

7     patterns like counsel was showing you yesterday

8     in the photograph of the pillowcase marked

9     People's Exhibit No. 36?

10         A    Yes.

11         Q    I am going to show you what I will

12    mark as People's Exhibit No. 240.  Do you see

13    some of the same dark patterns that you were

14    talking about?

15         A    Yes, by the seam, just to the left of mid

16    line, where the seam is, a dark --

17         Q    And orient the jury.  This shirt has

18    been cut.  But where did that seam appear on a

19    person's body, where does it appear?

20         A    Under the right arm.

21         Q    I will show you what I will mark as

22    People's Exhibit No. 241.  Is that a close-up of

23    that area under the arm you just talked about?

24         A    Yes.


                    NNN-141

1    hearing of anyone discussing it, nor read any

2    newspaper article, listen to any radio broadcast

3    nor view any television program that discusses

4    the case.  Stay away from the Internet.

5            And after this case is submitted to

6    you, you must discuss the case only in the jury

7    room when all members of the jury are present.

8    Keep an open mind.  You must not decide any

9    issue in the case until the case is submitted to

10   you for your deliberations under the

11   instructions of the Court.

12           With that we will be in recess for

13   lunch.

14       THE SHERIFF:  All rise for the jury.

15               (WHEREUPON, the jury left the

16                courtroom.)

17       THE COURT:  Folks, you may be seated.  Is

18   Mr. Englert excused here?

19       MS. GONZALEZ:  Yes.

20       THE WITNESS:  Thank you, your Honor.

21   Thank you, sir.

22       THE COURT:  Let's talk about the time

23   table here.  Why don't you go over the exhibits

24   here with the defense.  And we haven't

                    NNN-191

1  decided -- most of these have been seen by the

2  jury.  I don't know if there is an issue as to

3  that.

4          But what you're asking to have

5  admitted and then we will decide if it goes back

6  and obviously recording, stuff like that won't

7  go back, but why don't you guys get together

8  just for purposes of resting your case here.

9          We will do this before we bring the

10  jury back out, have the State formally rest with

11  the introduction of their exhibits and they can

12  do it in front of the jury after we listened to

13  any motions then, too.  Is there any other

14  matters that we need to discuss?

15          MR. RUECKERT:  Judge, can we talk about

16  that test?

17          THE COURT:  What do you want to say?

18          MR. RUECKERT:  I would like to be able to

19  do it.  It will take five minutes.  The State

20  can be there.  I have no idea what the results

21  are going to be so I think it's legitimate.  And

22  Mr. Englert testified that he knows about it.

23  The State knows about the test.  We didn't know

24  about the shirt, or the pillow case that we can

NNN-192

1    do it on.  So, I don't see any prejudice to the

2    State whatsoever.  I don't know what the answer

3    is going to be.  They don't know what the answer

4    is going to be.  It seems like a perfect thing

5    to do with an expert.

6         THE COURT:  Well, your test, I have heard

7    a little bit about it through the cross

8    examination of Mr. Englert.  With regard to this

9    test, what do you expect to do?  Who is going to

10   do it?  Give me a little bit more information.

11        MR. BEUKE:  If Mr. Noedel was here he

12   could explain.

13        THE COURT:  I want to explain right now

14   because we are going to go into the defense case

15   after lunch.  I want to find out about it.  Give

16   me the information.

17        MR. RUECKERT:  If Mr. Noedel can take

18   that pillowcase with the stain on it, and he

19   uses only half the stain.  He puts on a couple

20   drops of liquid and it turns color right away.

21   He can tell within five minutes if, in fact,

22   it's blood or not.  It's a test that Mr. Englert

23   said that he recognized.

24        THE COURT:  What's your position, State?

NNN-193

SUP R 4687

1    MS. GONZALEZ:  I am dumb founded by how

2    they sit there and say they didn't know about

3    this pillowcase.  I didn't pull this pillowcase

4    out yesterday or for the first time last week.

5    This pillowcase has been part of this case since

6    September 29th, 2010.

7         Their expert said in his report back

8    in 2013 that he recommended the test be done.

9    They chose not to do it.  And now they come into

10   here in the middle of my trial -- in the middle

11   of this trial, in the middle of the State's case

12   and ask that a piece of our evidence be tested.

13        I have no idea what the crime lab

14   would say.  I don't know if we had sent this to

15   the crime lab at the same time of the DNA

16   testing, and the GSR and all that, what they

17   would have said.  I have absolutely no idea now.

