# EXHIBIT 2

1  STATE OF ILLINOIS      )
                          )  SS:
2  COUNTY OF C O O K      )

3              IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT - CRIMINAL DIVISION
4
   THE PEOPLE OF THE STATE  )
5  OF ILLINOIS,             )
                            )
6              Plaintiff,   )
                            )  No.  10-CR-19174
7        vs.                )
                            )
8  ALLAN KUSTOK,            )
                            )
9              Defendant.   )

10                      REPORT OF PROCEEDINGS had at the

11  hearing in the above-entitled cause before the HONORABLE JOHN

12  HYNES, Judge of said court, on the 23rd day of August 2019.

13              PRESENT:

14              MS. KIMBERLY M. FOXX
                State's Attorney of Cook County, by:
15              MR. TODD DOMBROWSKI
                Assistant State's Attorney,
16                   appeared on behalf of the People;

17
                MR. KARL LEONARD
18                   appeared on behalf of the Defendant.

19

20

21

22  MARY T. CONNOLLY
    OFFICIAL COURT REPORTER
23  CIRCUIT COURT OF COOK COUNTY
    CRIMINAL DIVISION
24  LICENSE NO. 084-004734

—————————————1—————————————

ENTERED

NOV 25 2019
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

R 1436

1      THE COURT:  Good morning, everyone.

2      MR. LEONARD:  Good morning, your Honor.  Karl Leonard,

3 spelled with a K, L-e-o-n-a-r-d, from the The Exoneration

4 Project for Mr. Kustok.

5      MR. DOMBROWSKI:  Good morning, your Honor.  For the

6 record Assistant State's Attorney Todd Dombrowski.

7      THE COURT:  All right.  Good morning, gentlemen.  This

8 was set here for the Court's order on the postconviction

9 petition by Petitioner.  I have a written order I'm going to

10 distribute to both sides to the attorneys.

11      MR. DOMBROWSKI:  Acknowledge receipt.

12      MR. LEONARD:  Likewise, your Honor.

13      THE COURT:  I wanted to go into detail in the written

14 order and I want to highlight several things that were in the

15 order and maybe give a little explanation as to those before

16 we end today.

17      First of all in this matter, I set this for a second

18 stage postconviction hearing.  And at the second stage the

19 State can either answer the petition or move to dismiss it.

20 In this case the State moved to dismiss the petition.  And in

21 such a case, the Court has to decide whether to grant the

22 State's motion or advance the petition to a third evidentiary

23 stage.

24      The postconviction petitioner is entitled to an

R 1437

1    evidentiary hearing only when the allegations in the petition

2    supported by affidavits, records, and other evidence make a

3    substantial showing of a depravation of rights under either

4    the U.S. Constitution or the Illinois Constitution.  The

5    purpose of a postconviction proceeding is to permit inquiry

6    into constitutional issues involved in the original conviction

7    and sentence that were not and could not have been adjudicated

8    previously on direct appeal.

9         Issues that were raised and decided on direct appeal

10   are barred by res judicata and issues that could have been

11   raised on direct appeal but were not are forfeited; however,

12   the doctrine of res judicata and forfeiture are relaxed where

13   fundamental fairness so requires when the forfeiture stems

14   from ineffective assistance of Appellate Counsel or when the

15   facts related to the issue do not appear on the face of the

16   original Appellate record.

17        In this case neither side raised the issue of waiver

18   in their respective filings.  But the Court has looked at this

19   with the waiver issue in mind and based on the record before

20   the Court waiver is clearly applicable here.  Petitioner's

21   claim of ineffective assistance of counsel relies entirely on

22   trial record.

23        The Petitioner's claim is based on defense counsel's

24   failure to seek a confirmatory test for gunshot residue on a

R 1438

1    pillowcase prior to trial. Petitioner cites the testimony of
2    expert witnesses at trial and at posttrial motion for a new
3    trial and supported a claim of ineffective assistance of
4    counsel. Clearly this is something that was of the record and
5    is not a situation where the Doctrine of Forfeiture should be
6    relaxed.

