# EXHIBIT 5

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

|  |  |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
|  | ) |
| Plaintiff-Respondent | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
|  | ) |
|  | ) |
| ALLAN KUSTOK, | ) |
|  | ) |
| Defendant-Petitioner. | ) |
|  | ) |

FILED
D5-203
AUG 23 2019
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

Post-Conviction
10-CR-19174

## **ORDER**

Petitioner, Allan Kustok, seeks post-conviction relief from a conviction for first degree murder. After a jury trial defendant-petitioner was convicted of the first degree murder of his wife, Anita Kustok, and sentenced to 60 years' imprisonment. Petitioner's conviction and sentence were affirmed on appeal. *People v. Kustok,* 2016 IL App (1st) 143812-U.

On appeal, Petitioner alleged: (1) the trial court improperly allowed the State to introduce evidence of his extramarital contacts with other women as proof of defendant's intent, motive and state of mind with respect to the murder of his wife; and (2) the trial court erred in denying defendant's post-trial motion for new trial based on newly discovered evidence.

The Appellate Court held that the trial court did not abuse its discretion in allowing the evidence of defendant's extramarital contacts. The Appellate Court also

affirmed the trial court's decision to deny defendant's post-trial motion on the grounds that the new evidence could have been discovered prior to trial by the exercise of due diligence.

The Illinois Supreme Court denied Kustok's petition for leave to appeal on March 29, 2017. *People v. Kustok,* 80 N.E. 3d 4 (2017).

Petitioner filed the instant Petition for Post-Conviction relief on December 22, 2017 and the Court docketed the petition for this Second-Stage review.

Petitioner alleges trial counsel's performance was deficient under the standards set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). Petitioner is seeking an evidentiary hearing where he can offer proof concerning the allegations in the petition.

*Strickland* set forth a two-prong test for determining a claim of ineffective assistance of counsel. To prevail on a claim of ineffective assistance, a defendant must show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶36, 987 N.E.2d 767, 370 Ill. Dec. 1 (citing *Strickland*, 466 U.S. at 687). *People v. Rodriguez*, 2018 IL App (1st) 160030, ¶48.

Regarding the first prong, Petitioner claims there can be no dispute the Defendant's trial counsel's performance fell below an objective standard of reasonableness. Petitioner's claim is based on defense counsel's failure to request additional testing of a pillowcase for gunshot residue prior to trial.

As to the second prong, Petitioner claims there is a reasonable probability that the result at trial would have been different absent counsel's errors. He argues that the post-trial testing of the pillowcase revealed the presence of gunshot residue. The presence of

C 334

gunshot residue destroyed the credibility and conclusions of the State's crime scene reconstruction expert Rod Englert.

The State filed a Motion to Dismiss the Petitioner's Post Conviction Petition. The State claims (a) Petitioner has failed to allege a cognizable constitutional claim under the Post Conviction Hearing Act and (b) Petitioner has failed to meet the two-pronged criteria under the *Strickland* analysis.

In support of their Motion to Dismiss, the State cites the strong evidence of guilt presented at Petitioner's trial. The State argues that the gunshot residue found on the pillowcase post trial was merely cumulative to the evidence presented at trial. Both witnesses called by defendant at the post-trial hearing—Nicole Fundell, who performed the post-trial tests, and Matthew Noedel, who testified to his opinions based on Ms. Fundell's testing, said the gunshot residue left on the pillow case could have been left by multiple firings of the gun. The State noted that defendant admitted to firing multiple shots into the armoire after discovering his wife had been shot.

The State also argues that both Ms. Fundell and Mr. Noedel agree that the gun was not lying on the pillowcase when it was fired. The gun had to be fired some distance away from the Ms. Kustok's head. Consequently, the post-trial testing does not resolve the issue of who fired the weapon that caused Anita Kustok's death.

In response Petitioner argues that the jury never heard that the Mr. Englert's crime scene reconstruction was fundamentally erroneous due to trial counsel's ineffective representation. Although trial counsel was involved in the case from the beginning, it was not until the tenth day of trial that defense counsel first sought to conduct the sodium rhodizonate test—the only definitive way of checking Mr. Englert's conclusions about

3

the pillowcase. Since mid-trial request was denied, the jury never heard that Mr. Englert's conclusions regarding the absence of soot and the location of the various pillows was demonstrably wrong.

