**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALLAN KUSTOK,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 6932** |
| | ) | |
| **DAVID MITCHELL,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In 2014, Allan Kustok was convicted of first degree murder after a jury trial in the Circuit Court of Cook County. The trial court sentenced him to a sixty-year prison term. In 2021, after exhausting the state court appellate and post-conviction process, Kustok filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Kustok asserts in his petition that his trial counsel rendered unconstitutionally ineffective assistance. For the reasons stated below, the Court denies Kustok's petition.

**Background**

Just before 7:00 a.m. on September 29, 2010, Kustok arrived at Palos Community Hospital with the deceased body of his wife, Anita "Jeannie" Kustok.[1] He told medical professionals that Jeannie had been shot in the head after a gun accidentally discharged in their bed around 5:30 that morning. Kustok stated that

---

[1] To be consistent with the record and avoid confusion, the Court will refer to Allan Kustok as Kustok and Anita Kustok as Jeannie.

Jeannie had brought the gun to bed because she was afraid an intruder would break into their home. He said that he did not immediately call 911 or seek medical care because he could tell she was dead. Kustok also said that he considered shooting himself with the gun but decided against it and discharged the five remaining bullets into nearby furniture. He then sat with and held Jeannie for awhile before attempting to clean the blood from her body and taking her to the hospital. Jeannie was pronounced dead shortly after her arrival, and Kustok was eventually charged with first degree murder.

## A. State court proceedings

### 1. Kustok's trial

#### a. Prosecution witnesses regarding the Kustoks' relationship

During the prosecution's case at trial, several witnesses testified regarding Jeannie and Kustok's relationship. The pair had been married for over thirty years and raised two adult children by the time of Jeannie's death, and friends and family members—including their daughter Sarah Kustok—stated that they were not aware of any marital strife between the two.[2]  Sarah testified that her mother was worried about home intrusions and burglaries in the neighborhood and did not like spending nights alone in the couple's Oak Park home when Kustok traveled out of town for work. Sarah also stated that she sometimes stayed at the Kustok home while Kustok was travelling to keep Jeannie company, and she slept in the same bed as Jeannie on those occasions.

Sarah and other family members said they did not know of any firearms in the

---

[2] To avoid confusion, the Court will refer to Sarah Kustok as Sarah.

house, and Sarah said that Jeannie never brought a gun to bed when Sarah slept over. Two of Jeannie's close friends, however, testified that during a conversation about being home alone at night Jeannie told them that she and Kustok had a gun. The manager of a local gun store confirmed that he sold Kustok a gun in June 2009, and he stated that Kustok did not mention home defense when purchasing the gun but said it was for target practice.

Five women testified at trial regarding Kustok's extramarital relationships. All the women had romantic encounters with Kustok during his marriage, ranging from a single meeting to a five-year relationship. Two of the women with whom Kustok had one-time encounters stated that he told them he was unhappy in his relationship or planned to get a divorce. The woman with whom Kustok had a five-year relationship testified that he "never spoke ill of" Jeannie and had no plans to leave his marriage. Resp.'s Answer, Ex. O ("Resp. Ex. O"), at 3036–37 (dkt. no. 22). The friends and family members who testified said they were not aware of these extramarital relationships at the time.

> **b.     Prosecution witnesses regarding events of September 29**

The prosecution called various medical professionals and police department personnel to testify regarding the events of September 29, 2010. A nurse and doctor both stated that they spoke with Kustok when he arrived at the hospital with Jeannie's body, and two police officers said they questioned Kustok about the events of that morning. Collectively, these witnesses testified that Kustok said (1) Jeannie woke up around 3:30 a.m. after hearing a noise and asked Kustok to investigate; (2) both of them went back to sleep after Kustok checked the house and found nothing; (3) Kustok heard a gunshot around 5:30 a.m. and saw that Jeannie had been shot; and (4) Kustok

3

cleaned Jeannie's body and sat with her before going to the hospital approximately ninety minutes later.[3]  One of the officers said he collected Kustok's clothing and glasses, while an investigator testified to finding various bloodstained pillows, bedding, towels, and clothing and an armoire with five bullet holes at the Kustoks' home.

Various forensic scientists testified about the physical evidence.  A scientist specializing in firearms stated that the gun "had single and double-action trigger modes" to prevent accidental discharge and that it "should not discharge if dropped in single-action mode," while another scientist testified that the gunshot residue (GSR) test results indicated that Jeannie "may not have discharged a firearm with either hand" but that Kustok "either discharged a firearm, was in the vicinity of a discharged firearm, or contacted a primer GSR-related item."  *People v. Kustok*, 2021 IL App 191899-U, ¶ 17, 18.  A third forensic scientist who performed DNA testing stated that the blood on the firearm, some of the clothing, and two pillowcases matched Jeannie's profile, but she "did not locate Kustok's DNA in the samples from the firearm."  *Id.* at 16.