18   Talk about an ambush, this is ridiculous.

19        MR. RUECKERT:  Judge, we never said that

20   we saw that piece of evidence.  That piece of

21   evidence was mis-marked and the State knows

22   that.

23        MS. GONZALEZ:  That has never been

24   mis-marked.  That has been Exhibit No. 7 from

NNN-194

1   the get go.

2        MR. RUECKERT:  There has been three

3   Exhibit No. 7's.  The gun was No. 7 at one

4   point.

5        THE COURT:  Well, be that as it may,

6   under the discovery rules, Supreme Court Rule

7   413 C, when we are talking about scientific

8   evidence and medical reports, scientific

9   reports, subject to constitutional limitations,

10  the Court shall, on written motion, require the

11  State to be informed of and permitted to inspect

12  a copy or photograph of any reports or results

13  or testimony relative thereto of physical or

14  mental examinations or of scientific tests

15  experiments or comparisons or any other reports

16  or statements of experts, which defense counsel

17  has in his possession or control, including a

18  statement of qualifications of such experts

19  except that those portions of the report

20  containing statements made by the defendant

21  maybe withheld if the defense counsel does not

22  intend to use any material contained in the

23  report at the hearing or trial.

24           In effect, this is a scientific test

SUP R 4689

1   that's being proposed to be done during the

2   middle of trial.

3           Surely your experts knew that this

4   test was possible as to any of these items

5   before the trial commenced.  During the course

6   of that, this test should have been done

7   beforehand because allowing these scientific

8   tests to be done during the course of the trial

9   is surprising and an unfair advantage.

10          And the whole idea of the rules of

11  discovery here is that they exist to prevent

12  unfair advantage, surprise to either side here.

13  I would surely not allow the State to do this.

14  And under the Supreme Court rules the defense is

15  not allowed to do this.

16          After you brought this to my

17  attention on what I believe to be the 10th day

18  of trial, today being the 12th, I read the case

19  that you submitted, that really had to do with

20  rebuttal witnesses and testimony of rebuttal

21  witnesses, does not have to do with scientific

22  testing during the course of a trial, I found no

23  cases that allow this, I think it puts the State

24  in an extreme disadvantage.  There is all kinds

NNN-196

1  of questions with regard to what they might have

2  done, could have done.  You know, there is all

3  kinds of questions here.

4          Consequently your request to test

5  this item will be denied.

6      MR. RUECKERT:  Can I just make my record,

7  please?

8      THE COURT:  Go right ahead.

9      MR. RUECKERT:  First of all, we didn't

10  know about this shirt.  That's the truth.  Mr.

11  Kish will say he didn't know about it until

12  Monday.

13          Second of all, I don't know what the

14  results of this test are going to be.  They

15  could be beneficial to the State for all I know

16  and it's going to be done right here in five

17  minutes and the State will get the same result

18  that I do.  So, it can't be prejudicial to

19  either side.  I don't know what the result is

20  going to be.

21      THE COURT:  Well, under the Rules of

22  Evidence or under the Supreme Court Rule of

23  Discovery, it's supposed to be done prior to

24  trial.  We are not going to break into the trial

NNN-197

SUP R 4691

1    on the 12th day of trial in order to do any type

2    of testing, scientific testing.  Once again, I

3    found no case that supports your position here.

4    So, your request will be denied.

5             We will be in recess until 2:30.

6    Let's get back here, we will go through the

7    evidence and we will start with the defense

8    case.

9                     (WHEREUPON, a lunch recess was

10                     had and there was a change of

11                     Court Reporters.)

SUP R 4692

```
1    STATE OF ILLINOIS      )

2                           ) SS:

3    COUNTY OF C O O K      )

4

5        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

6            COUNTY DEPARTMENT-CRIMINAL DIVISION

7

8                    I, Barbara A. Evans, C.S.R., an

9    Official Court Reporter in the Circuit Court of

10   Cook County, County Department, Criminal

11   Division, do hereby certify that I reported in

12   shorthand the proceedings had at the hearing of

13   the aforementioned cause; that I thereafter

14   caused the foregoing to be transcribed, which I

15   hereby certify to be a true and accurate

16   transcript taken to the best of my ability of

17   the proceedings.

18

19

20   _____
                Official Court Reporter
21

22   Dated February 13, 2015

23   CSR# 084-002722

24
```

NNN-199

SUP R 4693