7         Furthermore Petitioner did not make a claim of
8    ineffective assistance of appellate counsel. This issue is
9    often raised in postconviction petitions in addition to claims
10   of ineffective assistance of trial counsel. Since the
11   Petitioner has not raised this issue, there is no basis for
12   once again relaxing the Forfeiture Doctrine. In the case of
13   People versus Veach, the Illinois Supreme Court recently
14   reiterated its adherence to the Forfeiture Doctrine and they
15   have said that the issues that could have been raised and
16   considered on direct review are deemed procedurally defaulted
17   and is not a function of collateral review to consider claims
18   that could have been presented on direct review.

19         For these reasons the Court finds the Petitioner has
20   forfeited the issue of ineffective assistance of trial counsel
21   and the petition for postconviction relief is denied on that
22   basis; however, in the alternative I have looked at the
23   ineffective assistance of counsel claims and this order also
24   includes that. And for a claim of ineffective assistance of

**4**

1    counsel to prevail, there's a two-prong test on the case of

2    Strickland versus Washington and the petitioner or defendant

3    must show that both the counsel's performance was deficient

4    and (2) that this deficient performance prejudiced the

5    defendant.

6           To establish the first prong, the performance was

7    deficient, a defendant much show that counsel's performance

8    was objectively unreasonable under prevailing professional

9    norms.  Counsel's performance must be evaluated based on the

10   entire record.  To establish the second prong that this

11   deficient performance prejudiced the defendant, the defendant

12   must show that there's a reasonable probability that but for

13   counsel's unprofessional errors the result of the proceedings

14   would have been different.

15          I want to talk about the first prong here.

16   Petitioner's claim that there can be no dispute that the

17   defendant's trial counsel's performance fell below an

18   objective standard of reasonableness and Petitioner has based

19   this claim on defense counsel's failure to request this

20   additional testing of a pillow for gunshot residue prior to

21   trial.

22          The State in response in their motion said the

23   Petitioner has failed to demonstrate that trial counsel's

24   failure to request this test the sodium rhodizonate test was

R 1440

1   objectionably unreasonable.  They argue that the Petitioner

2   has failed to demonstrate how the posttrial testing results if

3   conducted prior to trial would allow Petitioner to set forth

4   any alternative defense theories.  And as I mentioned under

5   the first prong, counsel's performance must be evaluated on

6   the entire record.

7           And I have reviewed the entire record.  And I would

8   note here that this Court presided over all the pretrial

9   motions, the trial, and posttrial motions, and I had the

10  opportunity to observe defense counsel's performance

11  throughout the trial.  And I would say as to both sides, both

12  the State and the Defense they were ably represented by both

13  sides with attorneys.  With regard to defense at every stage

14  of the proceedings, the defense vigorously contested the

15  State's evidence and anticipated testimony at trial.

16          Prior to trial defense counsel filed motion to

17  suppress Defendant's statement for example made to both the

18  police and hospital personnel.  Regarding the statements made

19  to hospital personnel, defense argued any statement made to

20  hospital personnel were inadmissible because they were

21  protected by patient-client privilege which is something

22  that's out of the ordinary and somewhat novel for a motion to

23  suppress statements.

24          At the hearing defense presented evidence that the

1  Defendant was admitted as a patient because he claimed he had

2  suicidal thoughts.  Defense argued that as a patient any

3  statements he made to nurses and doctors was privileged.

4  Ultimately we had a hearing on this matter and the Court ruled

5  that these statements qualified as an exception to that

6  privilege and denied defense request.  Defense counsel also

7  contested to chain of custody on a number of items taken from

8  the Defendant at the hospital.  These items included clothing,

9  his glasses, the bedding he wrapped his wife in that was

10  brought to Palos Hospital.

11         Additionally the State filed a motion to admit other

12  crimes evidence to show motive, intent, or lack of mistake.

13  The State sought to introduce this evidence as evidence that

14  the Defendant and his wife were experiencing financial

15  difficulties and that the Defendant murdered his wife for her

16  insurance policy.  State also sought to introduce testimony of

17  a number of woman with whom the Defendant had extramarital

18  contact prior to his wife's murder.  As part of this last

19  category of evidence, the State sought to introduce photos and

20  statements allegedly made by the Defendant on a website known

21  as Ashley Madison which was a website designed for married

22  people to engage in extramarital affairs.