As to the second *Strickland* prong, Petitioner claims there is a reasonable probability that the result at trial would have been different absent counsel's failures. Petitioner argues Mr. Englert's conclusions were crucial to the State's case. Petitioner claims that the forensic evidence is the only evidence directly linking the petitioner to the crime. Petitioner claims there can no longer be any confidence in the verdict in this case.

## ANALYSIS

The Post-Conviction Hearing Act (725 ILCS 5/121-1 *et seq.* (West 2014)) provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial or sentencing. *People v. Pitsonbarger*, 205 Ill. 2d 444 (2002). If the post-conviction petition is not dismissed at the first stage as frivolous or patently without merit, it advances to the second stage. 725 ILCS 5/122-5 (West 2014). At the second stage, the State may either answer the petition or move to dismiss it. *People v. Domagala*, 2013 IL 113688, ¶ 33. If the State moves to dismiss the petition, the circuit court must decide whether to grant the State's motion or advance the petition to the third stage for an evidentiary hearing. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). A post-conviction petitioner is entitled to an evidentiary hearing only when the allegations in the petition supported by "affidavits, records, or other evidence" (725 ILCS 5/122-2 (West 2014)) make a substantial showing of a deprivation of rights under either

4

the United States or Illinois Constitutions or both. *Pitsonbarger*, 205 Ill. 2d at 455;

*Domagala*, 2013 IL 113688, ¶ 33. *People v. Dupree*, 2018 IL 122307, ¶ 28.

At the second stage, "[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. *Id.* In addition, at the second stage, the circuit court examines a post-conviction petition to determine its legal sufficiency and any allegations not affirmatively refuted by the record must be taken as true. *Domagala*, 2013 IL 113688, ¶ 35. Thus, the substantial showing of a constitutional violation that must be made at the second stage is "a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Id. Dupree*, 2018 IL 122307, ¶ 29.

The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal. *Id.* Issues that were raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *People v. Ligon, 239 Ill. 2d 94, 103, 940 N.E.2d 1067, 346 Ill. Dec. 463 (2010).* However, the doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the

5

issue do not appear on the face of the original appellate record. *People v. Williams, 209 Ill. 2d 227, 233, 807 N.E.2d 448, 282 Ill. Dec. 824 (2004).*

### Waiver/Forfeiture

Neither side addressed the issue of waiver in their respective filings. In the State's overview of the Post-Conviction Act, they cite *People v. Terry* for the proposition that "if an issue could have been presented on direct appeal and was not, that issue is forfeited or waived." *People v. Terry,* 2012 IL App (4th) 100205, ¶ 17. However, the State never argues that waiver applies in this case.

Similarly, Petitioner does not address the issue of waiver or forfeiture in his original petition or in his response to the State's Motion to Dismiss. Petitioner never addresses the issue of whether appellate counsel was ineffective for not raising the issue. Nor does he claim the doctrine of forfeiture should be relaxed because the facts relating to the issue do not appear on the face of the original appellate record.

Based on the record before the court, waiver is clearly applicable here. Petitioner's claim of ineffective assistance of counsel relies entirely on the trial record. Petitioner's claim is based on defense counsels' failure to seek a confirmatory test for gunshot residue on a pillow case prior to trial. Petitioner cites the testimony of expert witnesses at trial and at the post-trial motion for new trial in support of their claim of ineffective assistance of counsel. Clearly, this is not a situation where the doctrine of forfeiture should be relaxed.

Furthermore, Petitioner does not make a claim of ineffective assistance of appellate counsel. This issue is often raised in post-conviction petitions in addition to

C 338

claims of ineffective assistance of trial counsel. Since Petitioner has not raised this issue, there is no basis for relaxing the forfeiture doctrine.

The Illinois Supreme Court has recently reiterated adherence to the forfeiture doctrine as it pertains to claims of ineffective assistance of counsel. In *People v. Veach*, the Court stated:

> [I]n Illinois, a defendant must generally raise a constitutional claim alleging ineffective assistance of counsel on direct review or risk forfeiting the claim. *People v. Tate*, 2012 IL 112214, ¶ 14, 980 N.E.2d 1100, 366 Ill. Dec. 741. Moreover, issues that could have been raised and considered on direct review are deemed procedurally defaulted. *People v. Ligon*, 239 Ill. 2d 94, 103, 940 N.E.2d 1067, 346 Ill. Dec. 463 (2010). It is not the function of collateral review to consider claims that could have been presented on direct review. *People v. Thomas*, 38 Ill. 2d 321, 323, 231 N.E.2d 436 (1967). Procedural default does not, however, preclude a defendant from raising an issue on collateral review that depended upon facts not found in the record. *Thomas*, 38 Ill. 2d at 323-24. *People v. Veach*, 2017 IL 120649, ¶ 47.