### c. Forensic pathologist Dr. Hiliary McElligott

The state called DuPage County chief forensic pathologist Dr. Hiliary McElligott to testify about the cause and manner of Jeannie's death.  Dr. McElligott stated that she performed autopsy.  She opined that the gun was discharged at least six inches from Jeannie's face.  Dr. McElligott said she came to this conclusion because she did not see any soot around the injury, and "soot tends to disappear by approximately six inches

---

[3] The nurse stated that Kustok told her the gun went off while he was using the bathroom.  The police officers testified that Kustok said he woke up around 5:00 a.m., used the bathroom, and went back to bed before waking to the sound of a gunshot around 5:30 a.m.

when handguns are used."  Resp. Ex. O. at 2880.

Furthermore, Dr. McElligott determined that Jeannie's death was a homicide because she did not believe it was a suicide or an accident.  She concluded that Jeannie did not commit suicide because the gunshot wound was on the left side of Jeannie's face; a police officer informed her that the gun was in Jeannie's right hand; and it "seemed like an unlikely scenario to reach across one's body and fire with the right hand toward the left side of the face."  *Id.* at 2845.  Dr. McElligott also stated that most suicides involve a "contact range gunshot," in which the gun is in direct contact with the body at the time of discharge.  In this case, she testified, the lack of soot led her to conclude that the range of fire was at least six inches.  Lastly, Dr. McElligott testified that the facts of the case "didn't fit very well with a suicide" because Kustok said he was in the room when the shooting happened and there was "such a significant delay" before he sought medical treatment.  *Id.*

Dr. McElligott also testified that she believed Jeannie's death was not accidental. When first asked to explain her thinking, she mentioned the delay between the infliction of injury and Kustok's arrival at the hospital.  Dr. McElligott later stated that she considered "[t]he whole circumstances and autopsy as a complete package" and agreed that she used "many of the factors that [she] considered to rule out suicide" in determining that "it was not an accidental shooting."  *Id.* at 2848–49.

On cross-examination, Dr. McElligott again agreed that Kustok's delay in taking Jeannie to the hospital was "significant" to her analysis and "played into [her] decision to label [the death] a homicide."  *Id.* at 2869.  Dr. McElligott admitted that she was not a ballistics expert but stated said the nature of Jeannie's injury meant that her death was

"very quick" and "in all likelihood" within seconds. *Id.* at 2866. She also agreed that she "didn't really consider accident[] for too long" as a cause of death because "the detectives had told [her] that [Jeannie] had the gun in her right hand." *Id.* at 1275.

### d. Prosecution expert Rod Englert

The prosecution called Rod Englert to testify as an expert in crime scene reconstruction and blood pattern analysis. Englert said that he reconstructed the incident in a police garage based on photos and measurements from the Kustoks' bedroom. He stated that he believed the "high velocity impact" blood spatters on various pieces of evidence—including the carpet, pillows, gun, and Kustok's shirt, shorts, and glasses—were consistent with Kustok shooting Jeannie. When asked if the shooting could have been accidental, Englert cited the absence of soot on the pillows in ruling out that possibility.

On cross-examination, Englert stated that after he submitted his report stating his opinions, but before trial, the prosecution reached out to ask if a dark area on one of the pillowcase might be soot. Englert testified that he knew the Sodium Rhodizonate Test ("SR Test"), a laboratory examination that takes approximately five minutes, is the proper test for soot or cylinder gases "[i]f you can't visually see it[.]" *Id.* at 3307. He also said that he visually examined the pillowcase again after the prosecution's inquiry and did not see any soot but that he did not recommend administering the SR Test because "the soot is very recognizable, and [the stain] was obviously clotted blood." *Id.* Englert did not elaborate on this point beyond stating that he did not see any soot. When asked if he had recommended that any of the evidence be tested for cylinder gases that are easily obscured, he admitted that he had not. Over the course of

6

Englert's testimony, the jury heard him repeat on at least fifteen occasions that the pillow stain *was not soot* because he did not see or find any soot based on his examination of the evidence.

On redirect examination, Englert testified that as he had reconstructed the shooting, the pillow with the dark stain was located underneath both Jeannie's body and the pillow in which the bullet was found. As a result, he agreed that "neither side of that pillow" would have been "visible to get soot or a burn mark on it." *Id.* at 3704.