23         After extensive argument by defense counsel, the

24  Court denied the State's request to introduce evidence of the

R 1442

1    couple's financial difficulties.  Regarding the extramarital

2    evidence of the encounters, the Court denied the State's

3    request to introduce the postings of AshleyMadison.com and

4    also limited the number of woman who could testify to the

5    extramarital affairs to a time limit and to encounters that

6    for the most part involved incidents where he either said he

7    was trying to get out of his marriage or he was seeking a

8    divorce.

9            Even after the Court ruled that a number of woman

10   could testify, the defense continued to file motions on

11   different theories alleging different facts.  Once again when

12   I look at the entire record throughout the pretrial, trial,

13   and posttrial stages, defense counsels vigorously contested

14   the testimony of the State's expert in this case Rod Englert.

15   Prior to trial defense counsel filed a motion to preclude his

16   testimony.  They alleged his methodology and conclusions were

17   not supported by solid scientific theory in the field.  Based

18   on the defense motion, the Court agreed to hold a hearing

19   prior to trial to determine if there is a basis for

20   Mr. Englert's theory.

21           Defense was allowed to cross examine Mr. Englert

22   about the basis of his opinion and the Court ultimately ruled

23   he could testify at trial.  Although the Court found that the

24   defense and defense experts could have and should have sought

8

testing of the pillow case prior to trial in the posttrial
motion hearing, when you evaluate counsel's performance based
on the entire record, the Court finds that defense counsel's
performance was not constitutionally deficient.

This was a complicated case. The Defendant's action
before and after the murder contributed to the difficulty.
Defense had to contend with his extramarital encounters that
increased in the months leading up to the murder. During
several of these encounters the Defendant told women he was
getting out of his marriage or he was getting divorced. The
defense had a difficult task of explaining to the jury why
these encounters did not provide a motive for the Defendant to
kill his wife.

The defense also had to explain the Defendant's
delay in bringing Anita Kustok to the hospital after her
death. His claim that he fired the gun into the armoire
because he was afraid he would kill himself and his
contradictory statements to the medical personnel and police.
Defense counsel had to rebut the myriad of scientific
evidence. The State presented more than 250 exhibits at
trial. The defense presented more than 100 exhibits at trial.

There were many other items recovered during the
investigation that were not admitted at trial which had to be
examined by the defense. Based on the entire record, the

R 1444

1   Court finds that Petitioner has not met its burden in showing

2   that counsel's performance was deficient under the first prong

3   of Strickland.  But even if I were to so find trial counsel's

4   performance was deficient under the first prong, Petitioner

5   still must show that this deficient performance prejudiced the

6   Defendant.

7         Petitioner claims that there is a reasonable

8   probability that the result of the proceedings would have been

9   different because of defense counsel's failure to request that

10  the pillow be tested for gunshot residue.  He argues that the

11  testimony of Rod Englert was central to the State's case and

12  he opines that the entire theory is based on the premise that

13  there was no gunshot residue on the pillows.  And a posttrial

14  testing would show Englert's conclusion was flat wrong.

15        In their motion to dismiss, the State counters that

16  the posttrial evidence does not support a claim that there was

17  a reasonable probability that result at trial would have been

18  different.  The State cites Mr. Noedel at the posttrial

19  hearing where he concedes that the lead deposits on the

20  pillowcase could have been deposited when the gun was fired by

21  the Defendant into the armoire.  He also agreed that

22  Ms. Fundell's conclusion that the lead deposits could have

23  come from three separate firings.

24        State argues in their motion to dismiss that

—10—

R 1445

1   Ms. Fundell's testimony and Mr. Noedel's concessions would not

2   have changed the results at trial.  The posttrial testing

3   results and testimony would be cumulative to the evidence

4   presented at trial.  When I looked at the motion for a new

5   trial and we went through this, we had the hearing and the new

6   trial was mainly based on the introduction of the extramarital

7   affairs and the newly discovered evidence or what the defense

8   claimed is newly discovered evidence.

9          And after that hearing, the Court gave an extensive

10  reason why I was denying the motion for a new trial based on

11  newly discovered evidence.  But I think some of the reasons

12  for that are appropriate here with regard to the second prong

13  of Strickland.  Under the caselaw for newly discovery

14  evidence, newly discovered evidence warrants a new trial when

15  first it has been discovered since the trial; second, it's of

16  such a character that it could not have been discovered prior

17  to the trial by the exercise of due diligence; third, it is

18  material to the issue and not merely cumulative; and, fourth,

19  it is such a conclusive character that it would probably

20  change the result at a new trial.