For the foregoing reasons, the Court finds that Petitioner has forfeited the issue of ineffective assistance of trial counsel and the Petition for Post-Conviction relief is denied.

### Ineffective Assistance of Trial Counsel

Although the Court believes Petitioner has forfeited his claims by not raising them on direct appeal, the Court will address Petitioner's claim of ineffective assistance of trial counsel.

Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Domagala*, 2013 IL 113688, ¶36, 987 N.E.2d 767, 370 Ill. Dec. 1 (citing *People v. Albanese*, 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 85 Ill. Dec. 441 (1984) (adopting *Strickland* for Illinois)). To prevail on a claim of ineffective assistance, a defendant must

C 339

show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶36, 987 N.E.2d 767, 370 Ill. Dec. 1 (citing *Strickland*, 466 U.S. at 687). *People v. Rodriguez*, 2018 IL App (1st) 160030, ¶48.

To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶36, 987 N.E.2d 767, 370 Ill. Dec. 1. Counsel's performance "must be evaluated based on the entire record." *People v. Kirklin*, 2015 IL App (1st) 131420, ¶114, 390 Ill. Dec. 549, 29 N.E.3d 481. *Rodriguez*, 2018 IL App (1st) 160030, ¶49.

To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶36, 987 N.E.2d 767, 370 Ill. Dec. 1 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220, 808 N.E.2d 939, 283 Ill. Dec. 651 (2004); *People v. Colon*, 225 Ill. 2d 125, 135, 866 N.E.2d 207, 310 Ill. Dec. 396 (2007). Thus, to satisfy the second prong of Strickland, at a second-stage postconviction proceeding, a defendant must make only a substantial showing of a reasonable probability. See *Domagala*, 2013 IL 113688, ¶35, 987 N.E.2d 767, 370 Ill. Dec. 1. *Rodriguez*, 2018 IL App (1st) 160030, ¶50.

8

Although the Strickland test is a two-prong test, the analysis may proceed in any order. Since a defendant must satisfy both prongs of the Strickland test in order to prevail, a trial court may dismiss the claim if either prong is missing. *People v. Peterson*, 2017 IL 120331, ¶ 79; *People v. Cherry*, 2016 IL 118728, ¶24, 407 Ill. Dec. 439, 63 N.E.3d 871; *People v. Flores*, 153 Ill. 2d 264, 283, 606 N.E.2d 1078, 180 Ill. Dec. 1 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dismiss on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476, 795 N.E.2d 231, 276 Ill. Dec. 878 (2003); *Albanese*, 104 Ill. 2d at 527. *Rodriguez*, 2018 IL App (1st) 160030, ¶51.

At trial the State called Rod Englert as an expert in blood pattern analysis and crime scene reconstruction. In anticipation of trial, Englert prepared an 88-page written report on April 10, 2012. Both in his report and at trial, Englert opined that the victim did not shoot herself. Rather, the evidence indicated that she was shot by someone else standing near the head of the bed. His opinion was based in part, on the fact that there were no powder burns on any of the bedding.

In his report, he indicated that the State had requested a second inspection of a single pillow case for the presence of "soot." Englert met the State at O'Hare Airport on March 28, 2012 and visually inspected the pillowcase. He determined that deposit on the pillowcase was not soot, but a blood clot. At trial he acknowledged that he did not perform any chemical testing. He also acknowledged that chemical testing would have been more definitive in determining whether or not soot or gunshot residue was on the pillow.

C 341

Prior to trial, defense counsel did not move to test the pillowcase for gunshot residue. It was only after the trial had commenced, that the defense moved for testing of the pillowcase. The State objected, indicating that the defense or defense experts should have asked for any such tests before trial.

The defense responded that it was only after the defense received 400 pages of discovery in the weeks prior to trial that they discovered for the first time that there might be some question as whether or not the stain on the pillowcase in question contained blood or soot.

This Court heard the argument of the parties and concluded that any scientific testing should have taken place prior to trial. Allowing such testing midtrial would not conform to the discovery procedures outlined in Supreme Court Rule 413 (Ill. S. Ct. 413 (eff. July 1, 1982)). The Court denied defendant's request.