The defense then moved to administer the SR Test on the pillowcase. The trial court concluded that the defense should have administered the test before trial and denied the request. The prosecution rested its case, and the trial court denied the defense's motion for a mistrial and a directed verdict.

### e. Defense expert Paul Kish

Paul Kish testified as the defense's expert in bloodstain pattern analysis. He stated that he did not agree with Englert's conclusions after analyzing the carpet, pillows, gun, and Kustok's shirt, shorts, and glasses. Kish testified that he did not reconstruct the shooting because there was "insufficient data or facts of the case relative to the stain patterns and the alterations of the scene issues . . . to do a reconstruction that would add value or insight to the jury." *Id.* at 4019.

Kish also disagreed with Englert's analysis of the bloodstain evidence. He testified that the stains on the shirt were consistent with transfer stain patterns as opposed to spatter from a high impact gunshot. In addition, he stated that the stains on the gun itself were similarly inconclusive, as he "did not identify any stains that were clearly back spatter" from a gunshot; in addition, the stains that were on the gun

7

indicated only that the weapon "was in contact with a quantity of blood, which deposited blood on both sides[.]" *Id.* at 3913–14. Kish also testified that the "transient spots" on Kustok's glasses that Englert had analyzed had "no bloodstain pattern analysis value" because a "transient" spot or particle is one that is "not adhering" and "moveable," and "when we know there's transient pieces like that, there's no way to determine where those particular items were on the glasses, if they were on the glasses." *Id.* at 3927. Consequently, Kish testified, Englert's conclusion regarding the glasses was "simply an unreasonable opinion based on the facts of this case." *Id.* at 3931.

As for the blood on Kustok's shorts, Kish testified that he disagreed not only with Englert's conclusion but also with his analytical method. Kish said Englert's testimony was "the first time [Kish had] ever seen anybody try to utilize a gel lift [to] do a comparison of a bloodstain pattern." *Id.* at 3919–20. He further testified that he did not know of any "validation study for [Englert's gel lift method of comparing the blood stains]" or any "research or publication relative to [that] technique." *Id.* at 3920. In contrast, Kish stated that after examining the blood spots and considering the surface texture of the shorts, he concluded it was not possible to explain with reasonable certainty "the mechanism by which those stains were deposited there." *Id.* at 3917–18.

Kish also testified that he examined the dark area on the pillowcase that Englert had declined to test for soot. Kish said that the deposit had "no physical qualities of being blood" and was "not consistent with being a bloodstain at all actually." *Id.* at 3937. He also stated that the deposit should have been tested for soot and cylinder gases and that he knew the SR Test was one such test, but the testing was beyond his area of expertise. On cross-examination, Kish said that he reviewed Englert's report

8

before November 15, 2012, and the report mentioned that Englert had examined the dark area on the pillowcase for soot in March 2012. Kish also agreed that he could have reviewed the pillowcase or requested an SR Test when he examined the evidence in November 2012 but that he did not do so.

### f.   Defense expert Matthew Noedel

The defense also called Matthew Noedel as its ballistics and crime scene reconstruction expert. Noedel testified that it is not uncommon for the type of gun in question to unintentionally discharge. Based on his analysis of the stippling pattern on Jeannie's left cheek, he believed the gun had discharged three to six inches away from her face. In addition, Noedel discussed gunshot residue (GSR) tests and described a study which stated that "in half of the instances that they studied, people who are known to have discharged a gun in a self-inflicted gunshot wound did not possess these primer gunshot residues." *Id.* at 4099. Noedel also noted that Kustok's positive GSR test results could have been because he was sleeping next to Jeannie in the bed when the gun discharged.

### 2.   The verdict and post-trial motions

Following closing arguments, the jury found Kustok guilty of first degree murder. Kustok then moved for a new trial, and he also moved to administer the SR Test on the pillowcase stain that Englert and Kish had discussed. The prosecution did not oppose the motion to administer the SR test, and the trial court permitted it.

The trial court held a hearing on the motion for a new trial on November 20, 2014. Nicole Fundell, a forensic scientist for the Illinois State Police, testified that the pillowcase "did give a positive color reaction for the presence of lead or soot" after she

administered the SR Test.  *Id.* at 4634.  Fundell stated that she "found a positive reaction on both the outside . . . and on the inside of the pillowcase."  *Id.* at 4634–35.  In addition, she attempted to replicate the results of the SR Test with the gun and another pillow, and she "was able to reproduce [those results] . . . holding the gun greater than contact less than six inches at discharge."  *Id.* at 4653–54.  More specifically, Fundell stated that "[t]he examination [she] did at three inches [from discharge]" was most consistent with the actual size and pattern of the deposits, and the same test at four inches from discharge did not produce comparable results.  *Id.* at 4654, 4658.  Her testing also indicated that the gun did not discharge while lying on top of the pillow, and she agreed that the results from the SR Test were not consistent with the pillow being underneath Jeannie's body or another pillow.