21         Those third and fourth criteria under new trial that

22  legal analysis is material or I think is relevant to the issue

23  here of whether or not there's a reasonable probability that

24  the result at trial would have changed.  And in denying the

—11—

R 1446

1  Defendant's motion for a new trial, the Court went into great

2  detail discussing why this new evidence and testimony was

3  merely cumulative and why it was not of such a conclusive

4  character that it would probably change the result on retrial.

5       The facts that the Court considered in that ruling

6  on the motion for a new trial are relevant to the second prong

7  here.  And I think some of those are worth noting here.

8  During the trial both the experts for both sides were

9  contesting the methodology of the other side in great detail.

10  And as I looked at that, you could tell these two experts here

11  they disputed almost every conclusion of Mr. Englert, the two

12  experts for the defense, and they also let the jury know

13  Mr. Kish who was the blood spatter expert for the defense

14  informed the jury that the sodium rhodizonate test should have

15  been performed on the pillowcase.

16       Both defense experts made concessions that were

17  consistent with Mr. Englert and consistent with other evidence

18  and testimony presented by the State at trial.  For example

19  both of them agreed that Ms. Kustok would have been on the bed

20  at the time of her death and that the death was instantaneous.

21  Additionally Mr. Noedel posited different theories on how

22  Ms. Kustok could have accidentally or intentionally fired the

23  fatal shot.

24       However under questioning by the State, Mr. Noedel

---

**12**

1    who is the ballistics gun expert, admitted that the gun would

2    necessarily have been pointed towards her face and if she

3    accidentally shot herself while de-cocking the gun, meaning

4    having the hammer on the gun releasing that and pushing it

5    back towards it's normal resting position; he also conceded

6    that given the trajectory of the bullet, it would be hard for

7    the victim to fire the gun with her index finger.

8        Now the medical examiner testified that the bullet

9    entered the victim's left cheek exiting near the right ear

10    with a trajectory of left to right and slightly downward.

11    There was also testimony that Anita Kustok was right handed

12    which would make it even more difficult for somebody to kill

13    themselves given the trajectory and the type of weapon used.

14    Mr. Noedel opined that she could have accidentally or

15    intentionally killed herself but she would have probably had

16    to use both thumbs on the trigger to do that.

17        And Mr. Noedel also conceded on cross examination by

18    the State that there would be problems controlling the gun

19    because death would be instantaneous and the recoil of the gun

20    after the shot was fired would be difficult to control. At

21    the posttrial hearing, once again the conclusions and

22    methodology of the experts were thoroughly vetted.

23    Ms. Fundell who was an analyst for the Illinois State Police

24    not only did she perform the sodium rhodizonate test but she

—13—

1    also test fired the gun trying to duplicate the patterns of

2    soot that were on the pillowcase that were in question here.

3    And she was not able to produce these fact patterns in her

4    test findings.

5          She was able to produce similar patterns when the

6    gun was fired at a distance of three inches from the

7    pillowcase; however, she could never duplicate the exact

8    pattern of lead deposits on the pillowcase.  She could

9    actually never replicate the third rectangular deposit on the

10   pillowcase.  Ms. Fundell concluded that the gun was fired at a

11   distance of greater than contact but less than six inches away

12   from the pillowcase which is consistent with the medical

13   examiner in this case.

14         Ms. Fundell also testified at the posttrial hearing

15   that there was no test that could determine whether or not the

16   lead pattern was the result of a single gunshot or if it was

17   the result of multiple gunshot firings.  She testified that if

18   the gun had been fired five additional times in the bedroom as

19   the Defendant said in his statement, the lead deposits could

20   have come from these additional firings.  Mr. Noedel was

21   called by the defense in the posttrial hearing and he

22   testified that he reviewed Ms. Fundell's report and disputed

23   her conclusion that the gun was more than contact and less

24   than six inches from the pillowcase.