Defendant called two experts at trial. Paul Kish, an expert in bloodstain pattern analysis, testified that he reviewed the evidence in this case, as well as Mr. Englert's report. In his opinion, the evidence did not support Mr. Englert's conclusions regarding the blood stain evidence.

Additionally, Mr. Kish testified that Mr. Englert's conclusions regarding the pillowcase were unfounded because the stain on the pillowcase did not appear to contain blood. He opined that the stain should have been chemically tested for gunshot residue, as that was the standard and accepted method to make a definitive conclusion.

Kish acknowledged that, well before trial, he had been aware of the reference to a second examination of the pillowcase in Mr. Englert's report. He also acknowledged that he had access to all the evidence well before trial, and could have requested that the

pillowcase be tested, but did not make such a request. He explained that he did not ask that it be tested because he "just did not attach significance at that particular point in time." Vol. 19, PPP 133.

Defendant also called Matthew Noedel as an expert in crime scene reconstruction and ballistics. While he did not personally review the evidence in this matter, he did review all of the reports that had been generated, including Mr. Englert's report. In his opinion, the evidence did not support Mr. Englert's conclusions.

The State did not call any witnesses in rebuttal. The jury heard closing arguments by the parties and found defendant guilty of the first degree murder of his wife.

After the Petitioner's conviction at trial, both sides agreed to additional testing of the pillowcase in question. Nicole Fundell, a forensic scientist with the Illinois State Police laboratory, tested the pillowcase for gunshot residue. The pillowcase tested positive for the presence of lead in three separate areas. Additionally, Ms. Fundell test fired the gun found at the scene in an effort to duplicate the pattern found on the pillowcase in question.

The Court held an evidentiary hearing on the issue of whether the results of these tests constituted newly discovered evidence that would warrant a new trial. At the hearing the defense called Ms. Fundell and Mr. Noedel as witnesses.

At the conclusion of the testimony and the arguments of counsel, the Court determined the test results did not constitute newly discovered evidence that would warrant a new trial. In making this determination, the Court went through the factors the court is to consider when evaluating whether or not the evidence constitutes newly discovered evidence.

11

**Petitioner's claim of deficient performance**

Petitioner claims there can be no dispute the Defendant's trial counsel's performance fell below an objective standard of reasonableness. Petitioner's claim is based on defense counsel's failure to request additional testing of a pillow case for gunshot residue prior to trial.

To support his first prong analysis, Petitioner cites this Court's ruling on Defendant's Motion for New Trial. Pet. ¶ 123 (Tr. GGGG 145 ("the evidence could have been discovered prior to trial with the exercise of due diligence")). [1] Petitioner also cites the appellate court opinion to further support their claim. See Pet. ¶ 125 (*People v. Kustok*, 2016 IL App (1st) 143812-U, ("this evidence could have been discovered by defendant prior to the trial through the exercise of due diligence"))

The State claims Petitioner has failed to demonstrate that trial counsel's failure to request a sodium rhodizonate test was "objectively unreasonable." The State argues Petitioner fails to demonstrate how the post-trial testing results, if conducted prior to trial, would allow Petitioner to set forth any alternative defense theories.

Under the first prong analysis, counsel's performance "must be evaluated based on the entire record." *People v. Kirklin*, 2015 IL App (1st) 131420, ¶114, 390 Ill. Dec. 549, 29 N.E.3d 481. *Rodriguez*, 2018 IL App (1st) 160030, ¶49. This Court presided over all the pretrial motions, the trial and the post-trial motions. The Court had an opportunity to observe defense counsel's performance throughout the trial. At every stage of the

---

[1] Throughout Petitioner's written briefs and during his oral argument, he cites this Court's ruling on Defendant's Motion for New Trial as support for his argument that trial counsel was ineffective. Petitioner fails to point out the context in which the Court's remarks were made. The remarks were made in deciding whether newly discovered evidence warrants a new trial. The Court **was not** addressing the two-prong analysis under *Strickland*. Although the factors the court is to consider are similar, the criteria for granting a new trial based on newly discovered evidence is more detailed. The Court will discuss the criteria later on in this opinion.

C 344

proceedings the defense vigorously contested the State's evidence and the anticipated testimony at trial.