On cross-examination by the prosecution, Fundell did not dispute that it was possible that if the gun had discharged five other times, the other shots could be "just as equally likely to have left those lead spots."  *Id.* at 4667.  She similarly stated that it was a "possibility" that moving or relocating the pillow may have resulted in the deposits.  *Id.* at 4668.

Defense expert Noedel also testified at the hearing, and he stated that the test results changed his conclusions as compared with his trial testimony.  Noedel said that whereas he previously believed the gun discharged at least two inches from the pillowcase, Fundell's test results led him to conclude that the actual discharge range was two inches or less.  Noedel also testified that prosecution expert Englert's reconstruction "would have to be reconsidered into how we incorporate this pillow that we now know was associated with the discharge of a gun," and that many of Englert's

conclusions could not be accurate in light of the SR Test results.  *Id.* at 4720.

After the hearing, the trial court concluded that the SR Test results did not constitute newly discovered evidence warranting a new trial under Illinois law.  The trial court found that the evidence could have been discovered with the exercise of due diligence because Englert's report was available to the defense as of April 2012 and the defense could have requested the SR Test between that time and trial.  Nevertheless, the court considered the impact of the new evidence and concluded that it meant "[n]obody can say how [the shooting] happened[,] [n]o expert that testified can say how this happened."  *Id.* at 4842.  The trial court then stated that because this conclusion was "exactly what was testified to by the defense experts," the SR Test results were "merely cumulative and not of such a character that it would change the trial."  *Id.*  The court then discussed evidence other than Englert's testimony that it believed to be "overwhelming" and denied the motion for a new trial.  The trial court then sentenced Kustok to a sixty-year prison term.

## 2.    Appeal and post-conviction proceedings

Kustok appealed his conviction, arguing that the trial court erred in denying his motion for a new trial and by permitting testimony of five different women about his extramarital affairs.  On direct appeal, Kustok did not assert a claim of ineffective assistance of trial counsel.  The Illinois Appellate Court affirmed, and the Illinois Supreme Court denied his petition for leave to appeal.

Kustok filed a petition for post-conviction relief in 2017, arguing that his trial counsel was ineffective for failing to administer the SR Test before trial.  A state trial court judge granted the prosecution's motion to dismiss, finding that Kustok had

forfeited his ineffective assistance of counsel claim by failing to raise it on direct appeal and failing to allege ineffective assistance of appellate counsel in his postconviction petition.  In the alternative, the court held that Kustok had failed to establish a claim for ineffective assistance of counsel because his trial counsel's performance was not deficient and did not prejudice him.

Kustok appealed.  The Illinois Appellate Court affirmed, holding that he had forfeited his ineffective assistance of counsel claim because he could have raised it on direct appeal.  The appellate court did not address whether Kustok's trial counsel's performance was deficient, but it held that his ineffective assistance claim would fail on the merits because he did not "make a substantial showing of prejudice." *Kustok*, 2021 IL App 191899-U, ¶ 54.  The appellate court concluded that the "presence or lack of lead on the pillowcase does not significantly impact Englert's testimony regarding" the lack of "powder burns on the bedding, or any of the pillows or pillowcases" and blood spatter on the gun or Kustok's shirt and glasses.  *Id.* ¶ 55.

The appellate court also agreed with the post-conviction trial court that the SR Test results were "merely cumulative" of the defense experts' trial testimony and that "myriad additional evidence supported [Kustok]'s guilt." *Id.* ¶¶ 56, 57.  The appellate court specifically mentioned: (1) Dr. McElligott's testimony, (2) testimony regarding Kustok's extramarital affairs, and (3) the evidence of Kustok's actions immediately after the shooting.  The court noted that Dr. McElligott opined that the shooting was a homicide and that the gun discharged six to twenty-four inches from Jeannie's face, and it stated that "[t]he jury would have been justified to rely on this testimony alone" to convict Kustok.  *Id.* ¶ 57.  In addition, the appellate court held that the testimony from

five women about Kustok's affairs established motive and that a jury "could reasonably interpret" the undisputed evidence that Kustok cleaned up Jeannie and did not go to the hospital until forty-five to ninety minutes after the shooting "as suggestive of guilt because it reflected defendant's intent to inhibit the authorities' investigation."  *Id.* ¶ 58.  The appellate court therefore affirmed the dismissal of Kustok's petition.  The Illinois Supreme Court denied Kustok's petition for leave to appeal.