—— **14** ——

1        His opinion was that the firearm was less than two
2    inches from the pillowcase although he did not test fire the
3    gun himself and based his conclusions on past experiences
4    studying cylinder gap gases.  He also said that the new
5    evidence called Mr. Englert's conclusions into serious
6    question; however, on cross examination he acknowledged that
7    the lead could have gotten on the pillowcase if it was near
8    the firearm when the Defendant fired the gun into the armoire.

9        He was also impeached by his failure to alert the
10   defense counsel that the pillowcase should have been tested
11   prior to trial.  Noedel admitted he reviewed Englert's report
12   before the drafting of his own pretrial report.  He never
13   sought to have the pillowcase tested for gunshot residue prior
14   to trial.  He could not remember if he had told the defense
15   they should have the pillowcase tested for gunshot residue
16   before arriving in Chicago in March 2014.  The trial in this
17   matter started on February 18, 2014.

18       When he arrived in March, he did bring the chemicals
19   for the testing, but the Court had denied that based on the
20   Court's rulings there.  At the end of the hearing here, I made
21   the finding that no expert can say how this happened and
22   that's exactly what was testified to by the defense experts at
23   the posttrial motion.

24       They testified in different ways that they believed

-15-

R 1450

1    their explanations of how it could potentially be a suicide or
2    an accident, but the jury had the evidence at its disposal and
3    clearly that this evidence was merely cumulative and not of
4    such a character that would have changed the outcome of the
5    trial and I denied the motion for new trial.  Once again I
6    think that these criteria these last two criteria and under
7    the newly discovery evidence are relevant here for purposes of
8    whether or not there's a reasonable probability that the
9    result would have been different but for counsel's
10   deficiencies; because and if we conclude that these experts
11   actually cancel each other out, what do you do?  You look at
12   the evidence at trial.

13          The Petitioner in their petition claims that the
14   Defendant was convicted based on three things.  He was a
15   philanderer.  His reaction in the immediate aftermath of
16   finding his wife shot to death on the other side of her bed
17   was abnormal.  And, three, his attorneys were ineffective for
18   failing to seek a five-minute scientific test that could have
19   proven and later did prove the State's theory the case was
20   impossible.  But Petitioner admits the first two factors and
21   bases his petition on the third factor; however, I believe
22   that Petitioner downplays the significance of these first two
23   factors.  And he doesn't address the other evidence
24   overwhelming evidence of guilt presented at trial.

R 1451

1    Regarding the extramarital affairs, the secret life
2    that the Defendant had became more frequent and bolder in the
3    months preceding his wife's death.  He used the Ashley Madison
4    website to meet married women who were interested in
5    clandestine sexual affairs.  He came up to women on the street
6    or in a shopping mall and asked to meet them for a date.
7    During some of these rendezvous, he told these women that he
8    was unhappy in his marriage and he was getting a divorce.
9    These extramarital affairs were evidence of Defendant's motive
10   and intent to kill his wife.

11   In contrast Anita Kustok did not have a motive to
12   kill herself.  Witnesses who testified for both sides said
13   Ms. Kustok was upbeat planning for the future.  Although the
14   defense claimed that Anita was afraid of intruders, the
15   witnesses said they were never concerned that she would commit
16   suicide.  As to his reaction immediately after the incident, I
17   think Petitioner downplays the significance of these actions.
18   He never calls the police.  Never calls paramedics.  The
19   Petitioner told the police he stayed with his wife for 45
20   minutes before he drove her to the hospital.

21   State witnesses estimate that that time was more
22   like an hour to an hour and a half; either way it was a
23   significant period of time.  And during this time he admitted
24   to firing this gun five times into the armoire in the bedroom.

—17—

1   He seriously disturbed the crime scene, stacking bloody

2   pillows on the floor, taking bed sheets off the bed, and

3   wiping down areas of the bedroom with towels. These are not

4   the actions of an innocent person.

5          Additionally, I think Petitioner downplays the other

6   evidence at trial. There are inconsistent statements by the

7   Petitioner made to the police and a medical personnel. For

8   example at one point he told the authorities he was in the

9   bathroom when his wife shot herself. And then he changed his

10  story and said he was asleep next to her when she shot

11  herself. He, Petitioner, also told the police he bought this

12  weapon a .357 handgun for his wife's protection because she

13  was afraid of being alone; however, when he purchased the

14  weapon, he signed a federal document claiming he was

15  purchasing the gun for target practice.