Prior to trial, defense counsel filed a motion to suppress defendant's statements made to both the police and to hospital personnel. Regarding statements made to hospital personnel, the defense argued that any statements made to hospital personnel were inadmissible because they were protected by the patient-client privilege. At the hearing, the defense presented evidence that the defendant was admitted as a patient because he claimed he had thoughts of committing suicide. The defense argued that, as a patient, any statements made to nurses or doctors were privileged. The Court ultimately ruled that these statements qualified as an exception to the privilege and denied defense counsel's motion.

Defense counsel also contested the chain of custody on a number of items taken from the defendant at the hospital. Those items included his clothing, his glasses, and the bedding he wrapped his wife Anita in when he brought her to Palos Hospital.

Additionally, the State filed a motion to admit other crimes evidence to show motive, intent, and lack of mistake. The State sought to introduce evidence that the defendant and his wife were experiencing financial difficulties and that defendant murdered his wife for her insurance policy. The State also sought to introduce the testimony of a number of women with whom defendant had extramarital contacts prior to his wife's murder. As part of this last category of evidence, the State sought to introduce photos and statements allegedly posted by defendant on the Ashley Madison website.[2]

After extensive arguments by defense counsel, the Court denied the State's request to introduce evidence of the couple's financial difficulties. Regarding the

---

[2] The Ashley Madison website is designed to facilitate sexual affairs between married men and women.

C 345

evidence of extramarital encounters, the Court denied the State's request to introduce the postings on AshleyMadison.com. The Court also limited the number of woman who would testify to the extramarital encounters. Even after the Court's ruling, the defense continued to file motions to exclude this evidence based on additional facts and theories.

Throughout the pretrial, trial, and post-trial stages, defense counsel vigorously contested the testimony of the State's expert Rod Englert. Prior to trial, defense counsel filed a motion to preclude Mr. Englert's testimony. Defense alleged Englert's methodology and conclusions were not supported by solid scientific theory in the field. Based on the defense motion, the Court agreed to hold a hearing prior to trial to determine whether there was a basis for Mr. Englert's theories. The defense was allowed to cross-examine Mr. Englert about the basis for his opinions. The Court ultimately ruled that Mr. Englert could testify at trial.

Although the Court found that the defense and the defense experts could have and should have sought testing of the pillowcase prior to trial, when you evaluate counsel's performance based on the entire record, the Court finds counsel's performance was not constitutionally deficient.

This was a complicated case. The defendant's actions before and after the murder contributed to the difficulty. The defense had to contend with his extramarital encounters that increased in the months leading up to the murder. During several of these encounters, the defendant told the women he was getting out of his marriage or that he was getting divorced. The defense had the difficult task of explaining to the jury why these encounters did not provide a motive for defendant to kill his wife.

C 346

The defense also had to explain the defendant's delay in bringing Anita Kustok to the hospital; his claim that he fired the gun into the armoire because he was afraid he would kill himself; and his contradictory statements to medical personnel and the police.

As set forth earlier, defense counsel also had to rebut a myriad of scientific evidence. The State presented more than two-hundred and fifty exhibits at trial. The defense presented more than one-hundred exhibits at trial. There were many other items recovered during the investigation that were not admitted at trial, which had to be examined by the defense.

Based on the entire trial record, the Court finds Petitioner has not met its burden of showing counsel's performance was deficient under the first prong of *Strickland*.

### Petitioner's claim deficient performance prejudiced the defendant

Even if the Court was to find trial counsel's performance was deficient under the first prong of *Strickland*, Petitioner still must show that this deficient performance prejudiced the defendant. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶36, 987 N.E.2d 767, 370 Ill. Dec. 1 (citing *Strickland*, 466 U.S. at 694). That is, a defendant must show that counsel's deficiency was so serious that it deprived him of a fair trial. *People v. Smith*, 195 Ill. 2d 179,188 (2000); *People v. Dupree,* 2018 IL 123307, ¶ 44.

Petitioner claims there is a reasonable probability that the result of the proceedings would have been different because of defense counsel's failure to request that the pillow be tested for gunshot residue. Petitioner argues that Mr. Englert's

C 347

testimony was "central to the State's case."[3] He opines that Mr. Englert's entire theory is based on the premise that there was no gunshot residue on the pillows. The post-trial testing show that Mr. Englert's conclusions "were flat wrong." Pet. ¶ 134.

In support of his conclusion that the new test results would probably change the outcome at trial, the Petitioner cites the Court's comments in denying the defense motion for a new trial. (the Court asked, "what are we to draw from[the gunshot residue evidence]? and explained, "We're to draw that, at best, these competing expert opinions cancel each other out. Nobody can say how this happened. No expert that testified can say how this happened." (R. Vol 23 GGGG 147)) Pet. ¶ 138.