Kustok timely filed a petition for habeas corpus under 28 U.S.C. § 2254 in this Court on December 30, 2021, asserting a single claim of ineffective assistance of trial counsel.

## Discussion

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d); *see also Burt v. Titlow*, 571 U.S. 12, 18 (2013).  This is a "highly deferential standard for reviewing claims of legal error by the state courts."  *Id.*

The parties dispute both whether Kustok procedurally defaulted his ineffective assistance of counsel claim and whether his claim can succeed on the merits.  Because the Court concludes that Kustok defaulted his claim and cannot establish that the

miscarriage-of-justice exception applies, the Court denies his petition.

## A.    Procedural default

Before a federal court may address the merits of a habeas corpus petition from a state prisoner, the petitioner must give each level of the state's courts a fair opportunity to review his federal claims.  28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 32, (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999).  This means that a petitioner must have "invok[ed] one complete round of the State's established appellate review process," which includes "a petition for discretionary review in Illinois' Supreme Court."  *O'Sullivan*, 526 U.S. at 844–45.  "In Illinois, which has a two-tiered appellate review system, a petitioner must present a claim at each level of the state court system, either on direct appeal or in post-conviction proceedings."  *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013).  A petitioner who fails to properly assert a federal claim before the state courts has procedurally defaulted the claim.  *Sanders v. Radtke*, 48 F.4th 502, 509 (7th Cir. 2022).

The Illinois Appellate Court held that Kustok "forfeited his claim of ineffective assistance of trial counsel for failing to raise it on direct appeal," *Kustok*, 2021 IL App 191899-U, ¶ 52, and respondent contends that as a result, the claim is barred under *Crutchfield v. Dennison*, 910 F.3d 968 (7th Cir. 2018).  In *Crutchfield*, the Seventh Circuit recognized that the "*Martinez-Trevino* exception" allows habeas corpus petitioners to "obtain federal review of defaulted claims of ineffective assistance of trial counsel" when a state "does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal."  910 F.3d 968, 976 (internal citation and quotation marks omitted).  The Illinois Supreme Court

has held, however, that petitioners in Illinois "must generally raise a constitutional claim alleging ineffective assistance of counsel on direct review or risk forfeiting the claim" and "issues that could have been raised and considered on direct review are deemed procedurally defaulted." *People v. Veach*, 2017 IL 120649, ¶¶ 39, 47, 89 N.E.3d at 373-74, 375. Relying on *Veach*, the court in *Crutchfield* concluded that "Illinois law gives prisoners a meaningful opportunity to litigate claims of ineffective assistance of trial counsel on direct review" and "decline[d] to extend the *Martinez-Trevino* exception to Illinois prisoners." *Crutchfield*, 910 F.3d at 977–78.

Kustok argues that *Crutchfield* does not bar his claim because he brought his direct appeal before the Illinois Supreme Court decided *Veach* in May 2017. Yet respondent correctly points out that the same was true for the petitioner in *Crutchfield*, who brought his direct appeal more than five years before *Veach*, and the Seventh Circuit nevertheless held that he forfeited his claim. *Crutchfield*, 910 F.3d at 972. Because this Court is bound by *Crutchfield*, the Court agrees with the Illinois Appellate Court that Kustok defaulted his ineffective assistance of counsel claim.

## B.    Miscarriage of justice exception

When a habeas corpus petitioner has procedurally defaulted a claim, the federal court is barred from addressing the merits of the claim unless the petitioner can demonstrate both cause for and prejudice from the default or that a miscarriage of justice will occur if the Court fails to address the merits. *See, e.g.*, *House v. Bell*, 547 U.S. 518, 536 (2006); *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009). Kustok argues only the latter exception, which requires a petitioner to show that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner

15

guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536–37 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  A petitioner must support his claim "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010).

The Supreme Court has emphasized that the standard articulated in *Schlup* is demanding and allows review of a procedurally defaulted claim only in the "extraordinary" case.  *House*, 547 U.S. at 538; *see also McQuiggin v. Perkins*, 569 U,S, 383, 392 (2013).  In determining whether a petitioner has met his burden, the court is not bound by rules of admissibility that would govern at trial.  Instead, the court should consider all the evidence, including relevant evidence that was excluded or unavailable at trial.  *Schlup*, 513 U.S. at 327–28.  A court must consider all of the evidence, both old and new, and on the entire record "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538; *Coleman*, 628 F.3d at 319 (in assessing impact on jury, courts must presume jurors obey instruction requiring proof beyond a reasonable doubt).