16         He also told the gun owner of the shop a person he

17  knew from high school that he was buying the gun for target

18  practice. Also with regards to his statement that he bought

19  the gun for his wife's protection, this is belied by the type

20  of gun he purchased. And the State argued this to the jury.

21  This gun was a .357 handgun, a large gun. Defense ballistic

22  expert Noedel testified that someone firing that gun would

23  need to use a significant amount of pressure on the trigger in

24  order to fire the gun. If it was in what they call double

R 1453

1  action, meaning when you pull the trigger, the hammer would

2  have to go back and then come forward, would need 10 to 10-1/2

3  pounds of pressure. If it was in single action, meaning that

4  you cock the gun before firing it, you need 3 to 3-1/2 pounds

5  of pressure.

6  He also testified that there would be significant

7  recoil from the firing, forcing the gun and the hand of the

8  person backward. And this is not the type of gun that you

9  would buy for a woman who is seeking to protect herself. The

10  testimony from the medical examiner that Ms. Kustok was 5 foot

11  5 and 130 pounds.

12  Petitioner's statement that he bought the gun for

13  her protection is also contradicted by other evidence. The

14  police searched the home and found the ammunition for the gun

15  and the gun case in what would be a tool or work area

16  generally a workbench and tools in an area where it would be

17  somewhere a male like the Defendant would spend time.

18  Another critical piece of evidence in this case that

19  I think the Petitioner fails to recognize is the testimony of

20  Dr. Hillary McElligot the Medical Examiner. She testified to

21  the trajectory of the bullet, and she also testified that

22  there was stippling on Ms. Kustok's eyelid but there was no

23  soot. She said based on the stippling and lack of soot, the

24  gun was at least six inches from the left cheek, her left

—19—

1   cheek.  This would make it very difficult for someone to

2   commit suicide.

3          She testified that most suicides involve contact

4   wounds and stippling is normally not present.  She considered

5   all the possible scenarios including accident, suicide, and

6   homicide, and she came to the conclusion that this was a

7   homicide.  Doctor McElligot's testimony was corroborated by

8   the testimony of the other experts from both sides.  Given the

9   trajectory of the bullet and the characteristics of the gun

10   itself, all experts testified it would be difficult for

11   Ms. Kustok to kill herself.

12          Mr. Noedel talked about possible ways Ms. Kustok

13   could have accidentally or intentionally shot herself but none

14   of these scenarios were plausible.  In the end there's only

15   two people who could have fired that weapon that caused Anita

16   Kustok's death and the evidence leads to one conclusion.

17   Allan Kustok fired that weapon.  Consequently even if trial

18   counsel's performance was deficient, there is no reasonable

19   probability that the deficient performance prejudiced the

20   Defendant.

21          Based on the foregoing discussion here, the Court

22   finds Petitioner has forfeited his claim of ineffective

23   assistance of trial counsel because he failed to raise that

24   issue on direct appeal.  In the alternative Petitioner has

R 1455

1  failed to meet the two-prong test for ineffective assistance

2  of counsel under Strickland.  Petitioner has failed to make a

3  substantial showing that his constitutional rights were

4  violated at trial.  Accordingly the Court grants the State's

5  motion to dismiss and the petition for Postconviction relief

6  is hereby dismissed.

7          And I want to actually commend both attorneys for

8  doing a nice job in bringing these issues to the Court.  That

9  will be the order.  Thank you.

10                  (Which were all the proceedings had in the

11                  above-entitled cause.)

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1  STATE OF ILLINOIS      )
                           ) SS
 2  COUNTY OF C O O K      )

 3

 4

 5         I, MARY T. CONNOLLY, an Official Court Reporter for the

 6  Circuit Court of Cook County, Fifth Municipal District, do

 7  hereby certify that I reported in shorthand the proceedings

 8  had at the above-entitled cause; that I thereafter caused the

 9  foregoing to be transcribed into typewriting, which I hereby

10  certify to be a true and accurate transcript of the

11  proceedings had before the Honorable JOHN HYNES, Judge of said

12  court.

13

14

15         _____

16         MARY T. CONNOLLY
           Official Court Reporter
17         #084-004734

18

19  Dated this 9th day of October 2019.

20

21

22

23

24
```
—22—

R 1457