In their Motion to Dismiss, the State counters that the post-trial evidence does not support a claim that there is a reasonable probability that the trial result would have been different. The State cites the testimony of Mr. Noedel at the post-trial hearing where he concedes that the lead on the pillowcase could have been deposited when the gun was fired by the defendant into the armoire. He also agreed with Ms. Fundell's conclusions that the lead deposits could have come from three separate firing events.

The State also argues that Ms. Fundell testified that she test fired the gun to see if she could duplicate the pattern of lead deposits on the pillowcase. She testified she could not duplicate the exact position of the three lead deposits found on the pillowcase in question. Mr. Noedel agreed that Ms. Fundell conclusion that she could not duplicate the exact position of the lead deposits. He also agreed with Ms. Fundell that the gun was not lying on the pillow at the time of discharge.

---

[3] In support of his claim that Mr. Englert was central to the State's case, he argues that Englert was on the witness stand for two and one-half days. However, as the Court pointed out during arguments on the State's Motion to Dismiss, the defense cross-examination of Mr. Englert took more than one and one-half days.

C 348

The State argues Ms. Fundell's testimony and Mr. Noedel's concessions would not have changed the result at trial. The post-trial testing results and the testimony would be cumulative to the evidence presented at trial.

As noted earlier, Petitioner cites the Court's comments in ruling on Defendant's motion for new trial in support of his claim of ineffective assistance of trial counsel. The criteria for granting a new trial based on newly discovered evidence are more detailed than the two prong test under *Strickland*, but the legal analysis is similar.

Newly discovered evidence warrants a new trial when: (1) it has been discovered since the trial; (2) it is of such a character that it could not have been discovered prior to the trial by the exercise of due diligence; (3) it is material to the issue and not merely cumulative; and (4) it is of such a conclusive character that it will probably change the result on retrial." *People v. Gabriel*, 398 Ill.App.3d 332, 350, 924 N.E.2d 1133, 338 Ill. Dec. 607 (2010).

The legal analysis of whether or not newly discovered evidence is material and whether it is of such a conclusive character that it would probably change the result on retrial is almost identical to the *Strickland* analysis of whether there was a reasonable probability that outcome would have been different absent counsel's deficient performance.[4]

In denying Defendant's motion for new trial, the Court went into great detail in discussing why the new evidence and testimony was merely cumulative and why it was not of such a conclusive character that it would probably change the result on retrial. The facts the Court considered in ruling on the motion for new trial are relevant to the second

---

[4] When ruling on the defendant's motion for new trial, the Court was aware that there may be a claim of ineffective assistance of trial counsel made at a later date, so the Court also considered the evidence in light of the *Strickland* analysis.

C 349

prong analysis of *Strickland*. I will discuss the facts and the evidence that is applicable to the second prong analysis.[5]

### *Expert testimony*

At trial, the opinions and the methodology used by the experts was thoroughly scrutinized by both sides. Mr. Englert was on the witness stand for more than two days. Most of this time was spent by defense counsel picking apart his conclusions and setting the stage for the testimony of their experts. Mr. Englert admitted he did not test the pillowcase in question for gunshot residue even though he knew there was a simple confirmatory test.

Defense experts Paul Kish and Matthew Noedel disputed almost every conclusion that Mr. Englert posited. They also vigorously contested his reconstruction of the crime scene. Mr. Kish informed the jury that the sodium rhodizionate test should have been performed on the pillowcase in question.

Both defense experts also had to make concessions that were consistent with Mr. Englert and consistent with other evidence and testimony presented by the State at trial. For example, both defense experts agreed that Anita Kustok would have been on the bed at the time of death and that death would have been instantaneous.

Additionally, at trial, Mr. Noedel posited different theories on how Ms. Kustok could have accidentally or intentionally fired the fatal shot. However, under questioning by the State, Mr. Noedel admitted that the gun would necessarily have been pointed towards her face if she accidentally shot herself while "de-cocking" the gun. He also

---

[5] For a more detailed recitation, see the trial record Vol. 23, GGGG 136-153.

C 350

conceded that, given the trajectory of the bullet[6] it would be hard for the victim to fire the gun with her index finger on the trigger.[7] He opined that it would be more likely that the victim would need to use both thumbs over the trigger. Noedel also conceded that there would be problems controlling the gun because death would be instantaneous and the recoil of the gun after the shot was fired would be difficult to control.