In this case, the parties dispute whether the results of the SR Test likely would have left a reasonable juror with a reasonable doubt regarding Kustok's guilt.  Kustok contends that (1) the presence of soot on the pillow undercuts Englert's testimony, and (2) without that testimony, there was insufficient evidence for a reasonable jury to find guilt beyond a reasonable doubt.

### 1.    Englert's testimony

It is undisputed that the SR Test disproved Englert's conclusion that the dark

16

deposit on one of the pillowcases was blood rather than soot.  Respondent argues, however, that Englert's error in this regard did not affect the rest of his testimony.  The Illinois Appellate Court concluded similarly, stating that "the presence or lack of lead on the pillowcase does not significantly impact" Englert's testimony concerning the blood spatter on Kustok's shirt, glasses and gun.  *Kustok*, 2021 IL App 191899-U, ¶ 55.

In evaluating a miscarriage of justice "gateway" claim, the Seventh Circuit appears to have assumed that pursuant to 28 U.S.C. § 2254(e)(1), "[s]tate court findings . . . are presumed correct on federal habeas review, unless the petitioner rebuts those findings with 'clear and convincing evidence.'"  *Coleman v. Lemke*, 739 F.3d 342, 351 (7th Cir. 2014) (quoting *Woolley v. Rednour*, 702 F.3d 411, 426–27 (7th Cir. 2012)). Other federal courts of appeals have expressly held that "the presumption of correctness likewise applies when [federal courts] consider whether a petition satisfies the *Schlup* gateway standard[,]" *Cosey v. Lilly*, 62 F.4th 74, 82 (2d Cir. 2023) (collecting cases), and this Court agrees that "[s]ection 2254(e)(1) . . . come[s] into play because it refers to the 'determination of a factual issue'—that is, to a state court's findings of fact, rather than its conclusions of federal law."  *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).  The Court agrees that section 2254(e)(1) applies in this situation and thus will apply the presumption to the Illinois Appellate Court's findings relating to Englert's other testimony.

The presumption of correctness is difficult to overcome, but it is not insurmountable.  In this case, the Illinois Appellate Court summarily assumed that jurors would credit and give significant weight to Englert's blood spatter analysis even if scientific testing revealed that, as Kustok points out, he "could not even tell the

17

difference between blood and soot." Reply in Supp. of Pet. for Writ of Habeas Corpus at 10 (dkt. no. 25). The appellate court provided no explanation or reasoning to support this conclusion, and it also characterized the issue as merely involving "the presence or lack of lead on the pillowcase" without taking into account the overall context and how Englert had come to make such an error. *Kustok*, 2021 IL App 191899-U, ¶ 55.

Englert admitted on cross-examination that he was aware that the SR Test "is the definitive test for soot or cylinder gases," and he agreed that the test "is used when you can't see soot if you are concerned about the presence or absence of soot." Resp. Ex. O at 3306–07. He repeatedly asserted, however, that he did not see any soot.[4] And even though he conceded that the proper procedure in such a situation is to administer the SR Test, Englert did not dispute that he merely "looked at [the stain] visually, that's all that [he] did" *Id.* at 3306. And he did so, consistent with his initial claim that "the soot is very recognizable, and [the stain] was obviously blood[,]" despite his later concession that "soot, unless it is characteristic and concentrated deposits, can easily be masked by blood or difficult to recognize without the implementation of some level of testing beyond visual observation." *Id.* at 3307, 3332.[5]

---

[4] Englert's statements to this effect include but are not limited to: "We did not find soot in our examination with our magnification[,]" "I will repeat, that's what we did not find. We looked for [soot] and did not find it and I gave that opinion yesterday[,]" "[y]es, ma'am, there was no soot observed[,]" "we opened it up and looked at it visually and I had a Proscope that I looked at it and it was clotted blood, it was dark blood, it was not soot[,]" "[t]here was no soot that I saw," "this does not look like soot to me. This doesn't look like soot," "I did not see any soot and we looked at it microscopically," "I did not detect soot," and "I did not recognize it as soot and I recognized it as a clot, that is correct." Resp. Ex. O at 3301, 3301, 3305, 3306, 3307, 3312, 3313, 3333, 3356.