At the post-trial hearing, once again the conclusions and methodology of the experts were thoroughly vetted. As noted earlier, Ms. Fundell testified that she test fired the gun in an effort to duplicate the pattern of lead deposits found on the pillowcase in question. She was able to produce a similar pattern when the gun was fired from a distance of three inches from the pillowcase. However she could not duplicate the exact pattern of lead deposits on the pillowcase i.e., she could never replicate the third rectangular deposit on the pillowcase. Ms. Fundell concluded that the gun was fired at a distance greater than contact, but less than six inches away from the pillowcase.

Ms. Fundell also said that there was no test that could determine whether the lead pattern was the result of a single gunshot or if it was the result of multiple gunshot firings. She testified that if the gun was fired five additional times in the bedroom (as Defendant claimed in his statement), the lead deposits could have come from these additional firings.

Mr. Noedel was also called by the defense at the post-trial hearing. He testified that he reviewed Ms. Fundell's report and disputed her conclusion that the gun was more than contact and less than six inches from the pillowcase. In his opinion the discharge of

---

[6] The medical examiner testified the bullet entered the victim's left cheek, exiting near her right ear, with a trajectory left to right and slightly downward.
[7] There was also testimony that Anita Kustok was right handed, which would make it more unlikely that she could shoot herself in the left cheek given the trajectory of the bullet.

19

the firearm was less than two inches from the pillowcase. Although he did not test fire the gun himself, he based his conclusions on his past experience studying cylinder gap gases. Mr. Noedel also said the new evidence called Mr. Englert's conclusions into serious question.

On cross-examination, Noedel acknowledged that the lead could have gotten onto the pillowcase if it was near the firearm when the defendant fired the gun into the armoire. Noedel was also impeached by his failure to alert defense counsel that the pillowcase should have been tested prior to trial. Noedel admitted he reviewed Englert's report before drafting his own pretrial report and he never sought to have the pillowcase tested for gunshot residue prior to trial. Noedel could not remember if he ever told defense counsel they should have the pillowcase tested for gunshot residue before arriving in Chicago in March 2014 to testify. (Petitioner's trial started on February 18, 2014.) When he arrived in March he brought with him the chemicals to test the pillowcase, but the test was never performed.

At the conclusion of the post-trial hearing, the Court made the earlier comments cited by Petitioner. However, Petitioner takes the Court's comments out of context and fails to include the entire holding. The Court went on to conclude, "No expert that testified can say how this happened. And . . . that is exactly what was testified to by the defense experts [at the post-trial motion]. They testified that there were other ways that they believed or other explanations how it could potentially be a suicide. But the jury had this at their disposal. Clearly, this type of evidence *was merely cumulative and not of such a character that it could change the trial* (emphasis added)." R. Vol 23 GGGG 147.

20

C 352

In ruling that the defense had not met the third criteria for newly discovered evidence, the Court looked at the post-trial testimony in light of the entire evidence presented at trial.

The Court's analysis is also relevant to the second prong under *Strickland*. If the post-trial testing is merely cumulative, then trial counsel's deficiencies did not prejudice defendant. If the "competing expert opinions cancel each other out," then the court needs to look at the other evidence presented at trial to determine whether there is a reasonable probability counsel's deficient performance prejudiced the defendant.

### Evidence at Trial

Petitioner claims he was convicted on the basis of three things: (1) he was a "philanderer"; and (2) his reaction in the immediate aftermath of finding his wife shot to death on the other side of their bed was abnormal; and (3) his attorney was ineffective in failing to seek the 5-minute scientific test that could have proven (and later did prove) that the State's theory of the case was impossible. Pet. ¶ 20. Petitioner admits the first two factors and bases his petition on the third factor. Pet. ¶ 21-22.

However, Petitioner downplays the significance of the first two factors and he does not address the other, overwhelming evidence of guilt presented at trial.

Regarding his extramarital affairs, his secret life of philandering became more frequent and bolder in the months preceding his wife's death. He used the Ashley Madison website to meet married women who were interested in clandestine sexual affairs. He came up to women on the street or in the shopping mall and asked to meet them for a date. During some of these rendezvous he told these women that he was

21

unhappy in his marriage or that he was getting a divorce. These extramarital affairs were evidence of defendant's motive and intent to kill his wife.