[5] In stating that he did not see any soot, Englert admitted on multiple occasions that the stain resembled soot at first glance: "[w]hen I looked at this it looked very suspicious like it could be soot. And upon looking at [the stain] I did not recognize it as soot," "[i]t

The significance of the SR Test results therefore involves not simply "the presence or lack of lead on the pillowcase," *Kustok*, 2021 IL App 191899-U, ¶ 55, but also the prosecution expert's knowing refusal to use what he conceded was the appropriate test.  Englert was well aware that the SR Test was the "definitive test" when soot might be present but is not visible, but he chose not to administer the test when placed in that exact situation.  In fact, he admitted that he "didn't ever recommend that any of the items be tested for cylinder gases which can easily be obscured by dirt, blood, and other debris at the scene[,]" *id.* at 3308, but instead relied on his inability to see any soot to conclude that the stain was "obviously clotted blood"—even though he conceded that soot is not always visible.  *Id.* at 3308.

Although the jury learned on cross-examination of Englert's failure to follow proper testing procedures, without the test results it could not have known that this flawed approach led to Englert being wrong on this material factual issue.  Englert did not deny that the presence of soot on the pillowcase "would be a really important fact," and he agreed on redirect examination that in his reconstruction "neither side of . . . the pillowcase is going to be visible to get soot or a burn mark on it[.]"  *Id.* at 3305, 3704.  Although the appellate court concluded that the test results would have been merely cumulative, "[e]vidence that provides corroborating support to one side's sole witness on a central and hotly contested factual issue cannot reasonably be described as cumulative." *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012).  In this case, the

---

looked like soot and I would say when I first looked at it[,] it looked like soot, but upon looking at it I did not recognize it as soot[,]" and "[t]hings may look like something that it's not, like for instance that soot that looks like soot but when I looked it [sic] at it looked like something else."  Resp. Ex. O at 3354–55, 3355, 3382.

test results would have established that Englert's reconstruction was inconsistent with the physical evidence, while also corroborating defense expert Kish's testimony at trial that he did not believe the stain was blood.  Furthermore, the jury would have learned that (1) the prosecution's blood spatter and crime reconstruction expert could not accurately determine whether something is soot or "obviously clotted blood"; (2) this was a direct result of his deliberate choice not to administer a definitive test that he knew was appropriate; and (3) this error called into question the accuracy of his entire crime scene reconstruction.  Given that this evidence undercuts both Englert's overall methodology and his conclusion regarding the soot stain, Kustok has rebutted the appellate court's conclusion that the test results would "not significantly impact" a reasonable jury's reliance on Englert's other testimony.  The Court thus concludes that the appropriate approach is to determine whether there is sufficient evidence aside from Englert's testimony for a reasonable jury to convict Kustok.

### 2. Other evidence

To pass through the miscarriage-of-justice gateway and enable consideration of his ineffective assistance claim on the merits, Kustok must show that without Englert's testimony, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.  This is a heavy burden for Kustok to carry.  The Court certainly acknowledges that it is *possible* that a reasonable jury would not have convicted Kustok without Englert's testimony.  But after considering the remaining evidence, the Court cannot conclude that it is more likely than not that "*any* reasonable juror would have reasonable doubt" regarding Kustok's guilt.  *House*, 547 U.S. at 538 (emphasis added).

As both respondent and the Illinois Appellate Court point out, medical examiner Dr. McElligott testified that she concluded after performing the autopsy that Jeannie's death was a homicide—and there is no evidence so much as hinting that there was anyone else present other than Kustok.  Kustok contends that Dr. McElligott's testimony is insufficient to support a guilty verdict because she considered only "the fact that [Jeannie's death] was not a suicide and 'the lag or time delay between the time of injury and the time the medical treatment was sought'" in ruling out an accidental shooting. Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus ("Kustok Opening Br.") at 15 (dkt. no. 18) (quoting Resp. Ex. O at 2848).  Dr. McElligott testified, however, that she considered "many of the same factors that [she] considered to rule out suicide" in her "determination on whether or not this was an accidental shooting."  Resp. Ex. O at 2848–49.  And she named three specific factors in concluding Jeannie did not commit suicide:  the location of the wounds and the gun, the "range of fire" or distance at which she believed the gun discharged, and Kustok's delay in seeking medical treatment for Jeannie.  Although the range of fire is not as probative of the question of an accidental shooting because Dr. McElligott used it to rule out Jeannie intentionally discharging the weapon, the other two factors make it less likely that the shooting could have been either a suicide or an accident.

First, Dr. McElligott stated that because the entrance wound was on the left side of Jeannie's face and the exit wound was slightly lower on the right side, she concluded that "the bullet travelled from the left [side of her face] to the right and slightly downward."  *Id*. at 2842–43.  In addition, Dr. McElligott noted that "the gun was found in [Jeannie]'s right hand, and that her right hand was on her chest."  *Id*. at 2845.  These

two points together led Dr. McElligott to rule out suicide, because the bullet hit Jeannie on the left side of her face and it would be "an unlikely scenario to reach across one's body and fire with the right hand toward the left side of the face." *Id.* at 2845. To put it another way, Dr. McElligott was saying a scenario under which Jeannie held the gun with her right hand and shot herself in the face from the left was quite unlikely.