In contrast, Anita Kustok did not have a motive to kill herself. The witnesses who testified for both sides said that Ms. Kustok was upbeat, planning for the future. Although the defense claimed Anita was afraid of intruders, the witnesses said they were never concerned that Anita would commit suicide.

As to his reaction immediately after the incident, Petitioner downplays the significance of his actions. He never calls the police or the paramedics. Petitioner told the police he stayed with his wife for forty-five minutes before he drove his wife to the hospital. The State's witnesses estimated the time as one and one-half hours. Either way, it was a significant period of time. During that time he admitted firing the gun five times into the armoire in the bedroom. He seriously disturbed the crime scene—stacking bloody pillows on the floor, taking the bed sheets off the bed and wiping down areas of the bedroom with towels. These are not the actions of a person innocent of a crime.

Additionally, Petitioner downplays the other evidence at trial. There were the inconsistent statements Petitioner made to the police and to medical personnel. For example at one point he told authorities he was in the bathroom when his wife shot herself. He then changed his story and said he was asleep in bed with his wife when he heard the shots.

Petitioner also told the police he bought the weapon, a .357 handgun, for his wife's protection because she was afraid of being alone. However, when he purchased the gun, he signed a federal document claiming he was purchasing the gun for target practice.

C 354

He also told the owner of the gun shop, a person he knew from high school, that he was buying the gun for target practice.

His statement that he bought the gun for his wife's protection is also belied by the type of gun he purchased. A .357 handgun is a large gun. Defense ballistic expert Noedel testified that someone firing the gun would need to use a significant amount of pressure on the trigger in order to fire the gun.[8] He also testified that there would be significant recoil after the gun was fired, forcing the gun and the hand of the person backward. This is not the type of gun someone would buy for a petite[9] woman like Anita Kustok.

Petitioner's statement is also contradicted by other evidence. The police searched the home and found the ammunition for the gun and the gun case in a work area with a workbench and tools. This would more likely be an area Petitioner would spend time at.

Another critical piece of evidence Petitioner fails to discuss is the testimony of the Medical Examiner Hillary McElligot. As previously mentioned she testified that the entrance wound was to the left cheek, with an exit wound below the right ear. She testified the path of the bullet, left to right and slightly downward would be difficult for a right handed person (like Ms. Kustok) to accomplish.

She also testified that there was stippling on Ms. Kustok's eyelid, but there was no soot. She said based on the stippling and lack of soot, the gun was at least six inches from her left cheek. This would make it even more difficult for someone to commit suicide. Dr. McElligott testified that most suicides involve contact wounds, and stippling

---

[8] Noedel testified that if the hammer was in "double action" (when pulling the trigger, the hammer would need to go back and then forward, striking the bullet) it would require 10-10 ½ lbs. of pressure. If the hammer was in "single action" (the hammer was pulled back and "cocked" first, then the trigger was pulled), it would require 3-3 ½ lbs. of pressure. Noedel also testified how difficult it would be for the victim to shoot herself in light of the bullets trajectory.
[9] The medical examiner testified that Ms. Kustok was 5'5'' and 130 lbs.

C 355

is normally not present. She considered all the possible scenarios, including accident, suicide and homicide, and she came to the conclusion that this was a homicide.

Dr. McElligot's testimony was corroborated by the testimony of the other experts from both sides. Given the trajectory of the bullet and the characteristics of the gun itself, all the expert witnesses testified it would have been difficult for Ms. Kustok to kill herself. Mr. Noedel talked about possible ways Ms. Kustok could have accidentally or intentionally shot herself, but none of these scenarios was plausible.

In the end, only two people could have fired the weapon that caused Anita Kustok's death and the evidence leads to only one conclusion—Allan Kustok fired that weapon. Consequently, even if trial counsel's performance was deficient, there was no reasonable probability counsel's deficient performance prejudiced the defendant.

## **CONCLUSION**

Based upon the foregoing discussion, the Court finds that Petitioner has forfeited his claim of ineffective assistance of trial counsel because he failed to raise the issue on direct appeal. In the alternative, Petitioner has failed to meet the two-pronged analysis for ineffective assistance of counsel under *Strickland*. Petitioner has failed to make a substantial showing that his constitutional rights were violated at trial. Accordingly, the Court grants the State's Motion to Dismiss and the Petition for Post-Conviction relief is hereby dismissed.

**ENTERED:**

Judge John Joseph Hynes
Circuit Court of Cook County

24

C 356