The trajectory of the bullet and position of the gun also weigh against the possibility of an accidental shooting. Even if Kustok found the gun on Jeannie's chest *near* her right hand rather than *in* her hand,[6] that would not explain how the bullet travelled downward and from the left side of Jeannie's face to the right when the gun was below her head and face and on her chest. Kustok's argument therefore relies on the proposition that gun discharged in some other position and then ended up on Jeannie's chest. But although defense ballistics expert Noedel stated that he believed "[t]he gun could have dropped right on [Jeannie]'s chest[,]" he also agreed that any recoil would have forced the gun back in the "[o]pposite direction of the bullet path." *Id.* at 4153, 4155. There's no apparent way that gun would have "dropped right on" Jeannie's chest if, as Kustok contends, she did not shoot herself and the gun discharged accidentally while she was in the bed lying on her back. Similarly, with the bullet travelling downward and to the right, any recoil in the opposite direction would have pushed the gun upward and to the left—in other words, *away* from Jeannie's chest, where Kustok said he found the weapon.

The Court therefore cannot conclude that a reasonable jury more likely than not

---

[6] The defense argued during its closing statement that Kustok did not tell the police officers that he found the gun in Jeannie's right hand, but it does not dispute that he told them "the gun was on her chest." Resp. Ex. O at 4462.

would have disregarded Dr. McElligott's testimony. Even the defense's own expert admitted at trial that one of his reconstructions based on an "upward angle" was "not a valuable model to consider because it does not accurately represent what [Dr. McElligott] reported in the path of the bullet." *Id.* at 4144.

Dr. McElligott also considered the delay between Jeannie's injury and Kustok's arrival at the hospital in ruling out an accident. The Court agrees with Kustok that the delay *alone* would be insufficient to support a guilty verdict. But the Court must consider whether the miscarriage of justice standard is met "in light of *all* the evidence." *Schlup*, 513 U.S. at 327 (emphasis added) (internal citation and quotation marks omitted). "A jury is not required to disregard inferences that flow normally from the evidence" or "seek all possible explanations consistent with innocence and elevate them to reasonable doubt[.]" *People v. Charles*, 2018 IL App 153625, ¶ 25, 138 N.E.3d 785, 793. Kustok's allegedly inconsistent statements to the emergency room personnel and police officers are not significantly probative of guilt, but other evidence indicative of an intentional, non-suicidal shooting includes (1) the position of the wounds and gun, (2) Kustok's extramarital affairs, and (3) Sarah's testimony that Jeannie never brought a gun to bed when Sarah stayed over and they slept in the same bed. Taking all of this into consideration, the Court cannot conclude that no reasonable jury would credit Dr. McElligott's testimony that the evidence taken together, including Kustok's failure to call 911 or his family and his delay in going to the hospital, indicated the shooting was a homicide. And as the Court has noted, there is no indication of anyone else inside the house other than Kustok.

Kustok relies heavily on the trial court's statement in denying a new trial that

"nobody can say how [the shooting] happened," Kustok Opening Br. at 22 (quoting Resp. Ex. O. at 4842), in contending that he has satisfied the miscarriage of justice standard.  But "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case," *House*, 547 U.S. at 538 (internal citation omitted), and the trial court made that statement in the context of a determination that the "competing expert opinions cancel each other out" and "[n]o expert that testified can say how this happened."  Resp. Ex. O at 4842.  The Court has discussed the evidence—*aside from* prosecution expert Englert's testimony—that points towards homicide rather than accident.  The results of the SR Test would not have precluded reasonable jurors from relying on that evidence.  Consequently, the Court finds no basis to conclude that proof at trial of Englert's errors would have more likely than not led to Kustok's acquittal.

Because Kustok cannot pass through the miscarriage-of-justice gateway, the Court cannot consider his ineffective assistance of counsel claim on the merits.  *House*, 547 U.S. at 536–37.

**Conclusion**

For the foregoing reasons, the Court denies Kustok's petition for a writ of habeas corpus (dkt. no. 1).  The Court does, however, issue a certificate of appealability.  The issues relating to procedural default and the miscarriage of justice exception, as well as the merits of Kustok's underlying claim, are fairly debatable and capable of a different resolution.  *See* 28 U.S.C. §2253(c)(2).

Date:  May 8, 2023

_____
MATTHEW F. KENNELLY
United States District Judge

24